1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MARYLAND
2

3   TALATHA SHERRILL           X
                               :
4         Plaintiff            :
                               :
5   v.                         :
                               :   1:18-CV-00476-JKB
6   DEPUTY JOSEPH CUNNINGHAM,   :
    et al.                      :
7                              :
          Defendants           :
8                              :
    --------------------------X
9

10          Pursuant to Notice, the deposition of DEPUTY

11   JOSEPH CUNNINGHAM, taken on Monday, April 8, 2019,

12   commencing at 9:55 a.m., at Cecil County Sheriff's

13   Office, 107 Chesapeake Boulevard, Elkton, Maryland

14   21921, before Linda Bahur, a Registered Professional

15   Reporter and Notary Public.

16

17

18

19

20

21   REPORTED BY:  Linda Bahur, RPR

```
 1              A P P E A R A N C E S

 2   ON BEHALF OF THE PLAINTIFF:

 3        JASON G. DOWNS, ESQUIRE

 4        Downs Collins, P.A.

 5        20 S. Charles Street

 6        Suite 901

 7        Baltimore, MD  21201

 8        (410) 462-4529

 9        jason@downscollins.com

10

11   ON BEHALF OF THE DEFENDANTS:

12        KEVIN KARPINSKI, ESQUIRE

13        Karpinski, Colaresi & Karp, P.A.

14        120 E. Baltimore Street

15        Suite 1850

16        Baltimore, MD  21202

17        (410) 727-5000

18        kevin@bkcklaw.com

19

20   Also present:  Corporal Jonathan Pristash

21
```

```
 1                        INDEX

 2                E X A M I N A T I O N

 3    Witness Name                              Page

 4    Deputy Joseph Cunningham

 5       By Mr. Downs ............................ 4

 6

 7                  E X H I B I T S

 8            (Attached to the transcript)

 9    Exhibit                                   Page

10    No. 1   Answers to Interrogatories        23

11    No. 2   Google map                        26

12

13

14

15

16

17

18

19

20

21
```

1               P R O C E E D I N G S

2    Whereupon --

3               DEPUTY JOSEPH CUNNINGHAM

4    having duly been sworn to tell the truth, the whole

5    truth, and nothing but the truth, testified as

6    follows:

7               EXAMINATION BY MR. DOWNS:

8        Q    Thank you very much.  Good morning again.

9        **A    Good morning.**

10       Q    Is it Deputy or is it Corporal?  What's your

11   title?  What do you prefer to be called?

12       **A    Deputy is fine.**

13       Q    Deputy?  All right.  Good morning, Deputy.

14   I introduced myself earlier, but I'll do it again for

15   the record.  I am Jason Downs.  I represent that

16   plaintiff, Talatha Sherrill, in this matter.

17       **A    Okay.**

18       Q    You understand who I am, right?

19       **A    Yes.**

20       Q    And for the record, it looks like we're

21   joined by your counsel and Corporal Pristash is in the

1    room as well; is that correct?

2          **A**    **Yes.**

3          Q     Have you sat through a deposition before in

4    the past?

5          **A**    **No.**

6          Q     So I'm going to ask you some questions.

7    Everything -- all your answers will be under oath as if

8    you were in a courtroom under oath?

9                Does that make sense?

10         **A**    **Yes.**

11         Q     Do you have any questions about that oath at

12   all?

13         **A**    **No.**

14         Q     If I ask a question that doesn't make any

15   sense or that, you know, you need clarification on,

16   just let me know and I'm happy to try to rephrase it.

17   If you answer the question, we will understand that you

18   understand the question.  Does that make sense?

19         **A**    **Yes.**

20         Q     If at any point you have to use the

21   restroom, take a break, grab a glass of water, grab a

1    glass of coffee, just let us know; we can take a break.

2    The only thing I will request is if I'm in the middle

3    of a question, please answer that question and then we

4    can take a break; all right?

5        **A    Okay.**

6        Q    Are you under the influence of any alcohol,

7    drugs, prescription drugs, anything to make it

8    difficult for you to testify truthfully here today?

9        **A    No.**

10       Q    All right.  What is your first and last

11   name?

12       **A    Joseph Cunningham.**

13       Q    And where do you work?

14       **A    Cecil County Sheriff's Office.**

15       Q    How long have you been working there?

16       **A    Five, going on six years.**

17       Q    Okay.  All right.  And how tall are you?

18       **A    Five-foot-eight.**

19       Q    How much do you weigh?

20       **A    Currently, 202 pounds.**

21       Q    What about back in 2016, how much did you

1    weigh back then in January?

2         **A    Approximately 170 pounds.**

3         Q    So you put on some weight?

4         **A    Yes.**

5         Q    How would you describe your build back in

6    2016?  Were you slim?  Average build?  Muscular?

7    Overweight?

8         **A    Athletic.**

9         Q    Athletic?  And you look pretty strong to me

10   now.  What do you bench now?

11        **A    Couldn't tell you.  It's been a quite a**

12   **while.**

13        Q    Okay.  What about back then?  Back in

14   2016?

15        **A    Maybe 2 --**

16        Q    Maybe 200?

17        **A    Maybe 2.**

18        Q    Okay.  Have you ever been investigated by

19   the Internal Affairs Division?

20             MR. KARPINSKI:  Objection.  You may answer.

21        **A    Yes.**

1      Q     For what?

2            MR. KARPINSKI:  Objection.  Continuing

3    objection in questions regarding Internal Affairs

4    investigations, but you may answer.

5      **A     It was a sick leave complaint and it was**

6    **unsustained.**

7      Q    Other than the sick leave complaint, have

8    you ever been investigated by the Internal Affairs

9    Division at any other point?

10     **A     No.**

11     Q     And when I said Internal Affairs, I meant

12   Cecil County Sheriff's Office.  Are we on the same page

13   there?

14     **A     Yes.**

15     Q     Have you ever served in the capacity of a

16   law enforcement officer before working for the Cecil

17   County Sheriff's Office?

18     **A     No.**

19     Q     Had you ever applied to any law enforcement

20   offices prior to applying to the Cecil County Sheriff's

21   Office?

1      **A      Yes.**

2      Q      Which ones?

3      **A      There's no way I can give you an accurate**

4      **answer on that.   I can give you the ones I remember.**

5      Q      Tell me the ones you remember.

6      **A      The Maryland State Police.**

7      Q      Okay.   Who else?

8      **A      Dover Police Department.   It's the only two**

9      **processes I remember at this time.**

10     Q      Approximately what year did you apply to the

11     Maryland State Police?

12     **A      2011.**

13     Q      Were you hired?

14     **A      No.**

15     Q      Is it accurate that you applied and that

16     they did not hire you?

17     **A      They called two days after the Sheriff's**

18     **Office called me with an employment offer and I had**

19     **already accepted the Sheriff's Office.**

20     Q      So when the Maryland State Police Department

21     called you, what did they say to you?

1     **A**     **That I had an academy spot and I needed to**

2     **go redo -- I needed to go refresh my background because**

3     **it had been a while, but I had an academy spot.**

4          Q     Dover Police, did they hire you?

5     **A**     **No.**

6          Q     Did they offer you a job?

7     **A**     **No.**

8          Q     What year was it that you applied to the

9     Dover Police Department?

10    **A**     **2011.**

11         Q     Is it accurate that you applied to the Dover

12    Police Department and you were not hired by the Dover

13    Police Department?

14    **A**     **Yes.**

15         Q     Did they tell you that you were not hired?

16    **A**     **Yes.**

17         Q     What reason did they give you, if

18    anything?

19         MR. KARPINSKI:   Objection.   You may

20    answer.

21    **A**     **They hired a certified police officer, and I**

1    **was not certified in Delaware at the time.**

2         Q    Okay.  Speaking of certification, are you

3    certified in the use of radar equipment?

4         **A    Yes.**

5         Q    Tell us, what do you mean by that?  What

6    kind of certification do you have when it comes to

7    radar?

8         **A    I have a radar certification guard.  I am a**

9    **certified operator in the use of radar and LIDAR speed**

10   **detecting equipment.**

11        Q    So let's start with radar.  When were you

12   certified in the use of radar equipment?

13        **A    I don't recall.**

14        Q    Did you receive the certification from the

15   Cecil County Sheriff's Office?

16        **A    Yes.**

17        Q    What did you have to do to receive a

18   certification in radar?

19        **A    I had to take an eight-hour class with a**

20   **test and I also had to complete a prescribed number of**

21   **observed traffic stops with the use of radar.**

1        Q      Is this certification, is it documented in

2    your police file?  Is it in your file here?

3        **A      Yes.**

4        Q      Have you seen it with your own eyes?

5        **A      The training coordinator should have it.**

6        Q      Other than undergo an eight-hour -- an

7    eight-hour class and a prescribed number of

8    observations, what else did you have to do to receive

9    your certification in radar?

10       **A      The test.**

11       Q      The test?

12       **A      The test.**

13       Q      Okay.  How long ago did you take that test?

14       **A      I don't recall.  I'll have to look at my**

15   **training record.**

16       Q      Is a part of radar testing, is a part of it

17   estimating a vehicle's speed?  Eyeballing the vehicle's

18   speed?

19       **A      Yes.**

20       Q      Tell us about that.  What does that mean?

21       **A      Being able to observe a vehicle either**

1   **traveling in your direction or away from your direction**

2   **and getting an approximate speed on that vehicle to be**

3   **able to observe and positively say that that vehicle is**

4   **traveling above the posted speed limit.**

5        Q    And do you confirm your eyeball test?  In

6   other words, do you first do the visual estimate and

7   then do the radar?

8        **A    Yes.**

9        Q    Okay.  What was the allowed margin of error

10  when you were testing?

11       **A    I don't remember.**

12       Q    Was there a margin of error?

13       **A    I believe there was.  I do not recall a**

14  **hundred percent.**

15       Q    How many vehicles did you have to estimate

16  and then corroborate using radar?  How many vehicles?

17       **A    The observed amount of stops, that I do not**

18  **remember the exact number.  I want to say 25, but I'm**

19  **not 100 percent certain.**

20       Q    Out of the 25, how many of them did you

21  estimate within 15 miles per hour?

1      **A     I don't recall.**

2      Q     Okay.   How many did you estimate within 20

3  miles per hour?

4      **A     I don't recall.   I don't recall any of the**

5  **estimates.**

6      Q     What about LIDAR, what is LIDAR?

7      **A     It is -- instead of a radio frequency, it is**

8  **a laser, which is more precise at pinpointing certain**

9  **cars.   It is another tool that we were offered.**

10     Q     And when you underwent LIDAR certification,

11  were you certified?

12     **A     Yes.**

13     Q     Same time, 20 -- around the same year?

14     **A     Should have been around the same time.   Yes.**

15     Q     When you were certified using LIDAR, did you

16  also have to do visual estimates of vehicles traveling

17  and then confirmed with LIDAR?

18     **A     Yes.**

19     Q     What was the margin of error?

20     **A     I don't recall.**

21     Q     Do you remember how many you estimated

1    correctly within 15 miles per hour?

2         **A    No.**

3         Q    Do you remember how many you estimated

4    correctly within 20 miles per hour?

5         **A    No.**

6         Q    What's VASCAR?

7         **A    VASCAR would be confirmed via aircraft.**

8         Q    Okay.  Was your vehicle on the day of this

9    incident, was it equipped with radar?

10        **A    No.**

11        Q    Was it equipped with LIDAR?

12        **A    No.**

13        Q    Do you have access to VASCAR?

14        **A    No.**

15        Q    And when I say "the day of this incident," I

16   should be more accurate.  I'm talking about the

17   incident between you and Talatha Sherrill in 2016.  Are

18   we on the same page?

19        **A    Yes.**

20        Q    So any time I use the phrase "this incident"

21   during this deposition, that's what I'm referring to.

1    Can we agree with that?

2         **A     Yes.**

3         Q     I want to take you to the day of this

4    incident.  How far away was Ms. Sherrill's vehicle the

5    first time you saw it?

6         **A     I don't recall exactly how far away, but I**

7    **approached from behind the suspected vehicle.**

8         Q     When you approached Ms. Sherrill's vehicle

9    from behind, did you estimate how far it was away?

10        **A     At the initial time I saw the vehicle, no, I**

11   **did not.**

12        Q     What was it that drew your attention to Ms.

13   Sherrill's vehicle the first time you saw it?

14        **A     The vehicle was called out by an undercover**

15   **vehicle that was set up in the area of Schoolhouse**

16   **Apartments.  The vehicle description that was given out**

17   **was silver in color, Chevy Cruze, traveling at a high**

18   **rate of speed coming out of the apartments.**

19        Q     Did you see it with your own eyes coming out

20   of the apartments?

21        **A     No.**

1       Q     What's the significance of that apartment

2   complex?  Is it a high crime area or something else?

3       **A     High crime, high drug area.**

4       Q     So is it accurate that when you first saw

5   Ms. Sherrill's vehicle, you thought that she was

6   involved with drugs?

7       **A     No.**

8       Q     You did not think that she was involved with

9   drugs when you first saw her vehicle?

10      **A     No.**

11      Q     When you saw the vehicle, what did you do

12  when you saw it?

13      **A     That's when I got up behind the vehicle and**

14  **I observed it to be traveling at a high rate of speed.**

15  **At that time, I conducted a pace.**

16      Q     Were there any vehicles between you and Ms.

17  Sherrill's vehicle when you saw it?

18      **A     No.**

19      Q     When you got behind the vehicle initially,

20  was there any -- were there any vehicles between you

21  and Ms. Sherrill's vehicle?

1      **A      No.**

2      Q      When you conducted the pace, did you have to

3  speed up to catch up to her?

4      **A      Yes.**

5      Q      When you sped up to catch up with her, how

6  much time did that take?

7      **A      I don't recall.**

8      Q      How much distance did you travel when you

9  had to speed up to get behind her to start the pace?

10     **A      I don't recall.**

11     Q      When you got behind her to start the pace,

12  did you estimate how far away she was at the time?

13     **A      Yes.**

14     Q      How did you estimate?  What did you

15  estimate?  How far away was she?

16     **A      Can I refer to my report?**

17     Q      Tell me what you remember first and then

18  you'll --

19     **A      I would say three to five car lengths**

20  **between myself and the suspect vehicle.  I don't recall**

21  **the exact number I would have wrote in my report.**

1       Q    All right.  And how many feet away would you

2    estimate that she was when you first started pacing the

3    vehicle?

4       **A    I usually don't do it in feet.  I would say**

5    **three to five car lengths, depending on what I judged**

6    **it at that day.**

7       Q    And how many yards away was Ms. Sherrill's

8    vehicle when you initially started the pacing?

9       **A    Once again, I don't do my distance in yards**

10   **or feet.  That's too -- that's way too difficult to**

11   **lock down a feet number.  I utilize the car lengths.**

12      Q    All right.  So is it accurate that it's too

13   difficult for you to estimate of amount of feet, but it

14   was between your vehicle and Ms. Sherrill's vehicle at

15   the time that you initially started pacing it?

16      **A    Yes.**

17      Q    Is it accurate that it was too difficult to

18   estimate the number of yards between your vehicle and

19   Ms. Sherrill's vehicle at the time you initially

20   started pacing it?

21      **A    I wouldn't say it would be too difficult to**

1    do it in yards.  I would say it's just not -- it's not

2    feasible.  We use car lengths.  I was always instructed

3    to use car lengths when conducting a pace, and the pace

4    is done by car lengths.

5         Q    So, in other words, it wasn't feasible to

6    estimate the number of yards?

7         A    It's not something we do as common practice.

8    We always do car lengths.

9         Q    Was it feasible to estimate yards?

10        A    I'm sure I could have.

11        Q    All right.  And as you sit here right now,

12   how many yards away was it approximately when you first

13   saw Ms. Sherrill's vehicle?

14        A    When I first saw it, I already instructed I

15   don't recall.

16        Q    That's a good point.

17             When you first started pacing Ms. Sherrill's

18   vehicle, how many yards away was it?

19        A    Twenty.

20        Q    Okay.  And how fast were you traveling when

21   you first saw Ms. Sherrill's vehicle at 20 yards away,

1    when you first got to 20 yards away?

2         **A     I would have to refer to my report because I**

3    **would be matching the speed of the suspect vehicle and**

4    **I would have to refer to my report for that number.**

5         Q     So as you sit here right now, you don't

6    know?  You don't remember?

7         **A     I agree that it was over the posted speed**

8    **limit.  I do not know the exact number at this point.**

9         Q     Okay.  And let's take a step back.  Before

10   you walked in here today, what did you do to prepare

11   for this deposition?  And don't tell me any

12   conversation that you had with your lawyer.  In other

13   words, don't tell me what your lawyer told you.

14        **A     Nothing outside of that scope.**

15        Q     Okay.

16        **A     I came to work like I do every day.**

17        Q     Did you review your answers to

18   interrogatories?

19        **A     Not before this morning.  No.**

20        Q     When is the last time you saw your answers

21   to interrogatories?

1    **A      Before this morning, it would have been**

2    **weeks.   The last time we were set for the depositions,**

3    **I reviewed them.**

4         Q      What about your police reports?   Right now

5    you have some documents sitting in front of you; is

6    that correct?

7         **A      Yes.**

8         Q      The first page of the document is Bates

9    stamped 0028; is that correct?   You have it sitting

10   right in front of you.

11        **A      Is that a date stamp?**

12        Q      The last four numbers on the page right in

13   front of you are 0028?

14        **A      Yes.**

15        Q      And did you bring those with you in

16   preparation for today's deposition?

17        **A      I brought them in case I needed to refer for**

18   **specifics.**

19        Q      And the last time you reviewed them was the

20   last time we were set for this deposition?

21        **A      These, I reviewed.   These, I read over**

1    today.

2         Q    All right.  And when you say "these," for

3    the record, that's -- what are they?

4         A    **My report and subsequent documents.**

5         Q    What are the subsequent documents?

6         A    **That's on my report and it would be the**

7    **report out of our system, which also has the cover**

8    **page, my report, and my use of force report.**

9         Q    All right.

10             (Exhibit No. 1, marked for

11        identification.)

12        Q    Deputy Cunningham, I'm showing you what has

13   been marked as Exhibit 1 to your deposition.  Those are

14   your answers to interrogatories in this case; right?

15        A    **Yes.**

16        Q    Take a look through them and look at the

17   last page and tell us if that's your signature

18   reflected on the last page.

19        A    **Yes.**

20        Q    And did you review those answers prior to

21   signing?

---

1        A     Yes.

2        Q     Thank you.  That's all.

3              Tell us about the road conditions now back

4    to when you were pacing Ms. Sherrill.  Tell us about

5    the road conditions.  How was the lighting?

6        A     It was dark outside at the time.

7        Q     Any hills?

8        A     That road's fairly flat.  There are some

9    turns, but that road is flat.

10       Q     Were there any curves between when you first

11   saw Ms. Sherrill and initially started pacing Ms.

12   Sherrill?  Were there any curves?

13       A     When I originally observed Ms. Sherrill, it

14   was on a curve.  She had slowed down to take the curve

15   by the VFW right on 222.  That's when I first observed

16   the vehicle.  And I did not conduct my pace until after

17   that turn because I was in a position to do my pace at

18   the time.

19       Q     Once you started doing the pace, were there

20   any curves between the pace -- the start of the pace

21   and the initial stop on Ms. Sherrill?

1      **A     No significant curves.  No.**

2      Q     When you say no significant curves, were

3  there any curves at all?

4      **A     I'm sure the road moves a little bit, but no**

5  **significant curves.  No.**

6      Q     Lighting was still dark?

7      **A     Yes.**

8      Q     Able to see how many occupants were in the

9  vehicle?

10     **A     No.**

11     Q     But before you stopped the vehicle?

12     **A     No.**

13     Q     Could you tell whether the person was male

14  or female before you stopped the vehicle?

15     **A     No.**

16     Q     How much distance did you travel prior to

17  initially stopping Ms. Sherrill's vehicle?  So between

18  the time you saw it and initially stopped it, how much

19  distance did you travel?

20     **A     I don't recall an exact number, but I waited**

21  **until the intersection because there was no safe place**

1    to pull over in between.

2         Q    The intersection of Route 1 and?

3         A    222.

4         Q    Did you stop at the intersection?

5         A    Just prior to the intersection.

6              (Exhibit No. 2, marked for

7         identification.)

8         Q    I'm going to show you a Google Map that's

9    marked as Exhibit 2.  Take a look at that and let us

10   know if that's an accurate depiction of the area in

11   which you initially saw Ms. Sherrill's vehicle.

12        A    The area of which I originally saw the

13   vehicle is not on this map.  No.

14        Q    All right.  So where did you initially stop

15   the vehicle?

16             MR. KARPINSKI:  Stopped the same vehicle or

17   see the vehicle?

18        Q    Stop.

19        A    Stop.  The original area of stop was just

20   prior to the intersection between Route 1 and

21   Susquehanna River Road, which is Route 222.

Case 1:18-cv-00476-JKB   Document 56-2   Filed 08/02/19   Page 27 of 112

Deposition of Deputy Joseph Cunningham                    Talatha Sherrill v. Deputy Joseph Cunningham, et al.

1        Q    With a pen, can you write "IS" for initial

2    stop in the location where you initially stopped Ms.

3    Sherrill's vehicle?

4        A    No.  I can't pinpoint the exact location on

5    this map.  It's impossible to do, but I can get close.

6        Q    Okay.  Get as close as you can.

7        A    (Witness complying).

8        Q    Thank you.  Now, prior to the stop, did you

9    observe Ms. Sherrill use any turn signals?

10       A    Now, is that to the activation of my

11   emergency equipment or prior to the vehicle stopping?

12       Q    Prior to the vehicle stopping initially at

13   all.  The very first time Ms. Sherrill's vehicle

14   stopped at the location where we have an IS on the map.

15       A    I observed turn signals when the vehicle was

16   preparing to stop while I was behind her with emergency

17   equipment activated.

18       Q    What turn signals did she use?

19       A    I'd like to refer to my report to be exact,

20   but I believe she turned on the left turn signal, which

21   there was no left she could have made at the time, and

1    then the right turn signal came on and she pulled to

2    the side where there is a gravel shoulder.

3          Q    Okay.  Now, how much time passed between you

4    activating your sirens and Ms. Sherrill stopping?

5          A    I don't recall.

6          Q    When you activated your sirens, did she

7    speed up?

8          A    No.

9          Q    Did she try to run away from you and try to

10   flee when you activated your sirens?

11         A    The initial stop?

12         Q    Yeah, the initial stop.

13         A    No, not at that time.

14         Q    Okay.  Were there any houses in the area

15   where Ms. Sherrill was initially stopped?

16         A    No.

17         Q    Any businesses in the area where she was

18   initially stopped?

19         A    No.

20         Q    When she initially stopped and you were

21   sitting behind her, could you see how many people were

1    in the vehicle?

2        **A      I could identify that there was one person**

3    **in the car.  I could not definitively say there was not**

4    **more than one.**

5        Q      And the person that you saw in the vehicle,

6    that person was sitting in the driver's seat?

7        **A      Correct.**

8        Q      Did you see that person through a mirror?

9    Like how did you see that person?

10       **A      Would have been through a mirror.**

11       Q      Are you able to see the mirror and see the

12   person's reflection in the mirror, is that correct,

13   from your vehicle?

14       **A      You can't make out an accurate reflection,**

15   **but you can make out that there's a silhouette of a**

16   **human being in that driver's seat.**

17       Q      Other than a silhouette of a human being in

18   the driver's seat, as you're sitting in your vehicle,

19   did you see that silhouette doing anything else?

20       **A      No.**

21       Q      Did you see that silhouette reaching around

1   the vehicle for anything?

2        **A**     **No.**

3        Q     Did you see the silhouette on the phone at

4   all?

5        **A**     **No.**

6        Q     Before stopping the vehicle, did you think

7   the person, the driver was on the phone?

8        **A**     **I did not know that I even thought the**

9   **person was on the phone.**

10       Q     When you got out of the vehicle and

11  approached the vehicle, where were your hands

12  initially?  Were your hands on your gun or somewhere

13  else?

14       **A**     **I don't recall.**

15       Q     How were you trained to approach a vehicle?

16       **A**     **One hand might have been down near my gun.**

17  **My hand would not have been on my gun.**

18       Q     Why would one hand be near your gun at the

19  time?

20       **A**     **Initial approach to the car.  You don't know**

21  **what you're walking into.**

1      Q      When you got to the vehicle and looked into

2    the vehicle initially, were you able to see that the

3    person was a woman driving the car?

4      **A      I could see that it was a woman.  Yes.**

5      Q      Could you see that the woman was pretty

6    small in stature?

7      **A      No.  I could not make that determination.**

8      Q      Was it your testimony that when you got to

9    the -- you initially stopped her in the location that

10   was so dark, that you couldn't see the person's size?

11          MR. KARPINSKI:  Objection.  You may

12   answer.

13     **A      No.  It had nothing to do with the lighting**

14   **at the time.  It had to do with the window being rolled**

15   **up.  And my attempt to use a flashlight to view in the**

16   **vehicle, the glare made it almost impossible to see her**

17   **lower half, if you will.  I could see her face but I**

18   **cannot see her lower half, what her hands were doing or**

19   **anything at the time, which would be important for**

20   **determining one's size and stature.**

21          Q      Were any windows on the vehicle tinted?

1       **A      I don't recall.**

2       Q      If the windows were tinted, would you have

3    written it in your report?

4       **A      Possibly.**

5       Q      As a police officer, traffic stops are, you

6    recognize that they're dangerous; right?

7       **A      Yes.**

8       Q      And because traffic stops are dangerous,

9    your goal is to make them as safe as possible?

10      **A      Correct.**

11      Q      And making a traffic stop as safe as

12   possible, you try to stop someone in a well lit area?

13      **A      When feasible.**

14      Q      Okay.  And stopping someone in a well lit

15   area when feasible would require you to, would help you

16   be able to see inside of a vehicle; right?  That's the

17   reason why you would want to stop them in a well lit

18   area?

19      **A      That's one reason.**

20      Q      What's another reason?

21      **A      A well lit area can do a lot of things.  You**

1     can see your surroundings around you, other vehicles,

2     other things coming up.  It's not just about the one

3     car.  There's a lot more things that go into a traffic

4     stop than just your target car.

5          Q    And were you able to see your surroundings

6     when you stopped Ms. Sherrill's vehicle?

7          A    Yes.

8          Q    So were you able to see the car sort of

9     passing by you?

10         A    See a vehicle if they passed by me, yes, I

11    would.

12         Q    Was there only one vehicle that passed by

13    you during this initial stop?

14         A    I don't recall.

15         Q    When you approached the vehicle initially,

16    did you immediately pull out your flashlight?

17         A    Yes.

18         Q    And when you immediately pulled out your

19    flashlight, did you turn it on?

20         A    I would turn it on as I reached the vehicle.

21         Q    Before you said a word to Ms. Sherrill, did

1    you turn on your flashlight?

2         **A**      **Yes.**

3         Q      Did your flashlight work?

4         **A**      **Yes.**

5         Q      And by work, I mean it lit up and

6    illuminated the area where you were pointing the

7    flashlight; right?

8         **A**      **Yes.**

9         Q      When you approached the vehicle with the

10   flashlight illuminated, did you shine the flashlight in

11   the vehicle?

12        **A**      **Yes.**

13        Q      Did you see the person's face?

14        **A**      **I could see her face, yes.**

15        Q      After shining to see the person's face, did

16   you move the flashlight to see the person's hands?

17        **A**      **Yes.**

18        Q      When you moved the flashlight to see the

19   person's hands, could you see the hands?

20        **A**      **No.**

21        Q      What was blocking your hands?

Case 1:18-cv-00476-JKB   Document 56-2   Filed 08/02/19   Page 35 of 112

Deposition of Deputy Joseph Cunningham                    Talatha Sherrill v. Deputy Joseph Cunningham, et al.

1       A     The glare off the windshield, off the side

2   window.

3       Q     And was this before or after you started

4   talking to the driver of the vehicle?

5       A     I immediately moved the flashlight out of

6   her face.  I don't make it a practice to keep my

7   flashlight in someone's face.  When I moved the

8   flashlight away from her face, I noticed I could not

9   see inside the vehicle with the hands and around her

10  person at the time.

11      Q     And you testified you couldn't see her hands

12  because of the glare?

13      A     There was a glare.  Yes.

14      Q     And when you claimed you couldn't see the

15  person's hands because of the glare, did you just turn

16  the flashlight off?

17      A     No.

18      Q     Why didn't you turn the flashlight off?

19      A     That would not have made my vision any

20  better at the time.

21      Q     So is it your testimony that turning the

1    flashlight off wouldn't have helped with the glare?

2         **A     It would have helped with the glare but not**

3    **with my vision.**

4         Q     Is it accurate that the glare, according to

5    you, was impacting your vision?

6         **A     To see her hands, yes.**

7         Q     So other than being unable to see her hands,

8    were you able to see the passenger side of the vehicle?

9         **A     No.**

10        Q     Were you able to see the back of the

11   vehicle?

12        **A     I don't recall looking in back of the**

13   **vehicle.**

14        Q     When you approached the vehicle, you did not

15   look into the back seat of the vehicle?

16        **A     I don't recall at this time.**

17        Q     Are you trained to look in the back seat of

18   a vehicle when you approach it?

19        **A     Most of our training depicts looking through**

20   **the vehicle as we come up to look for people.  I just**

21   **don't recall the specific event.**

1    Q    So after you got there with your flashlight

2    out, what's the first thing that you said to Ms.

3    Sherrill?

4         **A    I introduced myself.**

5    Q    What did you say?

6         **A    Said good evening, ma'am.  I'm Deputy**

7    **Cunningham with the Cecil County Sheriff's Office.**

8    **Could you roll your window down, please?**

9    Q    You remember those words pretty accurately?

10        **A    It's normal for me.  That's a normal**

11   **statement.**

12   Q    And other than it being normal, do you

13   specifically remember those words in this case?

14        **A    Yes.  I remember saying, telling her good**

15   **evening and requesting that she roll the window down.**

16   Q    Was her window all the way rolled up when

17   you approached?

18        **A    No.**

19   Q    What was it?

20        **A    I would say approximately a quarter of an**

21   **inch.**

1      Q     And when the window was approximately a

2    quarter of an inch down, did she roll it down any

3    further?

4      **A     No.**

5      Q     What did she say?

6      **A     "No, it's down far enough" was the response**

7    **I received.**

8      Q     Did you hear her say "No, it's down far

9    enough"?

10     **A     Yes.**

11     Q     And after you heard her say "No, it's down

12   far enough," what did you say?

13     **A     I requested that she roll the window down**

14   **again.  I asked her if she could.**

15     Q     How many times did you ask her to roll the

16   window down during this initial stop?

17     **A     I don't recall an exact number.  I would**

18   **have to refer to my report for that.**

19     Q     As you sit here right now, you don't know

20   how many times you asked that?

21     **A     I don't recall.**

1     Q    And after you asked her each time to roll

2     the window down farther, what was her response?

3          **A    I specifically remember hearing no.  I don't**

4     **remember hearing if there was anything else that she**

5     **had stated at the time.**

6     Q    And was there anything obstructing your

7     ability to hear her at the time?

8          **A    The window, obviously, makes it more**

9     **difficult to communicate on a traffic stop.  If the**

10    **window is up, it hinders the communication between two**

11    **people.**

12    Q    And in this particular case, there was

13    nothing stopping you from hearing Ms. Sherrill say no;

14    is that accurate?

15         **A    I heard no.  That's correct.  There may have**

16    **been other things that she was saying.  I could not**

17    **make out everything.**

18    Q    Is it your testimony that she was talking

19    and that you were unable to hear what she was saying

20    during this stop?

21         **A    Some things.  Some things I could**

1    understand.  Yes.

2         Q    And in this case, you have written -- how

3    much reports have you written?

4         A    For this case in particular?

5         Q    For this traffic stop in particular.

6         A    I wrote one report and then I did a use of

7    force report and a pursuit report.

8         Q    Out of those three reports, in any of those

9    reports, did you ever say that Ms. Sherrill was talking

10   and that you were unable to hear what she was saying?

11        A    I don't recall if I specifically put any of

12   that in there.  I don't recall.

13        Q    Other than talking, was she moving her

14   hands?  Was she doing anything else?

15        A    I couldn't clearly observe her hands.

16        Q    Did you say you could not clearly observe

17   her hands?

18        A    That's right.

19        Q    Did she threaten you at all during this

20   initial traffic stop?

21        A    No.

Case 1:18-cv-00476-JKB   Document 56-2   Filed 08/02/19   Page 41 of 112

Deposition of Deputy Joseph Cunningham                    Talatha Sherrill v. Deputy Joseph Cunningham, et al.

1        Q      Okay.  Were you afraid?

2        A      There's always a certain amount of fear

3    until you can confirm that the traffic stop is safe.

4    So until I can see clearly and we can communicate

5    clearly and the threat has been brought down, there's

6    always a little bit of fear on a traffic stop.

7        Q      All right.  And aside from the general fear

8    that is associated with any traffic stop, was there

9    anything about Ms. Sherrill that made you afraid?

10       A      I would say it was discomforting for all

11   parties involved when someone is refusing to roll down

12   the window and effectively communicate.  That is a sign

13   of deception and it's usually a sign that there is

14   something that is being concealed or hidden to do with

15   this traffic stop.  So it is very unnerving when

16   someone is continuously not cooperating with the

17   traffic stop.

18       Q      Did you say it's because it's usually a sign

19   of what?

20       A      Deception.

21       Q      Now, part of your job as a police officer

1    requires you to fill out what's called a vehicle

2    pursuit review.  You know what that is; right?

3         **A    Yes.**

4         Q    That is a form that is part of the stock

5    forms at the Cecil County Sheriff's Office.  That's a

6    normal form?

7         **A    Yes, it is a normal form.**

8         Q    On that form, there's a box that says "fear

9    of the police"; right?  You've seen that box before?

10        **A    I don't recall right at this point.  I would**

11   **have to look it up.**

12        Q    Right now, do you have 0039 in front of you?

13        **A    Yes.**

14        Q    Take a look at page 0039.  Actually, 0040,

15   excuse me.  Next page.  Tell me if there's a space for

16   fear of the police.

17        **A    Yes.**

18        Q    So in your role as a Cecil County sheriff or

19   deputy sheriff, you are aware that people can be afraid

20   of police?

21        **A    Yes.**

1        Q    In fact, you are trained that people can be

2    afraid of the police?

3        A    Yes.

4        Q    And that form where it says "fear of the

5    police," that's under the box or under the section

6    where reason for flight or reason the person ran away?

7        A    Correct.

8        Q    So you are trained that sometimes people run

9    away from the police because they are afraid of the

10   police?

11       A    Correct.

12       Q    So as you were on the side of the road and

13   Ms. Sherrill was refusing to roll down her window, you

14   were aware that one reason could have been that she was

15   afraid of the police?

16       A    Correct.  However, in my experience, if

17   they're afraid of the police, if a police officer is

18   requesting them to roll their window down, they would

19   normally comply with that order.  That's not a normal

20   order that a fear of the police would cause to not be

21   complied with.

1      Q    And according to the form in front of you, a

2   normal response would be running away, sort of fleeing

3   if a person was afraid of the police?

4      **A    It's not normal.  It is a possible response.**

5      Q    And you are trained that it is possible that

6   people run away because they are afraid?

7      **A    Correct.**

8      Q    On the day of this incident, you were aware

9   that Ms. Sherrill could have been running because she

10  was afraid of the police?

11     **A    It would have been a possibility at that**

12  **time.  Yes.**

13     Q    And you were aware of that possibility?

14     **A    It was one possibility.  Yes.**

15     Q    Is it one of the possibilities that you were

16  aware of or did you just have no idea that she could be

17  afraid of the police?

18     **A    It was a possibility.  I agree it was a**

19  **possibility.**

20     Q    I understand that you agree it's a

21  possibility.  Is your agreement based on the form in

1    front of you?

2          **A      Yes.**

3          Q      Is it also based on your training and

4    experience from the Cecil County Sheriff's Office?

5          **A      Yes.**

6          Q      And in your training and experience, is that

7    form accurate?  Is it one of the possibilities that

8    people flee, because they're afraid of the police?

9          **A      Yes.**

10         Q      Had you been aware of that form prior to

11   stopping Ms. Sherrill?

12         **A      Yes.**

13         Q      Had you been aware of that potential

14   possibility that people run because they're afraid of

15   the police prior to stopping Ms. Sherrill?

16         **A      Yes.**

17         Q      Was there anything that prevented you from

18   moving a flashlight, to turning the flashlight off --

19   when you had this glare, anything stop you from turning

20   it off?

21         **A      Nothing stopped me physically.  No.**

1      Q     Is there any particular reason you didn't

2   turn it off?

3      **A     Turning the flashlight off, it would have**

4   **still been a very dim lit area inside the vehicle.  So**

5   **it would not have improved my vision into the vehicle**

6   **at the time.**

7      Q     All right.  And forgive me.  Did you already

8   testify that you don't remember how many times you

9   asked her to get out of the vehicle?  Did you say that

10  already?

11     **A     I don't recall how many times I asked her,**

12  **requested that she roll the window down.**

13     Q     Got it.  Did there come a point where you

14  asked her to get out of the vehicle?

15     **A     Yes.**

16     Q     How many times?

17     **A     I know I asked her -- I asked her once.**

18     Q     When you asked her to get out of the vehicle

19  once, what did she say?

20     **A     I remember hearing no.**

21     Q     When she said no, what did she do

1    immediately after that?

2         **A      When I asked?**

3         Q      And she said no.

4         **A      When I asked, then I ordered her out of the**

5    **vehicle.**

6         Q      What was the difference between the request

7    and the order?

8         **A      A request would be can you please step out**

9    **of the vehicle?**

10        Q      Did you say "Can you please step out of the

11   vehicle?"

12        **A      Yes.**

13        Q      And that's when she said no?

14        **A      Yes.**

15        Q      After you said "Can you please step out of

16   the vehicle," what did you say after that?

17        **A      I ordered her out of the vehicle.**

18        Q      What did you say to order --

19        **A      "Ma'am, I am now ordering you to step out of**

20   **the vehicle."**

21        Q      Were those your exact words?

1      **A      Yes.**

2      Q      And you remember your exact words clearly;

3  is that right?

4      **A      I believe so.**

5      Q      And I neglected to say this.  One of the

6  things is that the court reporter is typing, so we have

7  to go out of our way not to talk over each other.  I

8  can't talk over you, and if I do, let me know because I

9  can stop.  And I've got to ask you to do the same

10  thing, because the court reporter can't take it down

11  accurately if we talk over each other.

12      **A      Yes, sir.**

13      Q      So you remembered your exact words when you

14  ordered her out of the vehicle?

15      **A      I believe that's my exact words.  I believe**

16  **it was.**

17      Q      How did she respond?

18      **A      I don't recall her exact words at that time.**

19      Q      After you ordered her out of the vehicle,

20  what else did you say, if anything?

21      **A      That's when I had to order her out of the**

1   **vehicle a second time where I reintroduced myself to**

2   **ensure her who I was, who I worked for, and exactly**

3   **what I wanted her to do and exactly what would happen**

4   **if she did not comply.**

5          Q    What did you tell her would happen if she

6   did not comply?

7          **A    She would be extracted from the vehicle.**

8          Q    And did you use those words, "extracted from

9   the vehicle"?

10         **A    Yes, sir.**

11         Q    And you remember your exact words being

12  "extracted from the vehicle"?

13         **A    I remember specifically saying "extracted**

14  **from the vehicle."**

15         Q    After you told her you would extract her

16  from the vehicle, what did she do?

17         **A    At that point, she screamed no and she put**

18  **the car in drive and drove away.**

19         Q    What was in your hand when you told her that

20  you would extract her from the vehicle?

21         **A    My flashlight.  It was my flashlight.**

1      Q    Were you carrying gloves that day?

2      **A    Yes.**

3      Q    Why were you carrying gloves that day?

4      **A    I carry gloves every day.**

5      Q    And where were your gloves located on your

6  person?

7      **A    At which point?**

8      Q    When you told her you would extract her from

9  the vehicle.

10     **A    I was putting them on my hands.**

11     Q    When she pulled off, how fast did you

12  estimate visually that she was going?

13     **A    I didn't keep a clear eye on the vehicle at**

14  **that point.  I saw her speed off.  At that point, I**

15  **went back to my vehicle, so I wasn't standing there**

16  **trying to calculate a speed.**

17     Q    And the location of this initial stop was

18  right before the intersection; right?  Right before the

19  light?

20     **A    I don't recall exactly the distance before**

21  **the light, but yes, it was prior to the light.**

1        Q     The reason it was close to the light was

2   because you wanted to be as close to the actual

3   physical lights as possible; is that accurate?

4        **A     That is one reason.  Yes.**

5        Q     So you got as close to the physical lighting

6   as possible for this initial stop; right?

7        **A     Correct.**

8        Q     Then she pulls off; is that accurate?

9        **A     Yes.**

10       Q     When she pulls off, she makes a right pretty

11   much immediately; is that accurate?  Because you're

12   right near the stop sign.

13       **A     When she reached the traffic signal, she did**

14   **make the right.**

15       Q     How much time passed between her pulling off

16   and her reaching the stop sign?

17       **A     I don't recall an exact time.  I couldn't**

18   **even tell you.**

19       Q     Are you able to estimate or are you unable

20   to estimate the time?

21       **A     I wouldn't be able to give you a fair**

1    estimate at this point.

2         Q    And speaking of estimates, are you able to

3    give us a fair estimate of how much time you were

4    pacing Ms. Sherrill prior to the initial stop?

5         A    I would have to refer to my report for

6    anything as far as that specific pace goes.

7         Q    And if it's not in your report, you don't

8    know?

9         A    If it's not in my report, I'm not going to

10   recall at this time.

11        Q    When she got to the stop sign, did she stop

12   or did she do something else?

13        A    Once again, I would have to refer to my

14   report.  I specifically documented every traffic

15   infraction that occurred from the time of the initial

16   flight from the first stop to the second stop area.

17        Q    As you sit here right now, is it accurate

18   that you don't remember whether Ms. Sherrill stopped at

19   the stop sign?

20        A    I couldn't give you an exact answer.

21        Q    Did you radio over the radio as to any

1   traffic infraction that you claim that she was

2   committing during this second -- I won't call it chase

3   or pursuit.  Did you radio about the traffic infraction

4   that you claim that she was committing?

5        A     **Morning than likely not.  My pursuit was**

6   **being called out over the air to get units in the area**

7   **and me calling out my pursuit would have outweighed me**

8   **calling out traffic infractions.**

9        Q     During the initial traffic stop, describe

10   Ms. Sherrill's demeanor.

11        A     **She was noncompliant would be her demeanor.**

12        Q     Did she scream at you?

13        A     **Not until the end.**

14        Q     Did she curse at you?

15        A     **No.**

16        Q     Did she try to hand you her driver's license

17   through the window?

18        A     **No.  We never got to that point.**

19        Q     Did you ask her for her driver's license and

20   registration?

21        A     **No.  I never got to this point.**

Case 1:18-cv-00476-JKB   Document 56-2   Filed 08/02/19   Page 54 of 112

Deposition of Deputy Joseph Cunningham                    Talatha Sherrill v. Deputy Joseph Cunningham, et al.

1      Q      Why didn't you ask her for her driver's

2   license and registration?

3      **A      Because until the window situation was**

4   **resolved as far as the effective communication and the**

5   **safety of the traffic stop, I wasn't going to move onto**

6   **the next stage of the traffic stop.**

7      Q      And the window being resolved, you mean you

8   couldn't hear?  That's what you mean?

9      **A      As far as effective communication and**

10  **vision.**

11     Q      So the window was obstructing your vision?

12     **A      Yes.**

13     Q      When she pulled off after the initial

14  traffic stop, is it accurate that she was traveling in

15  the direction of Royal Farms?

16     **A      Yes.**

17     Q      Were there any other vehicles traveling on

18  the road when she was traveling in the direction of

19  Royal Farms?

20     **A      Could you rephrase?  I'm not sure if you're**

21  **talking about the same direction against traffic.  I**

1    **don't understand the question.**

2         Q    Were there any vehicles traveling in between

3    you and Ms. Sherrill at the time when Ms. Sherrill was

4    traveling toward the Royal Farms?

5         **A    So in between our vehicles?**

6         Q    In between your vehicles.

7         **A    No.**

8         Q    Were there any vehicles going in the other

9    direction?

10        **A    I don't recall exact, if there was traffic**

11   **or not.  I would have possibly documented that.**

12        Q    How much time passed between the initial,

13   when she initially pulled off -- so at that initial

14   stop she pulls off, and then Ms. Sherrill coming to a

15   complete stop, how much time passed?

16        **A    I don't recall the exact time.**

17        Q    And if it's in your report, is it accurate

18   you don't know?

19        **A    That, I don't recall at this time.  I can**

20   **probably find out, but I don't know at this time.**

21        Q    How could you find out?  What could you find

1    out?  How could you find out the time?

2         **A     Probably through my radio traffic.**

3         Q     How far away from Ms. Sherrill's vehicle was

4    your vehicle when you started pacing her for the second

5    time?

6         **A     Once again, I would have to refer to my**

7    **report for the exact number of car lengths.  But it**

8    **should have been between three to five car lengths.  I**

9    **don't recall the exact number at the time without**

10   **referring.**

11        Q     But you remember it was between three to

12   five car lengths?

13        **A     I believe so.  I would have to refer for the**

14   **exact number.**

15        Q     What is your belief based on?

16        **A     Normal pace.  My normal pacing distances.**

17        Q     So if it was not between three to five, that

18   would not be a normal pace distance?

19        **A     It would still be normal depending on the**

20   **situation, the scenario.  But I try to keep it between**

21   **three to five.  Sometimes it goes up to six.  It**

1    **depends on the situation.**

2         Q    And is it accurate that during this second

3    pacing, you can't estimate how many feet away Ms.

4    Sherrill's car was at the time?

5         **A    Once again, I would never try to estimate**

6    **that in feet.**

7         Q    Understand you would never do it, but are

8    you able to estimate the amount of feet between Ms.

9    Sherrill's vehicle and your vehicle during the second

10   round of pacing?

11        **A    No, not at this time.**

12        Q    Yards?  No?

13        **A    I wouldn't say at this time, but I can't**

14   **specifically tell you how many vehicle lengths.  So I**

15   **would not be able to estimate how many yards at this**

16   **time.**

17        Q    On the day of this incident, were you able

18   to estimate the amount of yards between your vehicle

19   and Ms. Sherrill's vehicle during the second round of

20   pacing?

21        **A    Yes, I would have been able to.**

1        Q     And would you have recorded it somewhere?

2        **A     No.  It would have been recorded in car**

3   **lengths.**

4        Q     So if it was between three to five car

5   lengths, according to you, how many yards would that

6   be?

7        **A     It depends on is it three?  Is it five?  It**

8   **would depend and it would depend on the exact number**

9   **and the exact situation.**

10        Q     If it were three car lengths, how many yards

11   way would Ms. Sherrill's car have been during the

12   second round of pacing?

13        **A     If it was three, it would be approximately**

14   **18 to 20 yards.**

15        Q     If it was four car lengths away?

16        **A     Could have been, you know, 18 to 25.**

17        Q     And five car lengths away, how many yards

18   would that have been?

19        **A     It would have been approximately between,**

20   **you know, 25 and 30, 31-ish.**

21        Q     And how much time did you pace Ms.

1    Sherrill's car length for the second time around when

2    it comes to pacing?

3          A     I don't recall.

4          Q     Did you estimate the time the day of this

5    incident?

6          A     I don't recall if I did or not.  I should

7    have.  I would have normally, but I don't recall this

8    exact incident.

9          Q     And if you would have recorded the amount of

10   time or noticed the amount of time, would you have

11   recorded it somewhere?

12         A     I'd have to refer to my report to see if I

13   document in the report or not.  I don't recall if I did

14   or not at this time.

15         Q     And if you didn't document it in the report,

16   is it accurate you didn't know one way or the other?

17         A     No.

18         Q     So if you didn't document it in the report,

19   where would you have documented the amount of time?

20         A     I would have noted how much time.  It

21   doesn't mean I would have actually wrote it down, being

1    in a pursuit and everything that transpired that

2    evening.

3         Q    And how, total, how long was the pursuit

4    total?

5         A    I would have to refer back to the report for

6    that.  I don't -- I don't remember at this time.  It's

7    been, you know, three-plus years.

8         Q    So as you sit here right now, you don't know

9    how long the pursuit was total?

10        A    No.

11        Q    The day of this incident, did you know how

12   long the pursuit was total?

13        A    Yes.

14        Q    Did you record it somewhere?

15        A    I'm sure I did.

16        Q    The total time of the pursuit, how long was

17   it?

18        A    I don't recall at this time.  I would have

19   to refer.

20        Q    As you sit here right now, you don't know

21   how long the pursuit itself lasted total?

1        **A      No.**

2        Q      So as Ms. Sherrill was driving during this

3    second round of pacing, is it accurate that her vehicle

4    stopped abruptly before making contact with the patrol

5    vehicle?

6        **A      Yes.**

7        Q      Whose patrol vehicle did she almost make

8    contact with?

9        **A      Corporal Pristash.**

10       Q      And Corporal Pristash, where was his vehicle

11   in relation to Ms. Sherrill's vehicle when you said it

12   almost made contact?

13       **A      His patrol vehicle pulled out of, pulled**

14   **onto the roadway I believe either just prior to Royal**

15   **Farms or at the Royal Farms, and he was going to make**

16   **the U turn.  So he would have been across the lanes of**

17   **traffic at the time.**

18       Q      You said he was going to make a U turn.  Did

19   Corporal Pristash tell you he was going to make a U

20   turn?

21       **A      I suspected, to join into the pursuit.**

1    Q    Did he say that over the radio that he was

2  about to make a U turn?

3        **A    No.   That was my assumption.**

4    Q    How much time passed between Corporal

5  Pristash pulling into the roadway and Ms. Sherrill's

6  vehicle stopping?

7        **A    I don't recall.**

8    Q    Did Ms. Sherrill's vehicle make contact with

9  Corporal Pristash's vehicle?

10       **A    No.**

11   Q    Is it accurate that Corporal Pristash's

12  vehicle was perpendicular to Ms. Sherrill's vehicle at

13  the time where Ms. Sherrill's vehicle stopped abruptly

14  before making contact?

15       **A    Yes.**

16   Q    So is it accurate that Corporal Pristash's

17  vehicle was in front of Ms. Sherrill's vehicle and Ms.

18  Sherrill's vehicle came to an abrupt stop?

19       **A    Correct.**

20   Q    And just before Ms. Sherrill making the

21  abrupt stop, Corporal Pristash had just pulled into the

1    roadway?

2          A      **Yes.**

3          Q      How close -- when you say Royal Farms, are

4    we talking about the Royal Farms on Conowingo Road?

5          A      **Correct.**

6          Q      How close to the Royal Farms was Ms.

7    Sherrill's vehicle when it came to an abrupt stop?

8          A      **I don't recall the exact distance.**

9          Q      When Ms. Sherrill's vehicle came to an

10   abrupt stop, how far away from the vehicle were you?

11         A      **From her vehicle?**

12         Q      Yes, from Ms. Sherrill's vehicle.

13         A      **I don't recall the exact distance at the**

14   **time.**

15         Q      Do you recall in car lengths?

16         A      **I would say car lengths.**

17         Q      How many car lengths away were you?

18         A      **I don't recall the exact number.**

19         Q      Okay.  What did you see Corporal Pristash do

20   when Ms. Sherrill's car came to an abrupt stop?

21         A      **He exited his patrol vehicle and began**

1   **giving orders.**

2        Q     Could you hear him?

3        **A     Yes.**

4        Q     And were you driving at the time?

5        **A     No.**

6        Q     You were stopped at the time?

7        **A     Yes.**

8        Q     Was your window up or down?

9        **A     I don't recall.**

10       Q     You were in your vehicle, Corporal Pristash

11  was outside of his vehicle and you could hear the

12  orders that he was giving?

13       **A     Yes.**

14       Q     And what was he saying?

15       **A     "Show me your hands."**

16       Q     How many times did he say "Show me your

17  hands"?

18       **A     I don't recall at this time.**

19       Q     Did he have his weapon drawn?

20       **A     Yes.**

21       Q     Was the weapon pointed?

1        **A      Yes.**

2        Q      Where was it pointed?

3        **A      In the general area of the vehicle.   I**

4   **couldn't speak for his exact point of aim.**

5        Q      When you say "the vehicle," that's Ms.

6   Sherrill's vehicle?

7        **A      Correct.**

8        Q      And Ms. Sherrill was inside the vehicle at

9   that time?

10       **A      Correct.**

11       Q      When Corporal Pristash was yelling "Show me

12  your hands, show me your hands," how much time -- did

13  you get out of the car at that time?

14       **A      I radioed to dispatch that we had the**

15  **vehicle stopped and our location.   I got that out**

16  **before I completely exited my vehicle and approached**

17  **the other vehicle.**

18       Q      Other than radioing that you had the vehicle

19  stopped and the location, did you radio anything else

20  at this time before getting out of your vehicle?

21       **A      Not that I recall.**

1      Q     When you got out of your vehicle, what was

2    Corporal Pristash doing?

3      **A     He had approached the vehicle at that point.**

4    **He had got the door open and he was starting to get the**

5    **suspect, Ms. Sherrill, out of the vehicle.**

6      Q     You say he had gotten the door open.  Did it

7    appear to you that he struggled to get the door open?

8      **A     I don't recall.  I don't recall how he got**

9    **the door open or what had happened.**

10     Q     Did you see him open the door?

11     **A     No.**

12     Q     As you sit here right now, you don't know if

13   Corporal Pristash opened the door or if Ms. Sherrill

14   opened the door?

15     **A     I didn't see it.**

16     Q     Do you know one way or the other how the

17   door got open?

18     **A     Yes.**

19     Q     How do you know?

20     **A     Talking to Corporal Pristash after the**

21   **incident.**

1      Q     When did you talk to Corporal Pristash after

2   the accident?  At the scene?

3      **A     I don't know if it was at the scene or at**

4   **the office, but I don't recall which place we**

5   **discussed.**

6      Q     How many times did you talk to Corporal

7   Pristash about this incident?

8      **A     I don't recall.**

9      Q     Is it accurate you don't know how many times

10   you spoke to him about this incident?

11      **A     No.**

12      Q     No, it's not accurate or you no, you don't

13   remember how many times you spoke to him?

14      **A     No.  I don't remember.**

15      Q     After you saw the door was open, what did

16   you see Corporal Pristash doing?  What did you see him

17   doing?

18      **A     He had reached in and gripped the subject by**

19   **her coat and it started to get her out of the vehicle.**

20      Q     Were you able to see the coat clearly?

21      **A     Yes.**

1      Q      And what part of the coat?  Was it, like, a

2   hood, back of the coat, the front of the coat, the arm?

3   What was he grabbing?

4      **A      At that point, I believe it was the -- it**

5   **was up by the top of the coat.  It was a puffy, puffy**

6   **coat.**

7      Q      So you saw Corporal Pristash grabbing Ms.

8   Sherrill by the top of her coat?

9      **A      Yes.**

10      Q      What did you do when you saw him grabbing

11   her by the top of her coat?

12      **A      As she was coming out of the vehicle, I was**

13   **able to grab her coat by her -- the right arm of her**

14   **coat.**

15      Q      What side of the vehicle were you on when

16   you first touched Ms. Sherrill?

17      **A      The driver's side.**

18      Q      What side of the vehicle was Corporal

19   Pristash on when you first saw him touch Ms. Sherrill?

20      **A      The driver's side.**

21      Q      So you both were on the same side of the

1    car?

2         A    Correct.

3         Q    And is your testimony that Corporal Pristash

4    was grabbing the top of her coat; right?

5         A    Yes.

6         Q    You were grabbing her right side of her

7    coat?

8         A    The right arm of the coat.

9         Q    Right arm of the coat.  How much time passed

10   between Corporal Pristash initially grabbing Ms.

11   Sherrill and her being taken out of the car?

12        A    I don't recall.

13        Q    Is it your testimony that it took two of you

14   to get her out of the car?

15        A    It took two of us to effectively get her out

16   of the car.  She was not complying with orders to get

17   out of the vehicle, at which point using one person or

18   using less than what we did would have caused -- it

19   would have caused more likelihood of injury than using

20   two people.

21        Q    Likelihood of injury to who?

1      **A      Ourselves as well as the suspect.**

2      Q      And what was it about the suspect that you

3      believe that she could cause injury to you?

4      **A      At that point, we had not confirmed that**

5      **this person was not armed, this person was not intent**

6      **on committing harm to us or others.   There was no way**

7      **to tell at this point what her intentions were when she**

8      **fled the traffic stop.**

9      Q      When you initially saw Corporal Pristash

10     grabbing Ms. Sherrill, you could see the coat with your

11     own eyes?

12     **A      Yes.**

13     Q      Were you able to see her size?

14     **A      I did not notice her size at the time.**

15     Q      Is your testimony that you could see Ms.

16     Sherrill's coat but you couldn't see her size; correct?

17     **A      I was not paying attention to size.   I was**

18     **more focused on seeing hands and what was going on at**

19     **the time.**

20     Q      Did you see her hands?

21     **A      Once she was starting to come out of the**

1  **vehicle when I approached and I got the coat on the**

2  **right arm of the coat, I could see her hands at that**

3  **point.  Yes.**

4  Q    Could you see that her hands were empty;

5  nothing was in her hands?

6  **A    Yes.**

7  Q    Did Corporal Pristash look like he was

8  struggling to get Ms. Sherrill out of the car by

9  himself?

10  **A    I don't recall him struggling.  I don't**

11  **recall.**

12  Q    Did it look like Corporal Pristash was

13  having difficulty getting Ms. Sherrill out of the car

14  by himself?

15  **A    Ms. Sherrill was not complying in any way,**

16  **so, obviously, he was trying to get her out of the**

17  **vehicle by her coat and she was not complying by**

18  **stepping out of the vehicle.  So there is a slight,**

19  **slight struggle when a subject is not complying in any**

20  **way.**

21  Q    As a police officer, are you trained in the

1    difference between active and passive resistance?

2        **A**    **Yes.**

3        Q    All right.  Active resistance is just like

4    it sounds, is that when a suspect actively, physically

5    resists a police officer?

6        **A**    **Correct.**

7        Q    Passive resistance is something different;

8    is that correct?

9        **A**    **Correct.**

10       Q    Passive resistance is when a suspect simply

11   refuses to follow a command but doesn't physically

12   resist; is that accurate?

13       **A**    **Correct.**

14       Q    In this case, was Ms. Sherrill actively or

15   passively resisting?

16       **A**    **At the time of the incident we are talking**

17   **about right now, it was passive.**

18       Q    And right now, we mean when Corporal

19   Pristash was grabbing Ms. Sherrill?

20       **A**    **Was escorting her out of the vehicle.  Yes.**

21       Q    And to be clear, by escorting, he was

Case 1:18-cv-00476-JKB   Document 56-2   Filed 08/02/19   Page 73 of 112

Deposition of Deputy Joseph Cunningham                          Talatha Sherrill v. Deputy Joseph Cunningham, et al.

1   grabbing her by her coat; is that accurate?

2         A      Correct.

3         Q      And when he was grabbing by her coat, Ms.

4   Sherrill was passively resisting?

5         A      Correct.

6         Q      And when Ms. Sherrill was passively

7   resisting and Corporal Pristash was grabbing her by her

8   coat, that's when you grabbed her by her right side of

9   her arm on her coat?

10        A      The coat, yes.

11        Q      And then what did you both physically do

12  with Ms. Sherrill after Corporal Pristash had her coat,

13  you had her right side of her arm of the coat?

14        A      She was lowered to the ground at that point.

15        Q      How was she lowered to the ground?

16        A      By her coat.

17        Q      And when you say "lowered to the ground," do

18  you mean she was just sort of gently placed to the

19  ground?

20        A      Yes.

21        Q      And were you purposely gentle with her?

1       **A      I don't slam people to the ground for**

2    **passive resistance.  If you were passively resisting,**

3    **the idea is to get handcuffs on the suspect with the**

4    **least amount of force necessary, which is exactly what**

5    **we did that day.**

6       Q    And we'll talk about the least amount of

7    force.  But to be clear, is your testimony that you and

8    Corporal Pristash gently placed Ms. Sherrill to the

9    ground?

10      **A      Yes.**

11      Q    And when you gently placed her to the

12   ground, what did you -- what did she say?  Did she say

13   anything?

14      **A      I don't recall at this time.**

15      Q    What did she do physically when you gently

16   placed her to the ground?

17      **A      She took her hands and placed them**

18   **underneath her torso.**

19      Q    And is it accurate that you had the right

20   side of her coat?

21      **A      Correct.**

1      Q     Is it your testimony that Ms. Sherrill was

2    able to free her right arm from your grip and put it

3    under her body?

4      A     No.

5      Q     So how did she put her hands under her body

6    if you had her right side?

7      **A     I did not have her hand.  I had the coat,**

8    **which gave her plenty of leeway to move her hands**

9    **underneath of her body.**

10     Q     And did she put one hand or both hands

11   underneath her body?

12     **A     Both.**

13     Q     And when she put both hands underneath of

14   her body, this is after you had already seen that she

15   didn't have any weapons in her hand; correct?

16     **A     In her hands, correct.**

17     Q     Did you think that she had weapons in her

18   coat?

19     **A     Her waistband was quite possible.**

20     Q     Was there anything about Ms. Sherrill that

21   made you believe that she had a weapon in her

1  waistband?

2      **A      The furtive movement of shooting your hands**

3  **under your torso is a furtive movement for somebody**

4  **that is concealing a firearm or concealing another**

5  **weapon.**

6      Q    So it's your testimony that after you placed

7  Ms. Sherrill to the ground gently, you then thought she

8  had a gun in her waistband?

9      **A      I thought it was a possibility.**

10     Q    And after you placed her to the ground

11  gently and thought she had a gun in her waistband, how

12  did you physically respond to that?

13          MR. KARPINSKI:  Objection.  You may

14  answer.

15     **A      When I thought it was a possibility that she**

16  **was armed -- I wouldn't say I specifically thought she**

17  **was armed -- I then wanted to get -- I started pulling**

18  **against her arm while ordering her to place her hands**

19  **behind her back.**

20     Q    And when you started pulling against her

21  arm, this is when you thought she had a gun?

1        **A      When I thought it was a possibility.**

2        Q      You thought it was a possibility that she

3   had a gun and you started pulling on her arm?

4        **A      Correct.**

5        Q      So since you thought that there was a

6   possibility that she had a gun, how much force did you

7   use when pulling on her arm given that you thought she

8   had a gun, maybe had a gun?

9        **A      I was pulling.  I wasn't, like, the force of**

10  **me pulling an arm.  I wouldn't say I was -- I mean, I**

11  **wasn't striking.  I was just pulling an arm.**

12       Q      Were you were gentle, given that you thought

13  it was a possibility that she had a gun?

14       **A      I wouldn't say that I was gentle.**

15       Q      The level of physical interaction between

16  you and Ms. Sherrill had changed once she hit the

17  ground; is that correct?

18       **A      Once the resistance went from passive to**

19  **active, that's when it could have changed.  It still**

20  **stayed just at hands and control techniques.  It never**

21  **went above control techniques.**

1      Q    And the amount of force that you used, did

2   that change once she -- you claim that she started

3   putting her hands underneath her body?

4      **A    Could you clarify "level of force"?  Because**

5   **my level of force is control techniques and then it**

6   **moves on from there.  It never changed from control**

7   **techniques.**

8      Q    Before, you say that she tried to put her

9   hands underneath of her body, you were gentle with her.

10  Is that your testimony?

11     **A    Correct.**

12     Q    After she put her hands underneath of her

13  body, you say that you were no longer gentle; is that

14  right?

15         MR. KARPINSKI:  Objection.  You may

16  answer.

17     **A    I pulled her arm at that point.  I wouldn't**

18  **said I went overboard with being excessive.  I would**

19  **say I pulled her arm to get it out from underneath of**

20  **her.**

21     Q    When you pulled her arm to get it out from

1    underneath of her, was it gentle or something else?

2         **A      I would not say that it was gentle.**

3         Q      What arm did you pull to get from underneath

4    of her?

5         **A      Right.**

6         Q      What did Corporal Pristash do when you were

7    pulling her right arm?

8         **A      I believe he was trying to get the left arm**

9    **from underneath of her as well.**

10        Q      And you say trying.  Was he having trouble?

11        **A      I can't speak for what he was doing on his**

12   **side.  I know what I had and what I did at that time.**

13        Q      Did it look to you like Corporate Pristash

14   was having trouble with Ms. Sherrill in moving the left

15   side of her body?

16        **A      I was more focused on what I was doing at**

17   **the time.**

18        Q      Were you having trouble with the right side

19   of Ms. Sherrill's body when you --

20        **A      She was holding -- she was holding either**

21   **her waistband or her hands together.  She was holding**

---

1    something because there was resistance when trying to

2    get her hand from underneath of her body.

3         Q    And as you were trying to get her hand from

4    underneath of her body, was it hard for you?

5         A    It was slightly difficult.  Yes.

6         Q    At the point now where Ms. Sherrill is on

7    the ground, do you notice her size at this point?

8         A    I was never noting her size.  Her size

9    didn't come up until after she was secured and we knew

10   the situation was safe, then I noticed her stature.

11        Q    So after the use of force was over, that's

12   the first time you noticed Ms. Sherrill's size?

13        A    I mean, I noticed she was a female, so,

14   obviously, she was slightly smaller than me.  I never

15   documented her exact height or size.

16        Q    Would you agree that Ms. Sherrill is

17   abnormally small?

18        A    To me, no.  She is not.

19        Q    Did she look to be about 4'10 or underneath

20   4-foot-10?

21        A    Roughly.  Yes.

1        Q     And is it your testimony that that's not

2    unusually small in stature for your experience?

3        **A     My mother is the same size.  So no, it is**

4    **not abnormal for me to see a female of that stature.**

5    **No, it is not.**

6        Q     Your mother is 4-foot-10 approximately?

7        **A     Yes.**

8        Q     And when you saw Ms. Sherrill, you didn't

9    notice that she was about the same size as your mom?

10       **A     She was never standing.  If someone is**

11   **standing next to you, it's easy to gauge their height**

12   **to get a good gauge.  If someone is resisting to get**

13   **out of the car and you're trying to -- she was never**

14   **standing completely vertically for me to observe**

15   **exactly her height.**

16       Q     And prior to putting your hand on her coat,

17   it's your testimony that you had not noticed anything

18   about her size?  That's correct?

19       **A     She was a woman and I noticed she was a**

20   **woman.  I noticed she had appeared to be smaller than**

21   **I, but I could not make an accurate gauge on her height**

1    at that point.

2         Q    At what point did you take Ms. Sherrill's

3    size into consideration, if any?

4         A    Can you define "into consideration"?

5         Q    Did you take Ms. Sherrill's size into

6    consideration prior to, in your words, gently placing

7    her on the ground?

8         A    That she was substantial essentially smaller

9    than me and that it was, indeed, a woman, yes, that was

10   taken into account.

11        Q    When you -- excuse me.  Let me strike that

12   question and start over.

13             Now, when Ms. Sherrill, when you say she put

14   her hands underneath of her body, did you believe that

15   she was going to physically hurt you at that time?

16        A    I believed it was a possibility.

17        Q    Did you believe that -- you said it was a

18   possibility.  Did you believe that the possibility that

19   she had a gun and she was going to hurt you with the

20   gun?  It that what you thought?

21        A    Like I said, I believed it was a

1   possibility.  I can't say that I believed distinctively

2   she was going to hurt me at this time or that she was

3   going to attempt to kill me at this time.  Like I

4   cannot say that with 100 percent certainty.

5          I can say with 100 percent certainty that at

6   that time, I knew in my mind that at this point it was

7   a possibility.

8          Q    So let's talk about the possibility.  Was it

9   a possibility that she was armed with a knife?

10         A    Yes.

11         Q    Was it a possibility that she was unarmed?

12         A    Yes.

13         Q    Was it a possibility that she was just

14   afraid?

15         A    I did not take fear into account at that

16   point because of -- the hands going to the torso, I did

17   not take as a fearful movement.  If she would have

18   placed her hands, like, down to ease herself to the

19   ground like that, that, you could take as fear.

20   Something along those lines.  I did not take her

21   actions as fearful.

1      Q      Did you see with your own eyes Corporal

2   Pristash touch Ms. Sherrill's left arm?

3      **A      No.**

4      Q      Did you see Ms. Sherrill's face at any point

5   touch the concrete?

6      **A      I don't believe I ever saw it.  No.**

7      Q      When she was, in your words, gently placed

8   to the ground, what part of her body hit the ground

9   first?

10     **A      I don't recall at this time.**

11     Q      Did you use any techniques that were taught

12   in the academy to maneuver Ms. Sherrill's right arm?

13     **A      Yes.**

14     Q      What technique did you use?

15     **A      A wrist manipulation.**

16     Q      Is that the same thing as a wrist lock or

17   something different?

18     **A      It is an escort technique or a handcuffing**

19   **technique that is used by the wrist, which is a small**

20   **joint.**

21     Q      And the wrist manipulation that you used,

1  does it involve the hitting of any pressure points, or

2  no?

3      A    No.

4      Q    Describe the wrist maneuver that you used on

5  Ms. Sherrill's right wrist.

6      **A    Essentially I had a contact with her hand at**

7  **that point with one of my hands.  I believe it was my**

8  **right hand.  And I was able to maneuver her wrist in a**

9  **way that allowed me to get her hand behind her back.**

10     Q    Did you see whether Corporal Pristash used

11 any maneuver that was taught in the academy?  Did you

12 see that at all?

13     **A    I did not.**

14     Q    When you and Corporal Pristash grabbed Ms.

15 Sherrill the same time, would you say that you were

16 both helping each other?

17     **A    Yes.**

18     Q    It was your intent to assist Corporal

19 Pristash in pulling Ms. Sherrill out of the car?

20     **A    Yes.**

21     Q    At any point, did Ms. Sherrill say that she

1    was afraid of the police at any time?

2        **A      Any time up until this point?**

3        Q      Any time during your encounter with Ms.

4    Sherrill on this particular night, did she say that she

5    was afraid of the police?

6        **A      After where we were at, yes.**

7        Q      So after the use of force, that's the first

8    time you heard her say that she was afraid of the

9    police?

10       **A      Correct.**

11       Q      Can we agree that a pursuit, a vehicle

12   pursuit is a dangerous activity?

13       **A      Correct.**

14       Q      Can we agree that it exposes the

15   participants to substantial risk of injury?

16       **A      Correct.**

17       Q      Prior to you engaging in the pursuit of Ms.

18   Sherrill, did you resolve any doubt that the pursuit

19   was appropriate?

20       **A      Could you restate that, please?**

21       Q      Is it your understanding that based on your

1    training and experience, you are required as a Cecil

2    County police officer, Cecil County sheriff to resolve

3    any doubt that a pursuit is necessary prior to engaging

4    in a pursuit?

5        **A    At that point in the evening, the pursuit**

6    **was necessary.  We had not identified the suspect.  We**

7    **had not identified her intentions.  We had not**

8    **identified if there was criminal activity.  We have not**

9    **identified anything at that point.**

10       Q    Did you base your pursuit decision on what

11   you knew about Ms. Sherrill?

12       **A    I knew nothing about Ms. Sherrill at this**

13   **point.  At that point.**

14       Q    So at the time you decided to pursue Ms.

15   Sherrill, you didn't know anything about her?

16       **A    Correct.**

17       Q    Did you determine whether the danger to the

18   public outweighs an immediate danger -- excuse me.  Let

19   me rephrase that question.  Excuse me.

20            Prior to engaging in the pursuit, did you

21   see Ms. Sherrill reaching for a weapon?

1      A      No, I could not see her hands.

2      Q      Did you see any weapons in her vehicle?

3      A      No.

4      Q      Did you have any information that Ms.

5  Sherrill was armed?

6      A      No.

7      Q      Did you have any information that she had

8  ever hurt any person in her life?

9      A      No.

10     Q      Did you have any information that Ms.

11  Sherrill was wanted for any crime?

12     A      No.

13     Q      Did you have any information that she had

14  committed any more crime in the past?

15     A      No.

16     Q      What information did you have that Ms.

17  Sherrill posed a danger to the public prior to engaging

18  in the pursuit?

19         A      Her fleeing from a traffic stop at a high

20  rate of speed, her driving habits at that point after

21  fleeing the traffic stop, it posed a danger.

1    Q    So other than the response that you just

2    gave, was there any other information that you have,

3    that you had that Ms. Sherrill posed a danger to the

4    public prior to engaging in the pursuit?

5    A    No.

6    Q    Now, when you decided to engage in the

7    pursuit, this was on the same street where you say you

8    couldn't see inside the vehicle with a flashlight?

9    A    Correct.

10   Q    So the visibility in the location where you

11   decided to engage in the pursuit, there was poor

12   visibility there?

13   A    My visibility is not why I could not see

14   into the vehicle.

15   Q    The seriousness of the crime for which he

16   was being pursued, what crime was she being pursued

17   for?

18   A    At that point, it was nothing.  It was a

19   traffic violation and then it was fleeing and alluding

20   and failing to comply and obstructing and hindering.

21   Q    Can we agree that verbal communication

1    during a pursuit is of the utmost importance?

2         **A    Between who?**

3         Q    I'm going to make a statement.  Tell me if

4    you ever heard this statement or seen it at any point

5    during your career as a Cecil County sheriff.

6              "Verbal communication during a pursuit is of

7    utmost importance."  Have you ever heard that statement

8    before?

9         **A    I would say communications as far as over**

10   **the radio, yes.**

11        Q    Did you notify Dispatch of the pursuit?

12        **A    Yes.**

13        Q    Did you notify them of the location of the

14   pursuit?

15        **A    Yes.**

16        Q    Direction of travel?

17        **A    Yes.**

18        Q    Reason for the pursuit?

19        **A    I believe I did.  Yes.**

20        Q    And what's your belief based on?

21        **A    My memory, I believe I did.  I'd have to --**

1    like I said, it's been three and a half years, but I

2    believe I did.  Yes.

3         Q    And did you tell Dispatch the number of

4    passengers that were in the vehicle?

5         A    No.

6         Q    Did you check the registration through NCIC?

7         A    No.

8         Q    Did you check the registered owner's

9    information for any outstanding warrants?

10        A    No.

11        Q    Is it the policy of Cecil County Sheriff's

12   Office to use the minimal amount of force necessary to

13   effect an arrest and overcome any resistance?

14        A    Correct.

15        Q    How did Ms. Sherrill's elbow get injured, if

16   you know?

17        A    I do not know.

18        Q    Do you claim that it didn't happen during

19   this traffic stop?

20        A    I never made that claim.

21        Q    I'm asking you now.

1        **A      No, I do not.**

2        Q      Do you know whether you caused the injury to

3    her elbow?

4        **A      I do not.**

5        Q      Do you know whether Corporal Pristash caused

6    the injury?

7        **A      I do not.**

8        Q      Do you know that she started complaining

9    about pain to her elbow after the use of force?

10       **A      Yes, I do.**

11       Q      How much time passed between the use of

12   force pulling her out of the car and her starting to

13   complain?

14       **A      I don't recall the exact amount of time.**

15       Q      Did she seem genuine when she was

16   complaining about the pain?

17              MR. KARPINSKI:   Objection.   You may answer

18   if you can.

19       **A      I don't recall how genuine the response was.**

20   **I recall that any time a subject complains of pain**

21   **after a use of force incident, they are always afforded**

Case 1:18-cv-00476-JKB   Document 56-2   Filed 08/02/19   Page 93 of 112

Deposition of Deputy Joseph Cunningham                    Talatha Sherrill v. Deputy Joseph Cunningham, et al.

1    **medical treatment.**

2         Q    Did it look like she was making it up to

3    you?

4         **A    I don't recall judging that.**

5         Q    Did she cry?

6         **A    I don't recall.**

7         Q    Do you recall that she was placed in a sling

8    later that night?

9         **A    Yes.**

10         Q    Tell us about the vehicle searches.  Is it

11    your understanding that any time you stop a vehicle or

12    you arrest the driver, you're supposed to do a search

13    of the vehicle?

14         **A    No.**

15         Q    Tell us about your understanding of how a

16    vehicle search -- when a vehicle search is supposed to

17    happen.

18         **A    A vehicle search is done either by probable**

19    **cause or if the vehicle is going to be towed, it is**

20    **done -- an inventory search is completed prior to the**

21    **tow.**

1    Q    Is it your understanding that there is a

2  general order on inventory searches?

3         A    A general order?

4         Q    Is there a written policy on inventory

5  searches for the Cecil County Sheriff's Office?

6         A    There is not.

7         Q    Where is your training regarding inventory

8  searches?  Where does that come from?

9         A    Baltimore County Police Academy and as well

10  as in the unit I was in at the time, every vehicle that

11  we towed, an inventory search was completed.

12        Q    And was that inventory search conducted on

13  the scene, at an impound lot, or somewhere else?

14        A    On the scene, prior to the vehicle being

15  towed from the area.

16        Q    And who conducted it?

17        A    The stopping officer.

18        Q    In this case, did you search her vehicle for

19  weapons?

20        A    I did an inventory search of her vehicle

21  under the assumption the vehicle was to be towed.

1      Q      When you did an inventory search, what did

2   you find?

3      **A      I did not note anything of value or it would**

4   **have been noted in my report.**

5      **Q      Did you note any contraband?**

6      **A      No.**

7      **Q      Anything illegal at all?**

8      **A      No.**

9      Q      Who called the ambulance?

10      **A      I believe it was Sergeant Walmsley.**

11      Q      When the ambulance came, did you see the

12   paramedics with your own eyes?

13      **A      I saw the ambulance.  I did not specifically**

14   **remember any paramedics.**

15      Q      Did you see Corporal Pristash interact with

16   the paramedics?

17      **A      Not that I recall, no.**

18      Q      Did you interact with the paramedics?

19      **A      No.**

20      Q      Did you see Sergeant -- is it Walmsley?

21      **A      Walmsley.**

1     Q     Did you see Sergeant Walmsley interact with

2 the paramedics?

3     **A     Not personally.  No, I did not.**

4     Q     Do you have any information he interacted

5 with the paramedics?

6     **A     I don't recall if he did or not.**

7     Q     At the time of this stop, you had been

8 working for Cecil County for how long?

9     **A     I'd have to look exactly how long.  I'd say**

10 **between -- I'd say three years, four years.**

11     Q     What is the closest hospital to the location

12 of this stop?  What was the closest hospital?

13     **A     The closest hospital would be out of county,**

14 **which our ambulances don't transport to out of the**

15 **county unless it's a severe injury or it's something**

16 **that could be life-threatening if delayed.  They always**

17 **respond to Union Hospital in Elkton, which is in the**

18 **county.**

19     Q     So is it your testimony that the paramedics,

20 they made the decision to take her to Union Memorial?

21     **A     Union Hospital.**

1      Q     Union Hospital?

2      **A     Yes.  Correct.**

3      Q     It's your testimony they did?

4      **A     Yes.**

5      Q     And the Statement of Probable Cause in this

6  case, did you write it?

7      **A     Yes.**

8      Q     You had photographs that you took regarding

9  Ms. Sherrill in your phone; right?

10     **A     My work phone, yes.**

11     Q     Your work phone?

12     **A     Yes.  Correct.**

13     Q     How many photographs did you take?

14     **A     I don't recall the exact number.**

15     Q     What made you take photographs of Ms.

16  Sherrill?

17     **A     Because I was completing a use of force.**

18     Q     And when you took the photographs of Ms.

19  Sherrill, what did you do with them?

20     **A     They were emailed, printed and put with her**

21  **report.**

1      Q    And did you then -- was the phone destroyed?

2      **A    I was involved in a motor vehicle accident.**

3      Q    And what happened to the phone?

4      **A    After that, the phone was broken and sent**

5    **back to the Sheriff's Office for replacement.**

6      Q    Before sending the phone -- well, actually,

7    before the phone was destroyed during this traffic

8    accident, were all of the photographs of Ms. Sherrill

9    sent to your supervisor?

10     **A    Yes.**

11     Q    And which supervisor was that?

12     **A    That would have been Sergeant Walmsley.**

13     Q    Please give me a second.

14          Deputy, have you ever been sued before?

15     **A    No.**

16     Q    Have you ever been alleged to have used

17   excessive force before?

18     **A    No.**

19          MR. KARPINSKI:  Objection.  You may answer.

20          MR. DOWNS:  That's all I have.  Thank you

21   very much.

Deposition of Deputy Joseph Cunningham                Talatha Sherrill v. Deputy Joseph Cunningham, et al.

1          MR. KARPINSKI:  Okay.  Witness will read and

2   sign.

3          (Deposition concluded at 11:19 a.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

1                    CERTIFICATE OF DEPONENT

2

3          I hereby certify that I have read and

4     examined the foregoing transcript, and the same

5     is a true and accurate record of the testimony

6     given by me.

7              Any additions or corrections that I

8     feel are necessary, I will attach on a separate

9     sheet of paper to the original transcript.

10

11

12

13          _____

14              DEPUTY JOSEPH CUNNINGHAM

15

16

17          _____

18                    DATE

19

20

21

1    STATE OF MARYLAND )

2    COUNTY OF HARFORD )

3

4            I, Linda Bahur, a Notary Public of the State

5    of Maryland, do hereby certify that the above-captioned

6    proceeding took place before me at the time and place

7    herein set out.

8            I further certify that the proceeding was

9    recorded stenographically by me and this transcript is

10   a true record of the proceedings.

11           I further certify that I am not of counsel to

12   any of the parties, nor an employee of counsel, nor

13   related to any of the parties, nor in any way

14   interested in the outcome of this action.

15

16

17

18                    Linda M. Bahur

19                    My commission expires 8/27/2019

20

21   Dated:  April 17, 2019

## WORD INDEX

**< 0 >**
**0028** 22:9, *13*
**0039** 42:*12, 14*
**0040** 42:*14*

**< 1 >**
**1** 3:*10* 23:*10,*
*13* 26:2, *20*
**1:18-CV-00476-J**
**KB** 1:*5*
**100** 13:*19* 83:*4,*
*5*
**107** 1:*13*
**11:19** 99:*3*
**120** 2:*14*
**15** 13:*21* 15:*1*
**17** 101:*21*
**170** 7:*2*
**18** 58:*14, 16*
**1850** 2:*15*

**< 2 >**
**2** 3:*11* 7:*15, 17*
26:6, *9*
**20** 2:*5* 14:2, *13*
15:*4* 20:*21*
21:*1* 58:*14*
**200** 7:*16*
**2011** 9:*12*
10:*10*
**2016** 6:*21* 7:6,
*14* 15:*17*
**2019** 1:*11*
101:*19, 21*
**202** 6:*20*
**21201** 2:*7*
**21202** 2:*16*
**21921** 1:*14*
**222** 24:*15* 26:*3,*
*21*
**23** 3:*10*
**25** 13:*18, 20*
58:*16, 20*
**26** 3:*11*
**27** 101:*19*

**< 3 >**

**30** 58:*20*
**31-ish** 58:*20*

**< 4 >**
**4** 3:*5*
**410** 2:8, *17*
**4'10** 80:*19*
**462-4529** 2:*8*
**4-foot-10** 80:*20*
81:*6*

**< 7 >**
**727-5000** 2:*17*

**< 8 >**
**8** 1:*11* 101:*19*

**< 9 >**
**9:55** 1:*12*
**901** 2:*6*

**< A >**
**a.m** 1:*12* 99:*3*
**ability** 39:*7*
**able** 12:*21*
13:*3* 25:*8*
29:*11* 31:*2*
32:*16* 33:5, *8*
36:8, *10* 51:*19,*
*21* 52:*2* 57:*8,*
*15, 17, 21* 67:*20*
68:*13* 70:*13*
75:*2* 85:*8*
**abnormal** 81:*4*
**abnormally**
80:*17*
**above-captioned**
101:*5*
**abrupt** 62:*18,*
*21* 63:7, *10, 20*
**abruptly** 61:*4*
62:*13*
**academy** 10:*1,*
*3* 84:*12* 85:*11*
94:*9*
**accepted** 9:*19*
**access** 15:*13*
**accident** 67:*2*
98:2, *8*

**account** 82:*10*
83:*15*
**accurate** 9:*3, 15*
10:*11* 15:*16*
17:*4* 19:*12, 17*
26:*10* 29:*14*
36:*4* 39:*14*
45:*7* 51:*3, 8, 11*
52:*17* 54:*14*
55:*17* 57:*2*
59:*16* 61:*3*
62:*11, 16* 67:*9,*
*12* 72:*12* 73:*1*
74:*19* 81:*21*
100:*5*
**accurately** 37:*9*
48:*11*
**action** 101:*14*
**actions** 83:*21*
**activated** 27:*17*
28:6, *10*
**activating** 28:*4*
**activation** 27:*10*
**active** 72:*1, 3*
77:*19*
**actively** 72:*4, 14*
**activity** 86:*12*
87:*8*
**actual** 51:*2*
**additions** 100:*7*
**Affairs** 7:*19*
8:3, *8, 11*
**afforded** 92:*21*
**afraid** 41:*1, 9*
42:*19* 43:2, *9,*
*15, 17* 44:*3, 6,*
*10, 17* 45:8, *14*
83:*14* 86:*1, 5, 8*
**ago** 12:*13*
**agree** 16:*1*
21:*7* 44:*18, 20*
80:*16* 86:*11, 14*
89:*21*
**agreement**
44:*21*
**aim** 65:*4*
**air** 53:*6*
**aircraft** 15:*7*
**al** 1:*6*

**alcohol** 6:*6*
**alleged** 98:*16*
**allowed** 13:*9*
85:*9*
**alluding** 89:*19*
**ambulance** 95:9,
*11, 13*
**ambulances**
96:*14*
**amount** 13:*17*
19:*13* 41:*2*
57:8, *18* 59:*9,*
*10, 19* 74:4, *6*
78:*1* 91:*12*
92:*14*
**answer** 5:*17*
6:*3* 7:*20* 8:*4*
9:*4* 10:*20*
31:*12* 52:*20*
76:*14* 78:*16*
92:*17* 98:*19*
**Answers** 3:*10*
5:*7* 21:*17, 20*
23:*14, 20*
**apartment** 17:*1*
**Apartments**
16:*16, 18, 20*
**appear** 66:*7*
**appeared** 81:*20*
**applied** 8:*19*
9:*15* 10:*8, 11*
**apply** 9:*10*
**applying** 8:*20*
**approach** 30:*15,*
*20* 36:*18*
**approached**
16:7, *8* 30:*11*
33:*15* 34:*9*
36:*14* 37:*17*
65:*16* 66:*3*
71:*1*
**appropriate**
86:*19*
**approximate**
13:*2*
**Approximately**
7:*2* 9:*10* 20:*12*
37:*20* 38:*1*
58:*13, 19* 81:*6*

**April** 1:*11*
101:*21*
**area** 16:*15*
17:2, *3* 26:*10,*
*12, 19* 28:*14, 17*
32:*12, 15, 18, 21*
34:*6* 46:*4*
52:*16* 53:*6*
65:*3* 94:*15*
**arm** 68:2, *13*
69:8, *9* 71:*2*
73:9, *13* 75:*2*
76:*18, 21* 77:*3,*
*7, 10, 11* 78:*17,*
*19, 21* 79:3, *7, 8*
84:2, *12*
**armed** 70:*5*
76:*16, 17* 83:*9*
88:*5*
**arrest** 91:*13*
93:*12*
**aside** 41:*7*
**asked** 38:*14, 20*
39:*1* 46:9, *11,*
*14, 17, 17, 18*
47:2, *4*
**asking** 91:*21*
**assist** 85:*18*
**associated** 41:*8*
**assumption**
62:*3* 94:*21*
**Athletic** 7:8, *9*
**attach** 100:*8*
**Attached** 3:*8*
**attempt** 31:*15*
83:*3*
**attention** 16:*12*
70:*17*
**Average** 7:*6*
**aware** 42:*19*
43:*14* 44:8, *13,*
*16* 45:*10, 13*

**< B >**
**back** 6:*21* 7:*1,*
*5, 13, 13* 21:*9*
24:*3* 36:*10, 12,*
*15, 17* 50:*15*
60:*5* 68:*2*

Deposition of Deputy Joseph Cunningham                                    Talatha Sherrill v. Deputy Joseph Cunningham, et al.

76:*19*  85:*9*
98:*5*
**background**
10:*2*
**Bahur**  1:*14*, *21*
101:*4*, *18*
**Baltimore**  2:*7*,
*14*, *16*  94:*9*
**base**  87:*10*
**based**  44:*21*
45:*3*  56:*15*
86:*21*  90:*20*
**Bates**  22:*8*
**began**  63:*21*
**BEHALF**  2:*2*,
*11*
**belief**  56:*15*
90:*20*
**believe**  13:*13*
27:*20*  48:*4*, *15*,
*15*  56:*13*  61:*14*
68:*4*  70:*3*
75:*21*  79:*8*
82:*14*, *17*, *18*
84:*6*  85:*7*
90:*19*, *21*  91:*2*
95:*10*
**believed**  82:*16*,
*21*  83:*1*
**bench**  7:*10*
**better**  35:*20*
**bit**  25:*4*  41:*6*
**blocking**  34:*21*
**body**  75:*3*, *5*, *9*,
*11*, *14*  78:*3*, *9*,
*13*  79:*15*, *19*
80:*2*, *4*  82:*14*
84:*8*
**Boulevard**  1:*13*
**box**  42:*8*, *9*
43:*5*
**break**  5:*21*  6:*1*,
*4*
**bring**  22:*15*
**broken**  98:*4*
**brought**  22:*17*
41:*5*
**build**  7:*5*, *6*
**businesses**  28:*17*

**< C >**
**calculate**  50:*16*
**call**  53:*2*
**called**  4:*11*
9:*17*, *18*, *21*
16:*14*  42:*1*
53:*6*  95:*9*
**calling**  53:*7*, *8*
**capacity**  8:*15*
**car**  18:*19*  19:*5*,
*11*  20:*2*, *3*, *4*, *8*
29:*3*  30:*20*
31:*3*  33:*3*, *4*, *8*
49:*18*  56:*7*, *8*,
*12*  57:*4*  58:*2*, *4*,
*10*, *11*, *15*, *17*
59:*1*  63:*15*, *16*,
*17*, *20*  65:*13*
69:*1*, *11*, *14*, *16*
71:*8*, *13*  81:*13*
85:*19*  92:*12*
**career**  90:*5*
**carry**  50:*4*
**carrying**  50:*1*, *3*
**cars**  14:*9*
**case**  22:*17*
23:*14*  37:*13*
39:*12*  40:*2*, *4*
72:*14*  94:*18*
97:*6*
**catch**  18:*3*, *5*
**cause**  43:*20*
70:*3*  93:*19*
97:*5*
**caused**  69:*18*,
*19*  92:*2*, *5*
**Cecil**  1:*12*  6:*14*
8:*12*, *16*, *20*
11:*15*  37:*7*
42:*5*, *18*  45:*4*
87:*1*, *2*  90:*5*
91:*11*  94:*5*
96:*8*
**certain**  13:*19*
14:*8*  41:*2*
**certainty**  83:*4*, *5*
**CERTIFICATE**
100:*1*

**certification**
11:*2*, *6*, *8*, *14*, *18*
12:*1*, *9*  14:*10*
**certified**  10:*21*
11:*1*, *3*, *9*, *12*
14:*11*, *15*
**certify**  100:*3*
101:*5*, *8*, *11*
**change**  78:*2*
**changed**  77:*16*,
*19*  78:*6*
**Charles**  2:*5*
**chase**  53:*2*
**check**  91:*6*, *8*
**Chesapeake**
1:*13*
**Chevy**  16:*17*
**claim**  53:*1*, *4*
78:*2*  91:*18*, *20*
**claimed**  35:*14*
**clarification**
5:*15*
**clarify**  78:*4*
**class**  11:*19*
12:*7*
**clear**  50:*13*
72:*21*  74:*7*
**clearly**  40:*15*,
*16*  41:*4*, *5*  48:*2*
67:*20*
**close**  27:*5*, *6*
51:*1*, *2*, *5*  63:*3*,
*6*
**closest**  96:*11*,
*12*, *13*
**coat**  67:*19*, *20*
68:*1*, *2*, *2*, *5*, *6*, *8*,
*11*, *13*, *14*  69:*4*,
*7*, *8*, *9*  70:*10*, *16*
71:*1*, *2*, *17*  73:*1*,
*3*, *8*, *9*, *10*, *12*, *13*,
*16*  74:*20*  75:*7*,
*18*  81:*16*
**coffee**  6:*1*
**Colaresi**  2:*13*
**Collins**  2:*4*
**color**  16:*17*
**come**  36:*20*
46:*13*  70:*21*
80:*9*  94:*8*

**comes**  11:*6*
59:*2*
**coming**  16:*18*,
*19*  33:*2*  55:*14*
68:*12*
**command**  72:*11*
**commencing**
1:*12*
**commission**
101:*19*
**committed**
88:*14*
**committing**
53:*2*, *4*  70:*6*
**common**  20:*7*
**communicate**
39:*9*  41:*4*, *12*
**communication**
39:*10*  54:*4*, *9*
89:*21*  90:*6*
**communications**
90:*9*
**complain**  92:*13*
**complaining**
92:*8*, *16*
**complains**  92:*20*
**complaint**  8:*5*, *7*
**complete**  11:*20*
55:*15*
**completed**
93:*20*  94:*11*
**completely**
65:*16*  81:*14*
**completing**
97:*17*
**complex**  17:*2*
**complied**  43:*21*
**comply**  43:*19*
49:*4*, *6*  89:*20*
**complying**  27:*7*
69:*16*  71:*15*, *17*,
*19*
**concealed**  41:*14*
**concealing**  76:*4*,
*4*
**concluded**  99:*3*
**concrete**  84:*5*
**conditions**  24:*3*,
*5*
**conduct**  24:*16*

**conducted**
17:*15*  18:*2*
94:*12*, *16*
**conducting**  20:*3*
**confirm**  13:*5*
41:*3*
**confirmed**
14:*17*  15:*7*
70:*4*
**Conowingo**  63:*4*
**consideration**
82:*3*, *4*, *6*
**contact**  61:*4*, *8*,
*12*  62:*8*, *14*
85:*6*
**Continuing**  8:*2*
**continuously**
41:*16*
**contraband**  95:*5*
**control**  77:*20*,
*21*  78:*5*, *6*
**conversation**
21:*12*
**cooperating**
41:*16*
**coordinator**
12:*5*
**Corporal**  2:*20*
4:*10*, *21*  61:*9*,
*10*, *19*  62:*4*, *9*,
*11*, *16*, *21*  63:*19*
64:*10*  65:*11*
66:*2*, *13*, *20*
67:*1*, *6*, *16*  68:*7*,
*18*  69:*3*, *10*
70:*9*  71:*7*, *12*
72:*18*  73:*7*, *12*
74:*8*  79:*6*  84:*1*
85:*10*, *14*, *18*
92:*5*  95:*15*
**Corporate**  79:*13*
**correct**  5:*1*
22:*6*, *9*  29:*7*, *12*
32:*10*  39:*15*
43:*7*, *11*, *16*
44:*7*  51:*7*
62:*19*  63:*5*
65:*7*, *10*  69:*2*
70:*16*  72:*6*, *8*, *9*,
*13*  73:*2*, *5*

74:*21* 75:*15*, *16*
77:*4*, *17* 78:*11*
81:*18* 86:*10*, *13*,
*16* 87:*16* 89:*9*
91:*14* 97:*2*, *12*
**corrections**
100:*7*
**correctly** 15:*1*, *4*
**corroborate**
13:*16*
**counsel** 4:*21*
101:*11*, *12*
**County** 1:*12*
6:*14* 8:*12*, *17*,
*20* 11:*15* 37:*7*
42:*5*, *18* 45:*4*
87:*2*, *2* 90:*5*
91:*11* 94:*5*, *9*
96:*8*, *13*, *15*, *18*
101:*2*
**COURT** 1:*1*
48:*6*, *10*
**courtroom** 5:*8*
**cover** 23:*7*
**crime** 17:*2*, *3*
88:*11*, *14* 89:*15*,
*16*
**criminal** 87:*8*
**Cruze** 16:*17*
**cry** 93:*5*
**CUNNINGHAM**
1:*6*, *11* 3:*4* 4:*3*
6:*12* 23:*12*
37:*7* 100:*14*
**Currently** 6:*20*
**curse** 53:*14*
**curve** 24:*14*, *14*
**curves** 24:*10*,
*12*, *20* 25:*1*, *2*, *3*,
*5*

**< D >**
**danger** 87:*17*,
*18* 88:*17*, *21*
89:*3*
**dangerous** 32:*6*,
*8* 86:*12*
**dark** 24:*6* 25:*6*
31:*10*

**date** 22:*11*
100:*18*
**Dated** 101:*21*
**day** 15:*8*, *15*
16:*3* 19:*6*
21:*16* 44:*8*
50:*1*, *3*, *4* 57:*17*
59:*4* 60:*11*
74:*5*
**days** 9:*17*
**deception** 41:*13*,
*20*
**decided** 87:*14*
89:*6*, *11*
**decision** 87:*10*
96:*20*
**Defendants** 1:*7*
2:*11*
**define** 82:*4*
**definitively** 29:*3*
**Delaware** 11:*1*
**delayed** 96:*16*
**demeanor**
53:*10*, *11*
**Department** 9:*8*,
*20* 10:*9*, *12*, *13*
**depend** 58:*8*, *8*
**depending** 19:*5*
56:*19*
**depends** 57:*1*
58:*7*
**depiction** 26:*10*
**depicts** 36:*19*
**DEPONENT**
100:*1*
**deposition** 1:*10*
5:*3* 15:*21*
21:*11* 22:*16*, *20*
23:*13* 99:*3*
**depositions** 22:*2*
**DEPUTY** 1:*6*,
*10* 3:*4* 4:*3*, *10*,
*12*, *13*, *13* 23:*12*
37:*6* 42:*19*
98:*14* 100:*14*
**describe** 7:*5*
53:*9* 85:*4*
**description**
16:*16*

**destroyed** 98:*1*,
*7*
**detecting** 11:*10*
**determination**
31:*7*
**determine** 87:*17*
**determining**
31:*20*
**difference** 47:*6*
72:*1*
**different** 72:*7*
84:*17*
**difficult** 6:*8*
19:*10*, *13*, *17*, *21*
39:*9* 80:*5*
**difficulty** 71:*13*
**dim** 46:*4*
**direction** 13:*1*,
*1* 54:*15*, *18*, *21*
55:*9* 90:*16*
**discomforting**
41:*10*
**discussed** 67:*5*
**dispatch** 65:*14*
90:*11* 91:*3*
**distance** 18:*8*
19:*9* 25:*16*, *19*
50:*20* 56:*18*
63:*8*, *13*
**distances** 56:*16*
**distinctively**
83:*1*
**DISTRICT** 1:*1*,
*1*
**Division** 7:*19*
8:*9*
**document** 22:*8*
59:*13*, *15*, *18*
**documented**
12:*1* 52:*14*
55:*11* 59:*19*
80:*15*
**documents** 22:*5*
23:*4*, *5*
**doing** 24:*19*
29:*19* 31:*18*
40:*14* 66:*2*
67:*16*, *17* 79:*11*,
*16*

**door** 66:*4*, *6*, *7*,
*9*, *10*, *13*, *14*, *17*
67:*15*
**doubt** 86:*18*
87:*3*
**Dover** 9:*8* 10:*4*,
*9*, *11*, *12*
**DOWNS** 2:*3*, *4*
3:*5* 4:*7*, *15*
98:*20*
**drawn** 64:*19*
**drew** 16:*12*
**drive** 49:*18*
**driver** 30:*7*
35:*4* 93:*12*
**driver's** 29:*6*,
*16*, *18* 53:*16*, *19*
54:*1* 68:*17*, *20*
**driving** 31:*3*
61:*2* 64:*4*
88:*20*
**drove** 49:*18*
**drug** 17:*3*
**drugs** 6:*7*, *7*
17:*6*, *9*
**duly** 4:*4*

**< E >**
**earlier** 4:*14*
**ease** 83:*18*
**easy** 81:*11*
**effect** 91:*13*
**effective** 54:*4*, *9*
**effectively**
41:*12* 69:*15*
**eight-hour**
11:*19* 12:*6*, *7*
**either** 12:*21*
61:*14* 79:*20*
93:*18*
**elbow** 91:*15*
92:*3*, *9*
**Elkton** 1:*13*
96:*17*
**emailed** 97:*20*
**emergency**
27:*11*, *16*
**employee**
101:*12*

**employment**
9:*18*
**empty** 71:*4*
**encounter** 86:*3*
**enforcement**
8:*16*, *19*
**engage** 89:*6*, *11*
**engaging** 86:*17*
87:*3*, *20* 88:*17*
89:*4*
**enough,** 38:*12*
**ensure** 49:*2*
**equipment** 11:*3*,
*10*, *12* 27:*11*, *17*
**equipped** 15:*9*,
*11*
**error** 13:*9*, *12*
14:*19*
**escort** 84:*18*
**escorting** 72:*20*,
*21*
**ESQUIRE** 2:*3*,
*12*
**essentially** 82:*8*
85:*6*
**estimate** 13:*6*,
*15*, *21* 14:*2*
16:*9* 18:*12*, *14*,
*15* 19:*2*, *13*, *18*
20:*6*, *9* 50:*12*
51:*19*, *20* 52:*1*,
*3* 57:*3*, *5*, *8*, *15*,
*18* 59:*4*
**estimated** 14:*21*
15:*3*
**estimates** 14:*5*,
*16* 52:*2*
**estimating** 12:*17*
**et** 1:*6*
**evening** 37:*6*,
*15* 60:*2* 87:*5*
**event** 36:*21*
**exact** 13:*18*
18:*21* 21:*8*
25:*20* 27:*4*, *19*
38:*17* 47:*21*
48:*2*, *13*, *15*, *18*
49:*11* 51:*17*
52:*20* 55:*10*, *16*
56:*7*, *9*, *14* 58:*8*,

9 59:8 63:8, 13,
18 65:4 80:15
92:14 97:14
**exactly** 16:6
49:2, 3 50:20
74:4 81:15
96:9

**EXAMINATION**
4:7
**examined** 100:4
**excessive** 78:18
98:17
**excuse** 42:15
82:11 87:18, 19
**Exhibit** 3:9
23:10, 13 26:6,
9
**exited** 63:21
65:16
**experience**
43:16 45:4, 6
81:2 87:1
**expires** 101:19
**exposes** 86:14
**extract** 49:15,
20 50:8
**extracted** 49:7,
8, 12, 13
**eye** 50:13
**eyeball** 13:5
**Eyeballing**
12:17
**eyes** 12:4
16:19 70:11
84:1 95:12

**< F >**
**face** 31:17
34:13, 14, 15
35:6, 7, 8 84:4
**fact** 43:1
**failing** 89:20
**fair** 51:21 52:3
**fairly** 24:8
**far** 16:4, 6, 9
18:12, 15 38:6,
8, 12 52:6 54:4,
9 56:3 63:10
90:9

**Farms** 54:15,
19 55:4 61:15,
15 63:3, 4, 6
**farther** 39:2
**fast** 20:20
50:11
**fear** 41:2, 6, 7
42:8, 16 43:4,
20 83:15, 19
**fearful** 83:17, 21
**feasible** 20:2, 5,
9 32:13, 15
**feel** 100:8
**feet** 19:1, 4, 10,
11, 13 57:3, 6, 8
**female** 25:14
80:13 81:4
**file** 12:2, 2
**fill** 42:1
**find** 55:20, 21,
21 56:1 95:2
**fine** 4:12
**firearm** 76:4
**first** 6:10 13:6
16:5, 13 17:4, 9
18:17 19:2
20:12, 14, 17, 21
21:1 22:8
24:10, 15 27:13
37:2 52:16
68:16, 19 80:12
84:9 86:7
**Five** 6:16
18:19 19:5
56:8, 12, 17, 21
58:4, 7, 17
**Five-foot-eight**
6:18
**flashlight** 31:15
33:16, 19 34:1,
3, 7, 10, 10, 16,
18 35:5, 7, 8, 16,
18 36:1 37:1
45:18, 18 46:3
49:21, 21 89:8
**flat** 24:8, 9
**fled** 70:8
**flee** 28:10 45:8
**fleeing** 44:2
88:19, 21 89:19

**flight** 43:6
52:16
**focused** 70:18
79:16
**follow** 72:11
**follows** 4:6
**force** 23:8 40:7
74:4, 7 77:6, 9
78:1, 4, 5 80:11
86:7 91:12
92:9, 12, 21
97:17 98:17
**foregoing** 100:4
**forgive** 46:7
**form** 42:4, 6, 7,
8 43:4 44:1, 21
45:7, 10
**forms** 42:5
**four** 22:12
58:15 96:10
**free** 75:2
**frequency** 14:7
**front** 22:5, 10,
13 42:12 44:1
45:1 62:17
68:2
**further** 38:3
101:8, 11
**furtive** 76:2, 3

**< G >**
**gauge** 81:11, 12,
21
**general** 41:7
65:3 94:2, 3
**gentle** 73:21
77:12, 14 78:9,
13 79:1, 3
**gently** 73:18
74:8, 11, 15
76:7, 11 82:6
84:7
**genuine** 92:15,
19
**getting** 13:2
65:20 71:13
**give** 9:3, 4
10:17 51:21
52:3, 20 98:13

**given** 16:16
77:7, 12 100:6
**giving** 64:1, 12
**glare** 31:16
35:1, 12, 13, 15
36:1, 2, 4 45:19
**glass** 5:21 6:1
**gloves** 50:1, 3, 4,
5
**go** 10:2, 2 33:3
48:7
**goal** 32:9
**goes** 52:6 56:21
**going** 5:6 6:16
26:8 50:12
52:9 54:5 55:8
61:15, 18, 19
70:18 82:15, 19
83:2, 3, 16 90:3
93:19
**Good** 4:8, 9, 13
20:16 37:6, 14
81:12
**Google** 3:11
26:8
**gotten** 66:6
**grab** 5:21, 21
68:13
**grabbed** 73:8
85:14
**grabbing** 68:3,
7, 10 69:4, 6, 10
70:10 72:19
73:1, 3, 7
**gravel** 28:2
**grip** 75:2
**gripped** 67:18
**ground** 73:14,
15, 19 74:1, 9,
12, 16 76:7, 10
77:17 80:7
82:7 83:19
84:8, 8
**ground,** 73:17
**guard** 11:8
**gun** 30:12, 16,
17, 18 76:8, 11,
21 77:3, 6, 8, 8,
13 82:19, 20

**< H >**
**habits** 88:20
**half** 31:17, 18
91:1
**hand** 30:16, 17,
18 49:19 53:16
75:7, 10, 15
80:2, 3 81:16
85:6, 8, 9
**handcuffing**
84:18
**handcuffs** 74:3
**hands** 30:11, 12
31:18 34:16, 19,
19, 21 35:9, 11,
15 36:6, 7
40:14, 15, 17
50:10 64:15, 17
65:12 70:18, 20
71:2, 4, 5 74:17
75:5, 8, 10, 13,
16 76:2, 18
77:20 78:3, 9,
12 79:21 82:14
83:16, 18 85:7
88:1
**hands,** 65:12
**happen** 49:3, 5
91:18 93:17
**happened** 66:9
98:3
**happy** 5:16
**hard** 80:4
**HARFORD**
101:2
**harm** 70:6
**hear** 38:8 39:7,
19 40:10 54:8
64:2, 11
**heard** 38:11
39:15 86:8
90:4, 7
**hearing** 39:3, 4,
13 46:20
**height** 80:15
81:11, 15, 21
**help** 32:15
**helped** 36:1, 2

helping 85:16
hidden 41:14
high 16:17
  17:2, 3, 3, 14
  88:19
hills 24:7
hindering 89:20
hinders 39:10
hire 9:16 10:4
hired 9:13
  10:12, 15, 21
hit 77:16 84:8
hitting 85:1
holding 79:20,
  20, 21
hood 68:2
hospital 96:11,
  12, 13, 17, 21
  97:1
hour 13:21
  14:3 15:1, 4
houses 28:14
human 29:16,
  17
hundred 13:14
hurt 82:15, 19
  83:2 88:8

< I >
idea 44:16 74:3
identification
  23:11 26:7
identified 87:6,
  7, 8, 9
identify 29:2
illegal 95:7
illuminated
  34:6, 10
immediate
  87:18
immediately
  33:16, 18 35:5
  47:1 51:11
impacting 36:5
importance
  90:1, 7
important 31:19
impossible 27:5
  31:16

impound 94:13
improved 46:5
inch 37:21 38:2
incident 15:9,
  17, 20 16:4
  44:8 57:17
  59:5, 8 60:11
  66:21 67:7, 10
  72:16 92:21
incident, 15:15
INDEX 3:1
influence 6:6
information
  88:4, 7, 10, 13,
  16 89:2 91:9
  96:4
infraction 52:15
  53:1, 3
infractions 53:8
initial 16:10
  24:21 27:1
  28:11, 12 30:20
  33:13 38:16
  40:20 50:17
  51:6 52:4, 15
  53:9 54:13
  55:12, 13
initially 17:19
  19:8, 15, 19
  24:11 25:17, 18
  26:11, 14 27:2,
  12 28:15, 18, 20
  30:12 31:2, 9
  33:15 55:13
  69:10 70:9
injured 91:15
injury 69:19, 21
  70:3 86:15
  92:2, 6 96:15
inside 32:16
  35:9 46:4 65:8
  89:8
instructed 20:2,
  14
intent 70:5
  85:18
intentions 70:7
  87:7
interact 95:15,

18 96:1
interacted 96:4
interaction
  77:15
interested
  101:14
Internal 7:19
  8:3, 8, 11
Interrogatories
  3:10 21:18, 21
  23:14
intersection
  25:21 26:2, 4, 5,
  20 50:18
introduced 4:14
  37:4
inventory 93:20
  94:2, 4, 7, 11, 12,
  20 95:1
investigated
  7:18 8:8
investigations
  8:4
involve 85:1
involved 17:6, 8
  41:11 98:2

< J >
January 7:1
JASON 2:3
  4:15
jason@downscoll
  ins.com 2:9
job 10:6 41:21
join 61:21
joined 4:21
joint 84:20
Jonathan 2:20
JOSEPH 1:6,
  11 3:4 4:3
  6:12 100:14
judged 19:5
judging 93:4

< K >
Karp 2:13
KARPINSKI
  2:12, 13 7:20
  8:2 10:19
  26:16 31:11

76:13 78:15
  92:17 98:19
  99:1
keep 35:6
  50:13 56:20
KEVIN 2:12
kevin@bkcklaw.
  com 2:18
kill 83:3
kind 11:6
knew 80:9
  83:6 87:11, 12
knife 83:9
know 5:15, 16
  6:1 21:6, 8
  26:10 30:8, 20
  38:19 42:2
  46:17 48:8
  52:8 55:18, 20
  58:16, 20 59:16
  60:7, 8, 11, 20
  66:12, 16, 19
  67:3, 9 79:12
  87:15 91:16, 17
  92:2, 5, 8

< L >
lanes 61:16
laser 14:8
lasted 60:21
law 8:16, 19
lawyer 21:12, 13
leave 8:5, 7
leeway 75:8
left 27:20, 21
  79:8, 14 84:2
length 59:1
lengths 18:19
  19:5, 11 20:2, 3,
  4, 8 56:7, 8, 12
  57:14 58:3, 5,
  10, 15, 17 63:15,
  16, 17
level 77:15
  78:4, 5
license 53:16,
  19 54:2
LIDAR 11:9
  14:6, 6, 10, 15,

17 15:11
life 88:8
life-threatening
  96:16
light 50:19, 21,
  21 51:1
lighting 24:5
  25:6 31:13
  51:5
lights 51:3
likelihood
  69:19, 21
limit 13:4 21:8
Linda 1:14, 21
  101:4, 18
lines 83:20
lit 32:12, 14, 17,
  21 34:5 46:4
little 25:4 41:6
located 50:5
location 27:2, 4,
  14 31:9 50:7
  65:15, 19 89:10
  90:13 96:11
lock 19:11
  84:16
long 6:15
  12:13 60:3, 9,
  12, 16, 21 96:8,
  9
longer 78:13
look 7:9 12:14
  23:16, 16 26:9
  36:15, 17, 20
  42:11, 14 71:7,
  12 79:13 80:19
  93:2 96:9
looked 31:1
looking 36:12,
  19
looks 4:20
lot 32:21 33:3
  94:13
lower 31:17, 18
lowered 73:14,
  15, 17

< M >
ma'am 37:6
  47:19

making 32:*11*
61:*4* 62:*14*, *20*
93:*2*
male 25:*13*
maneuver
84:*12* 85:*4*, *8*,
*11*
manipulation
84:*15*, *21*
map 3:*11* 26:*8*,
*13* 27:*5*, *14*
margin 13:*9*, *12*
14:*19*
marked 23:*10*,
*13* 26:*6*, *9*
**MARYLAND**
1:*1*, *13* 9:*6*, *11*,
*20* 101:*1*, *5*
matching 21:*3*
matter 4:*16*
MD 2:*7*, *16*
mean 11:*5*
12:*20* 34:*5*
54:*7*, *8* 59:*21*
72:*18* 73:*18*
77:*10* 80:*13*
meant 8:*11*
medical 93:*1*
Memorial 96:*20*
memory 90:*21*
middle 6:*2*
miles 13:*21*
14:*3* 15:*1*, *4*
mind 83:*6*
minimal 91:*12*
mirror 29:*8*, *10*,
*11*, *12*
mom 81:*9*
Monday 1:*11*
morning 4:*8*, *9*,
*13* 21:*19* 22:*1*
53:*5*
mother 81:*3*, *6*
motor 98:*2*
move 34:*16*
54:*5* 75:*8*
moved 34:*18*
35:*5*, *7*
movement 76:*2*,
*3* 83:*17*

moves 25:*4*
78:*6*
moving 40:*13*
45:*18* 79:*14*
Muscular 7:*6*

**< N >**
Name 3:*3* 6:*11*
NCIC 91:*6*
near 30:*16*, *18*
51:*12*
necessary 74:*4*
87:*3*, *6* 91:*12*
100:*8*
need 5:*15*
needed 10:*1*, *2*
22:*17*
neglected 48:*5*
never 53:*18*, *21*
57:*5*, *7* 77:*20*
78:*6* 80:*8*, *14*
81:*10*, *13* 91:*20*
night 86:*4* 93:*8*
noncompliant
53:*11*
normal 37:*10*,
*10*, *12* 42:*6*, *7*
43:*19* 44:*2*, *4*
56:*16*, *16*, *18*, *19*
normally 43:*19*
59:*7*
Notary 1:*15*
101:*4*
note 95:*3*, *5*
noted 59:*20*
95:*4*
Notice 1:*10*
70:*14* 80:*7*
81:*9*
noticed 35:*8*
59:*10* 80:*10*, *12*,
*13* 81:*17*, *19*, *20*
notify 90:*11*, *13*
noting 80:*8*
number 11:*20*
12:*7* 13:*18*
18:*21* 19:*11*, *18*
20:*6* 21:*4*, *8*
25:*20* 38:*17*
56:*7*, *9*, *14* 58:*8*

63:*18* 91:*3*
97:*14*
numbers 22:*12*

**< O >**
oath 5:*7*, *8*, *11*
Objection 7:*20*
8:*2*, *3* 10:*19*
31:*11* 76:*13*
78:*15* 92:*17*
98:*19*
observations
12:*8*
observe 12:*21*
13:*3* 27:*9*
40:*15*, *16* 81:*14*
observed 11:*21*
13:*17* 17:*14*
24:*13*, *15* 27:*15*
obstructing
39:*6* 54:*11*
89:*20*
obviously 39:*8*
71:*16* 80:*14*
occupants 25:*8*
occurred 52:*15*
offer 9:*18* 10:*6*
offered 14:*9*
Office 1:*13*
6:*14* 8:*12*, *17*,
*21* 9:*18*, *19*
11:*15* 37:*7*
42:*5* 45:*4* 67:*4*
91:*12* 94:*5*
98:*5*
officer 8:*16*
10:*21* 32:*5*
41:*21* 43:*17*
71:*21* 72:*5*
87:*2* 94:*17*
offices 8:*20*
Okay 4:*17* 6:*5*,
*17* 7:*13*, *18* 9:*7*
11:*2* 12:*13*
13:*9* 14:*2* 15:*8*
20:*20* 21:*9*, *15*
27:*6* 28:*3*, *14*
32:*14* 41:*1*
63:*19* 99:*1*

Once 19:*9*
24:*19* 46:*17*, *19*
52:*13* 56:*6*
57:*5* 70:*21*
77:*16*, *18* 78:*2*
ones 9:*2*, *4*, *5*
one's 31:*20*
open 66:*4*, *6*, *7*,
*9*, *10*, *17* 67:*15*
opened 66:*13*,
*14*
operator 11:*9*
order 43:*19*, *20*
47:*7*, *18* 48:*21*
94:*2*, *3*
ordered 47:*4*,
*17* 48:*14*, *19*
ordering 47:*19*
76:*18*
orders 64:*1*, *12*
69:*16*
original 26:*19*
100:*9*
originally 24:*13*
26:*12*
outcome 101:*14*
outside 21:*14*
24:*6* 64:*11*
outstanding
91:*9*
outweighed 53:*7*
outweighs 87:*18*
overboard 78:*18*
overcome 91:*13*
Overweight 7:*7*
owner's 91:*8*

**< P >**
P.A 2:*4*, *13*
pace 17:*15*
18:*2*, *9*, *11* 20:*3*,
*3* 24:*16*, *17*, *19*,
*20*, *20* 52:*6*
56:*16*, *18* 58:*21*
pacing 19:*2*, *8*,
*15*, *20* 20:*17*
24:*4*, *11* 52:*4*
56:*4*, *16* 57:*3*,
*10*, *20* 58:*12*
59:*2* 61:*3*

Page 3:*3*, *9*
8:*12* 15:*18*
22:*8*, *12* 23:*8*,
*17*, *18* 42:*14*, *15*
pain 92:*9*, *16*, *20*
paper 100:*9*
paramedics
95:*12*, *14*, *16*, *18*
96:*2*, *5*, *19*
part 12:*16*, *16*
41:*21* 42:*4*
68:*1* 84:*8*
participants
86:*15*
particular
39:*12* 40:*4*, *5*
46:*1* 86:*4*
parties 41:*11*
101:*12*, *13*
passed 28:*3*
33:*10*, *12* 51:*15*
55:*12*, *15* 62:*4*
69:*9* 92:*11*
passenger 36:*8*
passengers 91:*4*
passing 33:*9*
passive 72:*1*, *7*,
*10*, *17* 74:*2*
77:*18*
passively 72:*15*
73:*4*, *6* 74:*2*
patrol 61:*4*, *7*,
*13* 63:*21*
paying 70:*17*
pen 27:*1*
people 28:*21*
36:*20* 39:*11*
42:*19* 43:*1*, *8*
44:*6* 45:*8*, *14*
69:*20* 74:*1*
percent 13:*14*,
*19* 83:*4*, *5*
perpendicular
62:*12*
person 25:*13*
29:*2*, *5*, *6*, *8*, *9*
30:*7*, *9* 31:*3*
35:*10* 43:*6*
44:*3* 50:*6*

69:*17*  70:*5, 5*
88:8
**personally** 96:*3*
**person's** 29:*12*
31:*10*  34:*13, 15,*
*16, 19*  35:*15*
**phone** 30:*3, 7, 9*
97:*9, 10, 11*
98:*1, 3, 4, 6, 7*
**photographs**
97:*8, 13, 15, 18*
98:8
**phrase** 15:*20*
**physical** 51:*3, 5*
77:*15*
**physically**
45:*21*  72:*4, 11*
73:*11*  74:*15*
76:*12*  82:*15*
**pinpoint** 27:*4*
**pinpointing** 14:*8*
**place** 25:*21*
67:*4*  76:*18*
101:*6, 6*
**placed** 73:*18*
74:*8, 11, 16, 17*
76:*6, 10*  83:*18*
84:*7*  93:*7*
**placing** 82:*6*
**Plaintiff** 1:*4*
2:*2*  4:*16*
**please** 6:*3*  37:*8*
47:*8, 10, 15*
86:*20*  98:*13*
**plenty** 75:*8*
**point** 5:*20*  8:*9*
20:*16*  21:*8*
42:*10*  46:*13*
49:*17*  50:*7, 14,*
*14*  52:*1*  53:*18,*
*21*  65:*4*  66:*3*
68:*4*  69:*17*
70:*4, 7*  71:*3*
73:*14*  78:*17*
80:*6, 7*  82:*1, 2*
83:*6, 16*  84:*4*
85:*7, 21*  86:*2*
87:*5, 9, 13, 13*
88:*20*  89:*18*
90:*4*

**pointed** 64:*21*
65:2
**pointing** 34:*6*
**points** 85:*1*
**Police** 9:*6, 8, 11,*
*20*  10:*4, 9, 12,*
*13, 21*  12:*2*
22:*4*  32:*5*
41:*21*  42:*9, 16,*
*20*  43:*2, 9, 10,*
*15, 17, 17, 20*
44:*3, 10, 17*
45:*8, 15*  71:*21*
72:*5*  86:*1, 5, 9*
87:*2*  94:*9*
**police,** 43:*5*
**policy** 91:*11*
94:*4*
**poor** 89:*11*
**posed** 88:*17, 21*
89:*3*
**position** 24:*17*
**positively** 13:*3*
**possibilities**
44:*15*  45:*7*
**possibility**
44:*11, 13, 14, 18,*
*19, 21*  45:*14*
76:*9, 15*  77:*1, 2,*
*6, 13*  82:*16, 18,*
*18*  83:*1, 7, 8, 9,*
*11, 13*
**possible** 32:*9,*
*12*  44:*4, 5*  51:*3,*
*6*  75:*19*
**Possibly** 32:*4*
55:*11*
**posted** 13:*4*
21:*7*
**potential** 45:*13*
**pounds** 6:*20*
7:*2*
**practice** 20:*7*
35:*6*
**precise** 14:*8*
**prefer** 4:*11*
**preparation**
22:*16*
**prepare** 21:*10*
**preparing** 27:*16*

**prescribed**
11:*20*  12:*7*
**prescription** 6:*7*
**present** 2:*20*
**pressure** 85:*1*
**pretty** 7:*9*  31:*5*
37:*9*  51:*10*
**prevented** 45:*17*
**printed** 97:*20*
**prior** 8:*20*
23:*20*  25:*16*
26:*5, 20*  27:*8,*
*11, 12*  45:*10, 15*
50:*21*  52:*4*
61:*14*  81:*16*
82:*6*  86:*17*
87:*3, 20*  88:*17*
89:*4*  93:*20*
94:*14*
**Pristash** 2:*20*
4:*21*  61:*9, 10,*
*19*  62:*5, 21*
63:*19*  64:*10*
65:*11*  66:*2, 13,*
*20*  67:*1, 7, 16*
68:*7, 19*  69:*3,*
*10*  70:*9*  71:*7,*
*12*  72:*19*  73:*7,*
*12*  74:*8*  79:*6,*
*13*  84:*2*  85:*10,*
*14, 19*  92:*5*
95:*15*
**Pristash's** 62:*9,*
*11, 16*
**probable** 93:*18*
97:*5*
**probably** 55:*20*
56:*2*
**proceeding**
101:*6, 8*
**proceedings**
101:*10*
**processes** 9:*9*
**Professional**
1:*14*
**Public** 1:*15*
87:*18*  88:*17*
89:*4*  101:*4*
**puffy** 68:*5, 5*

**pull** 26:*1*  33:*16*
79:*3*
**pulled** 28:*1*
33:*18*  50:*11*
54:*13*  55:*13*
61:*13, 13*  62:*21*
78:*17, 19, 21*
**pulling** 51:*15*
62:*5*  76:*17, 20*
77:*3, 7, 9, 10, 11*
79:*7*  85:*19*
92:*12*
**pulls** 51:*8, 10*
55:*14*
**purposely** 73:*21*
**Pursuant** 1:*10*
**pursue** 87:*14*
**pursued** 89:*16,*
*16*
**pursuit** 40:*7*
42:*2*  53:*3, 5, 7*
60:*1, 3, 9, 12, 16,*
*21*  61:*21*  86:*11,*
*12, 17, 18*  87:*3,*
*4, 5, 10, 20*
88:*18*  89:*4, 7,*
*11*  90:*1, 6, 11,*
*14, 18*
**put** 7:*3*  40:*11*
49:*17*  75:*2, 5,*
*10, 13*  78:*8, 12*
82:*13*  97:*20*
**putting** 50:*10*
78:*3*  81:*16*

**< Q >**
**quarter** 37:*20*
38:*2*
**question** 5:*14,*
*17, 18*  6:*3, 3*
55:*1*  82:*12*
87:*19*
**questions** 5:*6,*
*11*  8:*3*
**quite** 7:*11*
75:*19*

**< R >**
**radar** 11:*3, 7, 8,*
*9, 11, 12, 18, 21*

12:*9, 16*  13:*7,*
*16*  15:*9*
**radio** 14:*7*
52:*21, 21*  53:*3*
56:*2*  62:*1*
65:*19*  90:*10*
**radioed** 65:*14*
**radioing** 65:*18*
**ran** 43:*6*
**rate** 16:*18*
17:*14*  88:*20*
**reached** 33:*20*
51:*13*  67:*18*
**reaching** 29:*21*
51:*16*  87:*21*
**read** 22:*21*
99:*1*  100:*3*
**reason** 10:*17*
32:*17, 19, 20*
43:*6, 6, 14*  46:*1*
51:*1, 4*  90:*18*
**recall** 11:*13*
12:*14*  13:*13*
14:*1, 4, 4, 20*
16:*6*  18:*7, 10,*
*20*  20:*15*  25:*20*
28:*5*  30:*14*
32:*1*  33:*14*
36:*12, 16, 21*
38:*17, 21*  40:*11,*
*12*  42:*10*  46:*11*
48:*18*  50:*20*
51:*17*  52:*10*
55:*10, 16, 19*
56:*9*  59:*3, 6, 7,*
*13*  60:*18*  62:*7*
63:*8, 13, 15, 18*
64:*9, 18*  65:*21*
66:*8, 8*  67:*4, 8*
69:*12*  71:*10, 11*
74:*14*  84:*10*
92:*14, 19, 20*
93:*4, 6, 7*  95:*17*
96:*6*  97:*14*
**receive** 11:*14,*
*17*  12:*8*
**received** 38:*7*
**recognize** 32:*6*
**record** 4:*15, 20*
12:*15*  23:*3*

60:*14*  100:*5*
101:*10*
**recorded**  58:*1*,
*2*  59:*9*, *11*
101:*9*
**redo**  10:*2*
**refer**  18:*16*
21:*2*, *4*  22:*17*
27:*19*  38:*18*
52:*5*, *13*  56:*6*,
*13*  59:*12*  60:*5*,
*19*
**referring**  15:*21*
56:*10*
**reflected**  23:*18*
**reflection**  29:*12*,
*14*
**refresh**  10:*2*
**refuses**  72:*11*
**refusing**  41:*11*
43:*13*
**regarding**  8:*3*
94:*7*  97:*8*
**Registered**  1:*14*
91:*8*
**registration**
53:*20*  54:*2*
91:*6*
**reintroduced**
49:*1*
**related**  101:*13*
**relation**  61:*11*
**remember**  9:*4*,
*5*, *9*  13:*11*, *18*
14:*21*  15:*3*
18:*17*  21:*6*
37:*9*, *13*, *14*
39:*3*, *4*  46:*8*, *20*
48:*2*  49:*11*, *13*
52:*18*  56:*11*
60:*6*  67:*13*, *14*
95:*14*
**remembered**
48:*13*
**rephrase**  5:*16*
54:*20*  87:*19*
**replacement**
98:*5*
**report**  18:*16*, *21*
21:*2*, *4*  23:*4*, *6*,

*7*, *8*, *8*  27:*19*
32:*3*  38:*18*
40:*6*, *7*, *7*  52:*5*,
*7*, *9*, *14*  55:*17*
56:*7*  59:*12*, *13*,
*15*, *18*  60:*5*
95:*4*  97:*21*
**REPORTED**
1:*21*
**Reporter**  1:*15*
48:*6*, *10*
**reports**  22:*4*
40:*3*, *8*, *9*
**represent**  4:*15*
**request**  6:*2*
47:*6*, *8*
**requested**  38:*13*
46:*12*
**requesting**
37:*15*  43:*18*
**require**  32:*15*
**required**  87:*1*
**requires**  42:*1*
**resist**  72:*12*
**resistance**  72:*1*,
*3*, *7*, *10*  74:*2*
77:*18*  80:*1*
91:*13*
**resisting**  72:*15*
73:*4*, *7*  74:*2*
81:*12*
**resists**  72:*5*
**resolve**  86:*18*
87:*2*
**resolved**  54:*4*, *7*
**respond**  48:*17*
76:*12*  96:*17*
**response**  38:*6*
39:*2*  44:*2*, *4*
89:*1*  92:*19*
**restate**  86:*20*
**restroom**  5:*21*
**review**  21:*17*
23:*20*  42:*2*
**reviewed**  22:*3*,
*19*, *21*
**right**  4:*13*, *18*
6:*4*, *10*, *17*  19:*1*,
*12*  20:*11*, *11*
21:*5*  22:*4*, *10*,

*12*  23:*2*, *9*, *14*
24:*15*  26:*14*
28:*1*  32:*6*, *16*
34:*7*  38:*19*
40:*18*  41:*7*
42:*2*, *9*, *10*, *12*
46:*7*  48:*3*
50:*18*, *18*, *18*
51:*6*, *10*, *12*, *14*
52:*17*  60:*8*, *20*
66:*12*  68:*13*
69:*4*, *6*, *8*, *9*
71:*2*  72:*3*, *17*,
*18*  73:*8*, *13*
74:*19*  75:*2*, *6*
78:*14*  79:*5*, *7*,
*18*  84:*12*  85:*5*,
*8*  97:*9*
**risk**  86:*15*
**River**  26:*21*
**road**  24:*3*, *5*, *9*
25:*4*  26:*21*
43:*12*  54:*18*
63:*4*
**road's**  24:*8*
**roadway**  61:*14*
62:*5*  63:*1*
**role**  42:*18*
**roll**  37:*8*, *15*
38:*2*, *13*, *15*
39:*1*  41:*11*
43:*13*, *18*  46:*12*
**rolled**  31:*14*
37:*16*
**room**  5:*1*
**Roughly**  80:*21*
**round**  57:*10*, *19*
58:*12*  61:*3*
**Route**  26:*2*, *20*,
*21*
**Royal**  54:*15*, *19*
55:*4*  61:*14*, *15*
63:*3*, *4*, *6*
**RPR**  1:*21*
**run**  28:*9*  43:*8*
44:*6*  45:*14*
**running**  44:*2*, *9*

**< S >**

**safe**  25:*21*  32:*9*,
*11*  41:*3*  80:*10*
**safety**  54:*5*
**sat**  5:*3*
**saw**  16:*5*, *10*, *13*
17:*4*, *9*, *11*, *12*,
*17*  20:*13*, *14*, *21*
21:*20*  24:*11*
25:*18*  26:*11*, *12*
29:*5*  50:*14*
67:*15*  68:*7*, *10*,
*19*  70:*9*  81:*8*
84:*6*  95:*13*
**saying**  37:*14*
39:*16*, *19*  40:*10*
49:*13*  64:*14*
**says**  42:*8*  43:*4*
**scenario**  56:*20*
**scene**  67:*2*, *3*
94:*13*, *14*
**Schoolhouse**
16:*15*
**scope**  21:*14*
**scream**  53:*12*
**screamed**  49:*17*
**search**  93:*12*,
*16*, *16*, *18*, *20*
94:*11*, *12*, *18*, *20*
95:*1*
**searches**  93:*10*
94:*2*, *5*, *8*
**seat**  29:*6*, *16*, *18*
36:*15*, *17*
**second**  49:*1*
52:*16*  53:*2*
56:*4*  57:*2*, *9*, *19*
58:*12*  59:*1*
61:*3*  98:*13*
**section**  43:*5*
**secured**  80:*9*
**see**  16:*19*  25:*8*
26:*17*  28:*21*
29:*8*, *9*, *11*, *11*,
*19*, *21*  30:*3*
31:*2*, *4*, *5*, *10*, *16*,
*17*, *18*  32:*16*
33:*1*, *5*, *8*, *10*
34:*13*, *14*, *15*, *16*,
*18*, *19*  35:*9*, *11*,
*14*  36:*6*, *7*, *8*, *10*

41:*4*  59:*12*
63:*19*  66:*10*, *15*
67:*16*, *16*, *20*
70:*10*, *13*, *15*, *16*,
*20*  71:*2*, *4*  81:*4*
84:*1*, *4*  85:*10*,
*12*  87:*21*  88:*1*,
*2*  89:*8*, *13*
95:*11*, *15*, *20*
96:*1*
**seeing**  70:*18*
**seen**  12:*4*  42:*9*
75:*14*  90:*4*
**sending**  98:*6*
**sense**  5:*9*, *15*, *18*
**sent**  98:*4*, *9*
**separate**  100:*8*
**Sergeant**  95:*10*,
*20*  96:*1*  98:*12*
**seriousness**
89:*15*
**served**  8:*15*
**set**  16:*15*  22:*2*,
*20*  101:*7*
**severe**  96:*15*
**sheet**  100:*9*
**sheriff**  42:*18*,
*19*  87:*2*  90:*5*
**Sheriff's**  1:*12*
6:*14*  8:*12*, *17*,
*20*  9:*17*, *19*
11:*15*  37:*7*
42:*5*  45:*4*
91:*11*  94:*5*
98:*5*
**SHERRILL**  1:*3*
4:*16*  15:*17*
24:*4*, *11*, *12*, *13*,
*21*  27:*9*  28:*4*,
*15*  33:*21*  37:*3*
39:*13*  40:*9*
41:*9*  43:*13*
44:*9*  45:*11*, *15*
52:*4*, *18*  55:*3*, *3*,
*14*  61:*2*  62:*20*
65:*8*  66:*5*, *13*
68:*8*, *16*, *19*
69:*11*  70:*10*
71:*8*, *13*, *15*
72:*14*, *19*  73:*4*,

6, 12  74:8  75:1,
20  76:7  77:16
79:14  80:6, 16
81:8  82:13
85:15, 19, 21
86:4, 18  87:11,
12, 15, 21  88:5,
11, 17  89:3
97:9, 16, 19
98:8
**Sherrill's** 16:4,
8, 13  17:5, 17,
21  19:7, 14, 19
20:13, 17, 21
25:17  26:11
27:3, 13  33:6
53:10  56:3
57:4, 9, 19
58:11  59:1
61:11  62:5, 8,
12, 13, 17, 18
63:7, 9, 12, 20
65:6  70:16
79:19  80:12
82:2, 5  84:2, 4,
12  85:5  91:15
**shine** 34:10
**shining** 34:15
**shooting** 76:2
**shoulder** 28:2
**show** 26:8
64:15, 16  65:11,
12
**showing** 23:12
**sick** 8:5, 7
**side** 28:2  35:1
36:8  43:12
68:15, 17, 18, 20,
21  69:6  73:8,
13  74:20  75:6
79:12, 15, 18
**sign** 41:12, 13,
18  51:12, 16
52:11, 19  99:2
**signal** 27:20
28:1  51:13
**signals** 27:9, 15,
18
**signature** 23:17

**significance**
17:1
**significant** 25:1,
2, 5
**signing** 23:21
**silhouette** 29:15,
17, 19, 21  30:3
**silver** 16:17
**simply** 72:10
**sir** 48:12  49:10
**sirens** 28:4, 6,
10
**sit** 20:11  21:5
38:19  52:17
60:8, 20  66:12
**sitting** 22:5, 9
28:21  29:6, 18
**situation** 54:3
56:20  57:1
58:9  80:10
**six** 6:16  56:21
**size** 31:10, 20
70:13, 14, 16, 17
80:7, 8, 8, 12, 15
81:3, 9, 18  82:3,
5
**slam** 74:1
**slight** 71:18, 19
**slightly** 80:5, 14
**slim** 7:6
**sling** 93:7
**slowed** 24:14
**small** 31:6
80:17  81:2
84:19
**smaller** 80:14
81:20  82:8
**somebody** 76:3
**someone's** 35:7
**sort** 33:8  44:2
73:18
**sounds** 72:4
**space** 42:15
**speak** 65:4
79:11
**Speaking** 11:2
52:2
**specific** 36:21
52:6

**specifically**
37:13  39:3
40:11  49:13
52:14  57:14
76:16  95:13
**specifics** 22:18
**sped** 18:5
**speed** 11:9
12:17, 18  13:2,
4  16:18  17:14
18:3, 9  21:3, 7
28:7  50:14, 16
88:20
**spoke** 67:10, 13
**spot** 10:1, 3
**stage** 54:6
**stamp** 22:11
**stamped** 22:9
**standing** 50:15
81:10, 11, 14
**start** 11:11
18:9, 11  24:20
82:12
**started** 19:2, 8,
15, 20  20:17
24:11, 19  35:3
56:4  67:19
76:17, 20  77:3
78:2  92:8
**starting** 66:4
70:21  92:12
**State** 9:6, 11, 20
101:1, 4
**stated** 39:5
**statement** 37:11
90:3, 4, 7  97:5
**STATES** 1:1
**stature** 31:6, 20
80:10  81:2, 4
**stayed** 77:20
**stenographically**
101:9
**step** 21:9  47:8,
10, 15, 19
**stepping** 71:18
**stock** 42:4
**stop** 24:21
26:4, 14, 18, 19,
19  27:2, 8, 16
28:11, 12  32:11,

12, 17  33:4, 13
38:16  39:9, 20
40:5, 20  41:3, 6,
8, 15, 17  45:19
48:9  50:17
51:6, 12, 16
52:4, 11, 11, 16,
16, 19  53:9
54:5, 6, 14
55:14, 15  62:18,
21  63:7, 10, 20
70:8  88:19, 21
91:19  93:11
96:7, 12
**stopped** 25:11,
14, 18  26:16
27:2, 14  28:15,
18, 20  31:9
33:6  45:21
52:18  61:4
62:13  64:6
65:15, 19
**stopping** 25:17
27:11, 12  28:4
30:6  32:14
39:13  45:11, 15
62:6  94:17
**stops** 11:21
13:17  32:5, 8
**Street** 2:5, 14
89:7
**strike** 82:11
**striking** 77:11
**strong** 7:9
**struggle** 71:19
**struggled** 66:7
**struggling** 71:8,
10
**subject** 67:18
71:19  92:20
**subsequent**
23:4, 5
**substantial** 82:8
86:15
**sued** 98:14
**Suite** 2:6, 15
**supervisor** 98:9,
11
**supposed** 93:12,
16

**sure** 20:10
25:4  54:20
60:15
**surroundings**
33:1, 5
**suspect** 18:20
21:3  66:5  70:1,
2  72:4, 10  74:3
87:6
**suspected** 16:7
61:21
**Susquehanna**
26:21
**sworn** 4:4
**system** 23:7

**< T >**
**take** 5:21  6:1,
4  11:19  12:13
16:3  18:6  21:9
23:16  24:14
26:9  42:14
48:10  82:2, 5
83:15, 17, 19, 20
96:20  97:13, 15
**taken** 1:11
69:11  82:10
**TALATHA** 1:3
4:16  15:17
**talk** 48:7, 8, 11
67:1, 6  74:6
83:8
**talking** 15:16
35:4  39:18
40:9, 13  54:21
63:4  66:20
72:16
**tall** 6:17
**target** 33:4
**taught** 84:11
85:11
**technique** 84:14,
18, 19
**techniques**
77:20, 21  78:5,
7  84:11
**tell** 4:4  7:11
9:5  10:15  11:5
12:20  18:17
21:11, 13  23:17

CRC Salomon, Inc.
Office (410) 821-4888
www.crcsalomon.com - info@crcsalomon.com
2201 Old Court Road, Baltimore, MD 21208
Page: 9
Facsimile (410) 821-4889

24:*3*, *4*   25:*13*
42:*15*   49:*5*
51:*18*   57:*14*
61:*19*   70:*7*
90:*3*   91:*3*
93:*10*, *15*
**telling**   37:*14*
**test**   11:*20*
12:*10*, *11*, *12*, *13*
13:*5*
**testified**   4:*5*
35:*11*
**testify**   6:*8*   46:*8*
**testimony**   31:*8*
35:*21*   39:*18*
69:*3*, *13*   70:*15*
74:*7*   75:*1*   76:*6*
78:*10*   81:*1*, *17*
96:*19*   97:*3*
100:*5*
**testing**   12:*16*
13:*10*
**Thank**   4:*8*
24:*2*   27:*8*
98:*20*
**these,**   23:*2*
**thing**   6:*2*   37:*2*
48:*10*   84:*16*
**things**   32:*21*
33:*2*, *3*   39:*16*,
21, 21   48:*6*
**think**   17:*8*
30:*6*   75:*17*
**thought**   17:*5*
30:*8*   76:*7*, *9*, *11*,
15, 16, 21   77:*1*,
2, 5, 7, 12   82:*20*
**threat**   41:*5*
**threaten**   40:*19*
**three**   18:*19*
19:*5*   40:*8*   56:*8*,
11, 17, 21   58:*4*,
7, 10, 13   91:*1*
96:*10*
**three-plus**   60:*7*
**time**   9:*9*   11:*1*
14:*13*, *14*   15:*20*
16:*5*, *10*, *13*
17:*15*   18:*6*, *12*
19:*15*, *19*   21:*20*

22:*2*, *19*, *20*
24:*6*, *18*   25:*18*
27:*13*, *21*   28:*3*,
13   30:*19*   31:*14*,
19   35:*10*, *20*
36:*16*   39:*1*, *5*, *7*
44:*12*   46:*6*
48:*18*   49:*1*
51:*15*, *17*, *20*
52:*3*, *10*, *15*
55:*3*, *12*, *15*, *16*,
19, 20   56:*1*, *5*, *9*
57:*4*, *11*, *13*, *16*
58:*21*   59:*1*, *4*,
10, 10, 14, 19, 20
60:*6*, *16*, *18*
61:*17*   62:*4*, *13*
63:*14*   64:*4*, *6*,
18   65:*9*, *12*, *13*,
20   69:*9*   70:*14*,
19   72:*16*   74:*14*
79:*12*, *17*   80:*12*
82:*15*   83:*2*, *3*, *6*
84:*10*   85:*15*
86:*1*, *2*, *3*, *8*
87:*14*   92:*11*, *14*,
20   93:*11*   94:*10*
96:*7*   101:*6*
**times**   38:*15*, *20*
46:*8*, *11*, *16*
64:*16*   67:*6*, *9*,
13
**tinted**   31:*21*
32:*2*
**title**   4:*11*
**today**   6:*8*
21:*10*   23:*1*
**today's**   22:*16*
**told**   21:*13*
49:*15*, *19*   50:*8*
**tool**   14:*9*
**top**   68:*5*, *8*, *11*
69:*4*
**torso**   74:*18*
76:*3*   83:*16*
**total**   60:*3*, *4*, *9*,
12, 16, 21
**touch**   68:*19*
84:*2*, *5*

**touched**   68:*16*
**tow**   93:*21*
**towed**   93:*19*
94:*11*, *15*, *21*
**traffic**   11:*21*
32:*5*, *8*, *11*   33:*3*
39:*9*   40:*5*, *20*
41:*3*, *6*, *8*, *15*, *17*
51:*13*   52:*14*
53:*1*, *3*, *8*, *9*
54:*5*, *6*, *14*, *21*
55:*10*   56:*2*
61:*17*   70:*8*
88:*19*, *21*   89:*19*
91:*19*   98:*7*
**trained**   30:*15*
36:*17*   43:*1*, *8*
44:*5*   71:*21*
**training**   12:*5*,
15   36:*19*   45:*3*,
6   87:*1*   94:*7*
**transcript**   3:*8*
100:*4*, *9*   101:*9*
**transpired**   60:*1*
**transport**   96:*14*
**travel**   18:*8*
25:*16*, *19*   90:*16*
**traveling**   13:*1*,
4   14:*16*   16:*17*
17:*14*   20:*20*
54:*14*, *17*, *18*
55:*2*, *4*
**treatment**   93:*1*
**tried**   78:*8*
**trouble**   79:*10*,
14, 18
**true**   100:*5*
101:*10*
**truth**   4:*4*, *5*, *5*
**truthfully**   6:*8*
**try**   5:*16*   28:*9*,
9   32:*12*   53:*16*
56:*20*   57:*5*
**trying**   50:*16*
71:*16*   79:*8*, *10*
80:*1*, *3*   81:*13*
**turn**   24:*17*
27:*9*, *15*, *18*, *20*
28:*1*   33:*19*, *20*
34:*1*   35:*15*, *18*

46:*2*   61:*16*, *18*,
20   62:*2*
**turned**   27:*20*
**turning**   35:*21*
45:*18*, *19*   46:*3*
**turns**   24:*9*
**Twenty**   20:*19*
**two**   9:*8*, *17*
39:*10*   69:*13*, *15*,
20
**typing**   48:*6*

**< U >**
**unable**   36:*7*
39:*19*   40:*10*
51:*19*
**unarmed**   83:*11*
**undercover**
16:*14*
**undergo**   12:*6*
**underneath**
74:*18*   75:*9*, *11*,
13   78:*3*, *9*, *12*,
19   79:*1*, *3*, *9*
80:*2*, *4*, *19*
82:*14*
**understand**
4:*18*   5:*17*, *18*
40:*1*   44:*20*
55:*1*   57:*7*
**understanding**
86:*21*   93:*11*, *15*
94:*1*
**underwent**
14:*10*
**Union**   96:*17*, *20*,
21   97:*1*
**unit**   94:*10*
**UNITED**   1:*1*
**units**   53:*6*
**unnerving**   41:*15*
**unsustained**   8:*6*
**unusually**   81:*2*
**use**   5:*20*   11:*3*,
9, 12, 21   15:*20*
20:*2*, *3*   23:*8*
27:*9*, *18*   31:*15*
40:*6*   49:*8*   77:*7*
80:*11*   84:*11*, *14*
86:*7*   91:*12*

92:*9*, *11*, *21*
97:*17*
**usually**   19:*4*
41:*13*, *18*
**utilize**   19:*11*
**utmost**   90:*1*, *7*

**< V >**
**value**   95:*3*
**VASCAR**   15:*6*,
7, 13
**vehicle**   12:*21*
13:*2*, *3*   15:*8*
16:*4*, *7*, *8*, *10*, *13*,
14, 15, 16   17:*5*,
9, 11, 13, 17, 19,
21   18:*20*   19:*3*,
8, 14, 14, 18, 19
20:*13*, *18*, *21*
21:*3*   24:*16*
25:*9*, *11*, *14*, *17*
26:*11*, *13*, *15*, *16*,
17   27:*3*, *11*, *12*,
13, 15   29:*1*, *5*,
13, 18   30:*1*, *6*,
10, 11, 15   31:*1*,
2, 16, 21   32:*16*
33:*6*, *10*, *12*, *15*,
20   34:*9*, *11*
35:*4*, *9*   36:*8*, *11*,
13, 14, 15, 18, 19
42:*1*   46:*4*, *5*, *9*,
14, 18   47:*5*, *9*,
11, 17, 20   48:*14*,
19   49:*1*, *7*, *9*, *12*,
14, 16, 20   50:*9*,
13, 15   56:*3*, *4*
57:*9*, *9*, *14*, *18*,
19   61:*3*, *5*, *7*, *10*,
11, 13   62:*6*, *8*, *9*,
12, 12, 13, 17, 17,
18   63:*7*, *9*, *10*,
11, 12, 21   64:*10*,
11   65:*3*, *6*, *8*, *15*,
16, 17, 18, 20
66:*1*, *3*, *5*   67:*19*
68:*12*, *15*, *18*
69:*17*   71:*1*, *17*,
18   72:*20*   86:*11*
88:*2*   89:*8*, *14*

91:*4*  93:*10*, *11*,
*13*, *16*, *16*, *18*, *19*
94:*10*, *14*, *18*, *20*,
*21*  98:2
**vehicle,**  47:*16*
65:*5*
**vehicles**  13:*15*,
*16*  14:*16*  17:*16*,
*20*  33:*1*  54:*17*
55:2, *5*, 6, 8
**vehicle's**  12:*17*,
*17*
**verbal**  89:*21*
90:6
**vertically**  81:*14*
**VFW**  24:15
**view**  31:*15*
**violation**  89:*19*
**visibility**  89:*10*,
*12*, *13*
**vision**  35:*19*
36:*3*, *5*  46:*5*
54:*10*, *11*
**visual**  13:6
14:*16*
**visually**  50:*12*

**< W >**
**waistband**
75:*19*  76:*1*, 8,
*11*  79:*21*
**waited**  25:*20*
**walked**  21:*10*
**walking**  30:*21*
**Walmsley**  95:*10*,
*20*, *21*  96:*1*
98:*12*
**want**  13:*18*
16:*3*  32:*17*
**wanted**  49:*3*
51:2  76:*17*
88:*11*
**warrants**  91:9
**water**  5:*21*
**way**  9:*3*  19:*10*
37:*16*  48:7
58:*11*  59:*16*
66:*16*  70:6
71:*15*, *20*  85:9
101:*13*

**weapon**  64:*19*,
21  75:*21*  76:5
87:*21*
**weapons**  75:*15*,
*17*  88:2  94:*19*
**weeks**  22:2
**weigh**  6:*19*  7:*1*
**weight**  7:3
**well**  5:*1*  32:*12*,
*14*, *17*, *21*  70:*1*
79:9  94:9  98:6
**went**  50:*15*
77:*18*, *21*  78:*18*
**we're**  4:*20*
**window**  31:*14*
35:2  37:8, *15*,
*16*  38:*1*, *13*, *16*
39:2, 8, *10*
41:*12*  43:*13*, *18*
46:*12*  53:*17*
54:*3*, *7*, *11*  64:8
**windows**  31:*21*
32:2
**windshield**  35:*1*
**Witness**  3:*3*
27:7  99:*1*
**woman**  31:*3*, *4*,
*5*  81:*19*, *20*
82:9
**word**  33:*21*
**words**  13:6
20:5  21:*13*
37:9, *13*  47:*21*
48:2, *13*, *15*, *18*
49:8, *11*  82:6
84:7
**work**  6:*13*
21:*16*  34:*3*, *5*
97:*10*, *11*
**worked**  49:2
**working**  6:*15*
8:*16*  96:8
**wrist**  84:*15*, *16*,
*19*, *21*  85:*4*, *5*, 8
**write**  27:*1*  97:6
**written**  32:*3*
40:2, *3*  94:*4*
**wrote**  18:*21*
40:6  59:*21*

**< Y >**
**yards**  19:7, *9*,
*18*  20:*1*, 6, 9, *12*,
*18*, *21*  21:*1*
57:*12*, *15*, *18*
58:*5*, *10*, *14*, *17*
**Yeah**  28:*12*
**year**  9:*10*  10:8
14:*13*
**years**  6:*16*
60:7  91:*1*
96:*10*, *10*
**yelling**  65:*11*