Case 1:18-cv-00476-JKB  Document 56-3  Filed 08/02/19  Page 1 of 128

Deposition of Talatha Sherrill                    Talatha Sherrill v. Deputy Joseph Cunningham, et al.

1           IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF MARYLAND

3

4    TALATHA SHERRILL,              :

5             Plaintiff            :

6        vs.                       :

7    DEPUTY JOSEPH CUNNINGHAM, :   CIVIL ACTION NUMBER:

8    et al.                        :   1:18-CV-00476-JKB

9             Defendants           :

10                 --------------------

11

12        Deposition of TALATHA SHERRILL, taken on

13   Monday, March 18, 2019, at 9:30 a.m., at Downs

14   Collins, 20 South Charles Street, Baltimore,

15   Maryland, before Linda A. Crockett, Notary

16   Public.

17

18                 --------------------

19

20   Reported by:

21   Linda A. Crockett

1    APPEARANCES:

2

3              JASON G. DOWNS, ESQUIRE

4              Downs Collins, P.A.

5              20 South Street, Suite 901

6              Baltimore, Maryland 21201

7              (410) 462-4529

8                   On behalf of the Plaintiff

9

10

11             KEVIN KARPINSKI, ESQUIRE

12             Karpinski, Colaresi & Karp, P.A.

13             120 East Baltimore Street, Suite 1850

14             Baltimore, Maryland 21202

15             (410) 727-5000

16                  On behalf of the Defendants

17

18

19

20

21

1              T H E   P R O C E E D I N G S

2                - - - - - - - - - - - - -

3                    STIPULATIONS

4    It is stipulated and agreed by and between

5    counsel for the respective parties that the

6    reading and signing of this deposition by the

7    witness is hereby not waived.

8                - - - - - - - - - - - - -

9                    TALATHA SHERRILL,

10   first duly sworn to tell the truth, the whole

11   truth, and nothing but the truth, testified as

12   follows:

13            EXAMINATION BY MR. KARPINSKI:

14       Q.   Would you please state your full name

15   for the record?

16       **A.   Talatha Danielle Sherrill.**

17       Q.   Ms. Sherrill, have you given a

18   deposition before?

19       **A.   No.**

20       Q.   Well, let me start off with some

21   preliminary stuff.  My name is Kevin Karpinski.

1    I represent the defendants in the case that you

2    have pending in the United States District Court

3    for the District of Maryland.  We're here to take

4    your deposition today, which you can see a court

5    reporter is here, and I'm going to ask you some

6    questions and my questions and your answers are

7    going to be taken down by the court reporter.

8            It is important that you give audible

9    responses to all of my questions, although we can

10   communicate with hand gestures and nodding of the

11   head and things of that sort.

12           The court reporter is taking down

13   everything that is said.  And we want to make her

14   job as easy as possible, and that's to go ahead

15   make sure we give a verbal response.

16           If I ask you a question that you don't

17   understand, it's probably because the question

18   doesn't make any sense, so you should just tell

19   me you don't understand the question, and I'll

20   try and make it clear.

21           It's important that we do not speak over

1   each other, so if you would be so kind as to let

2   me finish my question before you begin to answer,

3   I certainly will extend the same courtesy to you.

4          This is not an endurance test.  If you

5   need a break at any time during the deposition,

6   just let know me, and we can take a break.

7          Do you understand?

8      **A.  Yes, I do.**

9      Q.  Are you taking any medications today

10  that would affect your ability to understand my

11  questions and to provide full and complete and

12  accurate answers to them?

13     **A.  No, nothing.**

14     Q.  Do you have any nicknames or aliases

15  that you go by?

16     **A.  T.**

17     Q.  Is that a family nickname?  How did you

18  get the nickname?

19     **A.  It's a nickname.  It's an abbreviation**

20  **of my name.**

21     Q.  What is your current age?

1    **A.   This is the terrible.   43.**

2    Q.   Always the toughest question.   What is

3    your current address?

4    **A.   65 Griffith Lane, G-R-I-F-F-I-T-H,**

5    **Manchester, Pennsylvania 17345.**

6    Q.   How long are you lived at that address?

7    **A.   About maybe eight months, nine months.**

8    Q.   And who lives with you at that address?

9    **A.   My husband and my daughter.**

10   Q.   And what's your husband's name?

11   **A.   Michael.**

12   Q.   And your daughter's name?

13   **A.   Teacora, T-E-A-C-O-R-A.**

14   Q.   And where did you live prior to

15   Manchester?

16   **A.   2714 Green Road in Baldwin, Maryland**

17   **21013.**

18   Q.   How long did you live at that address?

19   **A.   About five years.**

20   Q.   Who lived with you at that address?

21   **A.   My husband and my daughter.**

1        Q.   You've been married one time?

2        **A.   Yes.**

3        Q.   And you have one daughter; is that

4    correct?

5        **A.   Yes.**

6        Q.   Walk me through, please, your

7    educational background.

8        **A.   I graduated from Dunbar High School.**

9        Q.   Dunbar High School in Baltimore?

10        **A.   Yes.**

11        Q.   Were you born --

12        **A.   Born and raised in Baltimore.**

13        Q.   What year did you graduate from Dunbar?

14        **A.   `93.   And I went to -- attended Drexel**

15    **University in Philadelphia.  From there I went to**

16    **University of Maryland in Baltimore County.  I**

17    **did not obtain degrees.**

18        Q.   What year did you graduate from Drexel?

19        **A.   I did not.  I did not obtain a degree.**

20        Q.   From Drexel?

21        **A.   No, I did not.**

1      Q.   What years did you attend Drexel?

2      A.   `93 to `95.   Then from there I attended

3   University of Maryland Baltimore County.   But I

4   did not finish.   I didn't complete the degree.

5      Q.   How close were you to completing your

6   degree?

7      A.   Maybe a year off.

8      Q.   What was your desired degree?

9      A.   At the time, I was pre med.

10      Q.   Any educational experience beyond your

11   time at Drexel and University of Maryland

12   Baltimore?

13      A.   I pursued psychology after University of

14   Maryland.   That would be at Strayer University,

15   but I didn't finish.

16      Q.   When you say you pursued psychology,

17   what do you mean by that?

18      A.   I changed my major.

19      Q.   Okay.   And you took classes with a goal

20   towards getting a degree in psychology?

21      A.   Yes, yes.

1      Q.  But if I'm correct, what you're telling

2  me is you did not obtain that degree?

3      **A.  I did not obtain that.**

4      Q.  Any other post high school education

5  that you had?

6      **A.  I have a -- I'm a licensed aesthetician**

7  **in the State of Maryland.**

8      Q.  And what exactly does one do in that

9  vocation?

10     **A.  Facials.**

11     Q.  Do you hold any certificates or

12  licenses?

13     **A.  I do for -- with the State of Maryland**

14  **as an aesthetician, and I have certification in**

15  **early childhood education.**

16     Q.  What was the process to become certified

17  in early childhood education?

18     **A.  Very short.  I was an in-home day care**

19  **provider.**

20     Q.  Any other post high school education or

21  certifications that we haven't talked about?

1        A.   I don't think so.

2        Q.   Are you currently employed?

3        A.   I currently do have my own business as a

4   psychiatric rehabilitation counselor.  I have a

5   PRP that I run, and I have certifications.

6   Forgot about that.  Certifications through the

7   State of Maryland as a psychiatric rehabilitation

8   counselor running a program.  So it's called PRP.

9        Q.   That's the name of your program?

10       A.   It's called Parents on Patrol.  It's a

11  psychiatric rehabilitation program.

12       Q.   I'm familiar with sort of your

13  employment history.  So I would assume that you

14  have some sort of a certification from the State

15  of Maryland or from some other state?

16       A.   Yes, I have licensing.

17       Q.   In what field?

18       A.   From the Office of Health Care Quality

19  Assurance.

20       Q.   And when did you obtain your license?

21       A.   Through the State of Maryland, you have

1    **to apply for the licensing, go through -- if**

2    **you're asking if there's a specific license**

3    **geared toward an individual, no, there is not.**

4         Q.   Actually I asked when you obtained your

5    license.

6         **A.   Oh, when?   I thought you said where.**

7    **I'm sorry.   It was July 2017.**

8         Q.   And what was the process by which you

9    obtained your license?

10        **A.   The process, there are inspections, your**

11   **history, clinical background, and my relationship**

12   **with the clinician, which is basically what the**

13   **license is based on, it's basically based on**

14   **having a licensed clinician.   I just run it.**

15        Q.   So you have a licensed clinician and you

16   run the program?

17        **A.   I'm just the owner.**

18        Q.   You're just the owner?

19        **A.   Yes.**

20        Q.   Parents on Patrol, where is that

21   located?

1      A.   In Aberdeen, Maryland, 8 Howard Street,

2   Aberdeen, Maryland.

3      Q.   And you've been doing that since 2017?

4      A.   Yes.

5      Q.   When you say you're just the owner, what

6   do you do on a day-to-day basis?

7      A.   Sometimes I see clients.

8      Q.   Do you work every day?

9      A.   No.

10      Q.   How many days a week do you work?

11      A.   Maybe one.

12      Q.   Do you have any other jobs that you have

13   other than this?

14      A.   No.

15      Q.   Any particular reason that you don't

16   have any other jobs, or is that just a choice

17   that you're just the owner of this business?

18      A.   Should I have another job?

19      Q.   Well, no, not necessarily.

20      A.   Okay.

21      Q.   So it's of your own choice, there are no

1   limitations that you have, you've just chosen not

2   to have another job, you're happy being the

3   owner?

4       **A.   Can you be a little bit more explicit in**

5   **your questioning?**

6       Q.   Sure.  You are working, you said,

7   basically one day a week.  My question is:  Do

8   you have some limitation that would prevent you

9   from working more than one day a week?

10      **A.   Absolutely, absolutely.**

11      Q.   What is that?

12      **A.   Psychologically, I am not able to handle**

13  **the issues that come with being a mental health**

14  **counselor at this time.**

15      Q.   And explain to me as fully and

16  completely as you can why you don't feel that

17  you're capable of handling the duties of a mental

18  health counselor at this time?

19          MR. DOWNS:  Objection to the breath of

20  the question being overbroad.  You can answer it,

21  if you can.

1    A.  A lot of the mental health issues that

2  my clients deal with are triggering for me, and

3  most of my clientele are located in Cecil County,

4  Maryland, and Harford County, Maryland, and it

5  does not suit me well to take the road back and

6  forth, being the events that happened some years

7  ago, three years ago, in Cecil County.

8    Q.  Can you explain to me when you say

9  the -- when you say there are things that your

10  clients have that are triggering to you, what do

11  you mean by that?

12    A.  Some of them deal with PTSD, and that's

13  one of the issues that I deal with.  And quite

14  frankly traveling back and forth on the road with

15  the constant worry that an officer is following

16  me or I'll get stopped, I prefer to stay home.

17    Q.  Where did you work prior to your current

18  ownership interest in Parents on Patrol?

19    A.  With My Family Services which was also a

20  PRP program.

21    Q.  What does that stand for?

1          A.   Psychiatric Rehabilitation Program.

2          Q.   And what sort of services would you

3     provide for this psychiatric rehabilitation

4     program?

5          A.   Psychiatric rehabilitation counselor,

6     the same type of thing that I do in my own

7     business.

8          Q.   I guess one of the questions that I

9     apologize for not being more educated on is I

10    assume there must be some sort of a certification

11    process to become a counselor.  Am I incorrect in

12    that assumption?

13         A.   There are training hours, but it's --

14    we're not therapists.  So we work with

15    therapists, and we assist clients in their daily

16    living skills to be more functional within their

17    mental health needs.

18         Q.   So can you explain to me, for example,

19    when you worked for Win Team what your duties and

20    responsibilities would be?

21         A.   I would personally see clients in their

1  **home to make sure that they were being compliant**

2  **to state regulations based on their therapeutic**

3  **directives from their psychiatrist or therapist.**

4      Q.  How would you go about determining

5  whether they're compliant?

6      **A.  There's a close relationship with the**

7  **patient or client's therapist or psychiatrist.**

8      Q.  You had that job for approximately two

9  years?

10     **A.  Yes.**

11     Q.  Why did you stop working for Win Team?

12     **A.  January 14, 2016, I was in the incident**

13 with the officers in Cecil County, and I was not

14 able to work after that point, a broken elbow.

15     Q.  So did you leave employment with Win

16 Team, or were you separated from employment?

17     **A.  I left employment.**

18     Q.  Did you leave employment as of January

19 14, 2016?

20     **A.  No.  I did not.  I believe it was in**

21 **June I was not able to return.**

1    Q.  Did you do any work from January to

2  June?

3    **A.  I did not.  I was incapacitated with a**

4  **broken elbow.  I had hard cast.  There was talk**

5  **of surgery, and I had months of physical therapy.**

6  **I'm right-handed, and I could not do the**

7  **reporting as far as writing progress notes.**

8    Q.  Your elbow, was it ever in a cast?

9    **A.  Yes.**

10    Q.  A hard cast?

11    **A.  Yes.**

12    Q.  When was your elbow in a hard cast?

13    **A.  In January of 2016.**

14    Q.  For what period of time?

15    **A.  It was a few weeks, quite a few weeks.**

16  **I'm not exactly sure of the time, though.**

17    Q.  And then thereafter, you had physical

18  therapy?

19    **A.  Yes, a soft cast and physical therapy,**

20  **and I guess on and off.  I don't really recall**

21  **how many months, though.**

1      Q.   Are you still going through the physical

2   therapy?

3      **A.   I know you're sitting here thinking why**

4   **is she thinking about that.**

5      Q.   I'm not thinking about anything.  I'm

6   just thinking about my next question.

7      **A.   Okay.  Good, good, good.  I am in**

8   **physical therapy right now.**

9      Q.   Physical therapy for your elbow?

10      **A.   That is a part of it, yes.**

11      Q.   What other physical therapy are you

12   receiving?

13      **A.   I was recently in a car accident.  So**

14   **I'm in physical therapy for that, but my elbow**

15   **was affected as well.**

16      Q.   When were you involved in a car

17   accident?

18      **A.   December 24th.**

19      Q.   What injuries did you sustain in that

20   car accident?

21      **A.   There was back pain, lower back pain,**

1    and trauma to the right arm and the left arm, but

2    mostly the right arm.  It kind of exacerbated the

3    issue of the nerve pain that was already there.

4        Q.   Where did the accident occur?

5        A.   In Harford County.

6        Q.   Whereabouts in Harford County?

7        A.   On West Bel Air Avenue.

8        Q.   So currently you're going through

9    physical therapy for not only your elbow but your

10   back pain, I take it?

11       A.   Yes.

12       Q.   So prior to December 24, 2018, can you

13   give me an idea of the time between January 14,

14   2016, and December 24, 2018, during that time

15   period, how frequently were you going to physical

16   therapy?

17       A.   Intermittently, maybe a few months at a

18   time.  But I can't really -- I've been kind of

19   trying to home in on the fact of the nerve pain

20   issue.  So I am in treatment right now.

21       Q.   And when you did your physical therapy

1    following the January 14, 2016, incident, where

2    did you do that physical therapy?

3        A.   With -- it used to be Orthopedic

4    Associates, but I believe it's Ortho Maryland

5    now.

6        Q.   Where would you do your physical

7    therapy?

8        A.   Ortho Maryland, I believe, on Bellona

9    Avenue.

10        Q.   Where is that located?

11        A.   In Baltimore.  It's Lutherville.

12        Q.   Okay.  How would you get to physical

13    therapy?

14        A.   Sometimes my husband would take me.

15    Sometimes I would take myself.  Sometimes a

16    neighbor would take me.  Well, let me back that

17    up a little bit.  Initially, my appointments I

18    had to be driven by someone, but as time went on

19    I was able to take myself.

20        Q.   Can you give me an idea of what period

21    of time it was that you had to be driven, then

1   when you were able to drive yourself?

2        **A.   For at least, I guess, the first four or**

3   **five months.**

4        Q.   And then you were able to then go ahead

5   and drive yourself?

6        **A.   Yes, with some assistance to maneuver**

7   **the gear shifts.  A lot times my daughter would**

8   **go with me, and she would move the gear for me,**

9   **not being able to move my right arm.**

10       Q.   I gather you have a manual transmission

11  in your car?

12       **A.   I do not.  I have an automatic.  So**

13  **being able to maneuver the gearshift.**

14       Q.   From park to drive?

15       **A.   Yes.**

16       Q.   Prior to Win Team, you worked at Open

17  Door; is that correct?

18       **A.   Yes.**

19       Q.   And what were your duties and

20  responsibilities?

21       **A.   I was the director for an after-school**

1    program.

2         Q.  You said an after-school program for

3    kids at a school?

4         A.  Yes.

5         Q.  That would have been at Lutherville

6    Elementary School?

7         A.  Yes.

8         Q.  For what period of time did you hold

9    that position?

10         A.  That may have been about two years or

11   close to that.

12         Q.  And why did you leave that position?

13         A.  I believe they replaced and put a new

14   director in, and I was moved to another school.

15   I got the job with Win Team.

16         Q.  What other school were you moved to?

17         A.  Joppatowne, I think.  To be honest with

18   you, I don't remember the name of the school.  I

19   was not there very long.

20         Q.  Why were you moved from Lutherville

21   Elementary School to Joppatowne?

1      **A.   Why was I moved?   They were just making**

2   **changes in the company.**

3      Q.   And is that the name of the company,

4   Open Door?

5      **A.   Open Door, yes.**

6      Q.   And prior to that, you worked at Play

7   Keepers?

8      **A.   Yes.**

9      Q.   What were your duties and

10  responsibilities?

11     **A.   The same duties.**

12     Q.   For what period of time were you working

13  for Play Keepers?

14     **A.   I was at Play Keepers for a few years,**

15  **two or three years.**

16     Q.   Why did you leave Play Keepers?

17     **A.   Opportunity at Open Door.**

18     Q.   I assume you voluntarily left Play

19  Keepers?

20     **A.   Yes.**

21     Q.   And you voluntarily left your position

1    at Open Door?

2         A.   Yes.

3         Q.   When you worked for Win Team, how many

4    clients would you have?

5         A.   I had about I think at the time about 27

6    clients.

7         Q.   And how frequently would you see them?

8         A.   Adults were seen at a minimum of six

9    times per month.  Youth were seen a minimum of

10   three times a month.

11        Q.   When you would see them, how much time

12   would you spend with them?

13        A.   Minimum one hour.

14        Q.   And where were your -- did you have a

15   region where you covered?

16        A.   Cecil County, Harford County, Baltimore

17   County, Baltimore City.

18        Q.   And who was your supervisor?

19        A.   I was contractual, so I really didn't

20   have a supervisor.  But the director of the

21   program at the time, her name was Placida

1    **Braswell, P-L-A-C-I-D-A, last name**

2    **B-R-A-S-W-E-L-L.**

3        Q.   She was the one you reported to?

4        **A.   Yes.**

5        Q.   How would you get new clients, would it

6    be through Ms. Braswell?

7        **A.   Yes, yes.**

8        Q.   I'm just trying to understand exactly

9    how you would get paired up with new clients?

10       **A.   Yes.   That's kind of the process.   A lot**

11   **of clients were referred to me directly through**

12   **other clients.**

13       Q.   Okay.   So you would get some clients

14   through Ms. Braswell and then word-of-mouth they

15   would say Ms. Sherrill is a good one to work

16   with, you should request her and see whether

17   she's available; is that fair to say?

18       **A.   That's fair.**

19       Q.   Putting aside the January 14, 2016

20   incident, have you ever been arrested or detained

21   for any reason?

1    **A.   Never.**

2    Q.   I take it prior to this incident you did

3    not know Deputy Cunningham; is that correct?

4    **A.   No.**

5    Q.   That was a poor question.  Let me start

6    all over.

7         Did you know deputy Cunningham prior to

8    the incident we're here to talk about?

9    **A.   No, still the same answer, no.**

10   Q.   And Corporal Pristash, did you know him?

11   **A.   No.**

12   Q.   So the January 14 incident, do you

13   recall what day of the week it was?

14   **A.   It was a Thursday.**

15   Q.   Do you recall what time of the day that

16   you first had interaction with Deputy Cunningham?

17   **A.   Somewhere around quarter after 8 p.m.**

18   Q.   Let's start with what you did earlier in

19   the day.  What time did you begin your work for

20   the day?

21   **A.   I probably began my work day somewhere**

1    around 9 a.m., maybe earlier, and I went to Cecil

2    County.  So I saw about 15 clients that day.

3       Q.  15?

4       A.  Uh-huh.

5       Q.  Do you remember the names of those 15

6    clients?

7       A.  Maybe some.

8       Q.  What names do you recall?

9       A.  Is that something that I should answer,

10   putting their names into this?

11          MR. DOWNS:  You can answer.  You can

12   answer.

13      A.  I'm just thinking about the clients.  I

14   saw Jacelyn Young, J-A-C-E-L-Y-N, Young, Latasha,

15   I don't remember her last name.  Maybe her last

16   name was Johnson.  I saw her mom.  What was her

17   name?  I can't remember.  There are quite a few.

18   Lillian Williams, Taylor Hayes, Tessie Goodwin,

19   Jaffe Nye, J-A-F-F-E, N-Y-E.  There are some

20   others.  There were some others.  But those

21   were -- those are the ones I remember.

Deposition of Talatha Sherrill                    Talatha Sherrill v. Deputy Joseph Cunningham, et al.

1      **Q.   Do you recall the last client you saw**

2   **prior to the incident that brings us here today?**

3          A.   Yes.   That would be Latasha.

4          Q.   You believe her last name is Johnson?

5          A.   Yes.

6          Q.   Do you recall where Latasha Johnson

7   lived?

8          A.   She lived on Old Schoolhouse Drive.

9          Q.   And that's --

10         A.   In Port Deposit.

11         Q.   And what time do you think you saw

12   Latasha?

13         A.   I saw Latasha about I guess somewhere

14   around 7 p.m.

15         Q.   7 p.m.?

16         A.   Yes.

17         Q.   And I believe in your complaint or

18   perhaps in your Answers to Interrogatories, you

19   reference one of your clients gave you fruit or

20   something earlier in the day?

21         A.   Yes.

1       Q.   Who was that?

2       **A.   That was Jacelyn Young.**

3       Q.   Jacelyn Young.   What did Ms. Young give

4  you?

5       **A.   She gave me a lot of produce, cabbage**

6  **and oranges, and she baked cookies, Christmas**

7  **cookies and those types of thing, of which the**

8  **cookies went missing.   Yes, I just have a lot --**

9  **she blessed me with a lot of things.**

10      Q.   Cabbage and oranges.   Did she have a

11  garden or something?

12      **A.   She did, but it was wintertime.   So it**

13  **was probably some things that she picked up when**

14  **she went to do some volunteer work or something.**

15      Q.   Was that typical of her to give you

16  stuff when saw her?

17      **A.   Yes, it was.**

18      Q.   Did your other clients give you things

19  when you visited?

20      **A.   Sometimes they would, hey, Ms. T, candy,**

21  **cookies, whatever, sometimes.**

1        Q.   Do you recall the client that you saw

2    before Ms. Johnson?

3        A.   Ashley Hodges.

4        Q.   Where did Ms. Hodges live?

5        A.   On Old Schoolhouse Drive as well.  They

6    lived a few doors from each other.

7        Q.   When would you have seen her?

8        A.   I probably saw her somewhere around

9    6 o'clock, maybe quarter of 6 or something.

10       Q.   So walk me through, after you leave

11   Ms. Johnson's house, where are you going?

12       A.   I'm going home.

13       Q.   And what would be the path to get from

14   Ms. Johnson's house to your home?

15       A.   Schoolhouse Drive to 222, which is the

16   road that I was on to go home, the road that the

17   officer stopped me on.

18       Q.   Was 222?

19       A.   Yes.

20       Q.   Is that commonly referred to as

21   Susquehanna River Road?

1    A.  I'm not sure.  I guess so.  I always

2  call it Route 222.

3    Q.  That's what we'll call it then,

4  Route 222.  Do you recall where you were on Route

5  222?

6    A.  At what point?

7    Q.  When the officer stopped you?

8    A.  Yes.  I was heading towards Conowingo,

9  the Conowingo Dam, so heading in that direction.

10    Q.  When is the first time that you saw a

11  police officer in the area while you are on

12  Route 222?

13    A.  When I was -- when I made my right turn

14  out of the street.

15    Q.  When you say the street, what street?

16    A.  Old Schoolhouse.  I'm pretty sure it's

17  not Old Schoolhouse down there.  It's another

18  road.  But I'm not sure exactly what the name of

19  that road is.  But it leads to Old Schoolhouse

20  Drive, and I made the right turn to come out of

21  the street onto 222.  There were two cars in

1  front of me.  And as I passed, there's a parking

2  lot, a lot, and I saw the officer there.

3      Q.  Was the parking lot on your right-hand

4  side?

5      A.  On the right-hand side.

6      Q.  So you see the officer in the parking

7  lot, and you have two vehicles in front of you;

8  is that correct?

9      A.  Right.  And there were two vehicles

10 behind me.  There's a stop sign there.  Then I

11 came out, and there were two other ones behind

12 me.

13     Q.  In that area, describe for me what the

14 setup of the road is.  Is it a two-lane road or

15 more than two lanes?

16     A.  It's a two-lane road going -- I don't

17 know if that would be east or west, two-lane

18 road.

19     Q.  Is it one lane going on --

20     A.  One lane going and one lane coming.

21     Q.  What's the speed limit in that area?

Case 1:18-cv-00476-JKB   Document 56-3   Filed 08/02/19   Page 33 of 128

Deposition of Talatha Sherrill                    Talatha Sherrill v. Deputy Joseph Cunningham, et al.

1      A.   I believe the speed limit is --

2           MR. DOWNS:   Objection.   Now or then?

3      Q.   What was the speed limit then?

4      A.   Then, I don't even remember.   I want to

5  say it was 55, but I don't really recall.

6      Q.   Do you know what the speed limit is now?

7      A.   I don't.

8      Q.   When is the last time you were in that

9  area?

10      A.   I haven't been in that area since that

11  time.

12      Q.   It's your testimony that you haven't

13  been back in that area on Route 222 since

14  January 14 of 2016; is that your testimony?

15      A.   I want to make sure I'm right.   Going to

16  court I think my husband did take that route.

17  But I can't tell you exactly which court date

18  that was.

19      Q.   So you're driving on 222.   You see the

20  officers in the parking lot.   It sounds to me

21  like you have two cars in front of you; you have

1    two cars behind you?

2         **A.   Uh-huh.**

3         Q.   Describe for me what occurs next.  Does

4    the officer pull out?

5         **A.   Yes.  So as we're -- I'm driving on the**

6    **road and I check -- I always check all my**

7    **mirrors, I do see the officer pull out of the**

8    **parking lot behind the two vehicles that were**

9    **behind me.**

10        Q.   Let me stop you right there.  Are you on

11   the phone at this point, or are you not on the

12   phone at this point?

13        **A.   At that point, I was on the phone.  I**

14   **had my earplugs in, and I was on the phone with**

15   **my pastor.**

16        Q.   When you say your earplugs, I just want

17   to make sure we're talking about the same thing,

18   are you talking about earplugs or a Bluetooth

19   device for your cell phone?

20        **A.   It was a one earpiece in my ear.**

21        Q.   Connecting to the phone, or was it

1    wireless?

2         A.  Did it connect to the phone?  It was

3    connected to the phone.

4         Q.  Okay.  So you're driving, you're talking

5    to your pastor, you observe the officer pull out.

6    Walk me through what goes on next.

7         A.  I'm driving.  The other two cars are in

8    front of me.  I observe as I'm driving.  It's

9    dark, the conditions are dark.  It's dry, but

10   it's dark.  It's after 8:00, and there is a

11   wooded area.  I observe that the one car directly

12   behind me pulls into one of the off streets, and

13   then the other vehicle pulls into -- there's a

14   tavern on the right-hand side and all of the

15   these openings are on the right-hand side of the

16   road.  There's nothing but woods on the left-hand

17   side.  And the officer is directly behind me at

18   that point.  I'm just driving.

19        Q.  How, either in time or in distance, how

20   much distance is it between the time that the

21   officer pulls out and the time that he activates

1    his overhead lights?

2         **A.   How much time?**

3         Q.   Or distance.

4         **A.   I want to say about three miles.   It's a**

5    **pretty long road.**

6         Q.   How about the cars in front of you?

7    Were there still cars in front of you?

8         **A.   Yes.   So they proceeded on to I guess to**

9    **the end of 222, because after the -- that one**

10   **little cutout or whatever street, there's nothing**

11   **else there.   So they must have proceeded onto**

12   **Conowingo, Route 1.**

13        Q.   Route 1.   So the officer is behind you

14   for approximately three miles; is that correct?

15        **A.   Yes.**

16        Q.   He activates his lights?

17        **A.   Yes.**

18        Q.   Does he activate his siren?

19        **A.   I don't recall the siren.**

20        Q.   Do you hear him saying anything over a

21   speaker or anything?

1       **A.   No.**

2       Q.   What kind of vehicle are you driving at

3    that point?

4       **A.   A 2014 Chevy Cruze.**

5       Q.   Do you still have that car?

6       **A.   I do not.**

7       Q.   Was that the car that was involved in

8    the accident recently?

9       **A.   Yes.**

10      Q.   So the officer pulls you over.  I take

11   it you pull over to the shoulder?

12      **A.   I wouldn't actually call it a shoulder.**

13   **There's a little wooded kind of cutout, so yes.**

14      Q.   Were you off the path of travel?

15      **A.   You mean out of -- what do you mean off**

16   **of the path of travel?**

17      Q.   Off the road.

18      **A.   Not particularly.  It's not a whole lot**

19   **of space.  Now, was I out of the way of traffic**

20   **that may have come, they could go around.**

21      Q.   They could go around you?

1          **A.   Uh-huh, yes.**

2          Q.   So you pull over, the officer pulls in I

3    take it behind you, correct?

4          **A.   Yes.**

5          Q.   Are you still on the phone?

6          **A.   Yes.**

7          Q.   And you're speaking to your pastor at

8    that time?

9          **A.   Yes.**

10          Q.   And your pastor's name is what?

11          **A.   Felecia Bell, F-E-L-E-C-I-A, B-E-L-L.**

12          Q.   Do you still speak to Ms. Bell?

13          **A.   Yes.**

14          Q.   Do you have Ms. Bell's telephone number?

15          **A.   I do.**

16          Q.   What is her cell number?

17          **A.   443-813-8443.**

18          Q.   How long do you think you had been

19    speaking to Ms. Bell before the officer pulling

20    you over?

21          **A.   For I guess when I left my client maybe**

1   about 10/15 minutes.

2       Q.  Do you recall what you all were

3   discussing?

4       A.  She talked to me most times on my way

5   home from work.  It was usually late.  So she

6   would talk me home.  And so we would discuss

7   things about church, how was your day, you know,

8   those types of things.

9       Q.  How long had she been your pastor?

10      A.  At that point for I guess about seven

11   years.

12      Q.  Do you belong to a particular church or

13   denomination?

14      A.  I belong to her church.  I was actually

15   her assistant, which is why we had conversations

16   on a daily basis.

17      Q.  What was the name of the church?

18      A.  Lively Stones Ministries.

19      Q.  Do you still attend that church?

20      A.  Yes, we are still members.

21      Q.  Are you still -- is Pastor Bell still

1   there?

2        A.   Yes.

3        Q.   Are you still Pastor Bell's assistant?

4        A.   No, not since.

5        Q.   When did you cease being her assistant?

6        A.   I'm not sure, just kind of faded as my

7   ability to do certain things was not -- I wasn't

8   able to carry out certain tasks.  So I don't do

9   as much as I would normally would have done, no.

10       Q.   You tell me if I'm correct, would it be

11  sort of your routine that at the end of the day

12  you would have a conversation with Pastor Bell

13  talking about things that went on during your day

14  but also things related to the church?

15       A.   Yes.

16       Q.   So this was not atypical for you to do,

17  this would be something you would do on a regular

18  basis; is that fair to say?

19       A.   Yes.

20       Q.   So the officer pulls in behind you.  I

21  take it the officer gets out of his police

1    vehicle, correct?

2         A.   No.   He pulls behind me.   And my -- what

3    I said to my pastor was, oh, shoot, I'm being

4    pulled over.   She says for what.   I said I don't

5    know.   So I'm sitting there, and I said to her, I

6    said well, let me get my credentials.   And I got

7    my credentials.   I said I'll call you back.   And

8    I thought that I had cleared her off the phone.

9    But I sat there for quite a while before he even

10   approached my vehicle.

11        Q.   Can you give me an idea of how much time

12   you sat there before he approached your vehicle?

13        A.   At a minimum five minutes.

14        Q.   Okay.   It could have been longer than

15   five minutes?

16        A.   It could have been.   It was at least

17   five minutes.

18        Q.   What are you doing during this

19   five-minute period?

20        A.   Waiting for him to come to my car.   I

21   pulled my credentials, my registration, ID and

1   all that.  I was just waiting for him to come to

2   my car.

3        Q.  And at some point, did the officer get

4   out of his vehicle?

5        A.  He did.

6        Q.  Was this a marked or unmarked vehicle?

7        A.  It was a marked vehicle.

8        Q.  And the officer approached your vehicle?

9        A.  Yes.

10       Q.  Are you able to describe the deputy that

11   approached your vehicle?

12       A.  Am I able to describe him?

13       Q.  Yes.

14       A.  He was a white male.  He had on a

15   uniform.  He did not have on a badge or a name

16   tag, but at that the point I could see that he

17   was a uniformed officer.

18       Q.  You didn't have any doubts that he was a

19   police officer, did you?

20       A.  Did I have any doubts?

21       Q.  Right.

1      **A.   I don't know.   What do you mean did I**

2  **have any doubts, the fact that he was in a marked**

3  **car and he had on a uniform.   I mean, I don't**

4  **guess I would have had a doubt.**

5      Q.   And so he's a white male in a uniform.

6  Are you able to describe him any more than that?

7      **A.   Not really at this point in time, no.**

8  **It was pretty dark.**

9      Q.   Have you subsequently learned his name?

10     **A.   Yes.**

11     Q.   And what's his name?

12     **A.   Joseph Cunningham.**

13     Q.   Deputy Cunningham approaches your

14  vehicle, and describe for me as fully and

15  completely as you what occurs after that?

16         MR. DOWNS:   Objection to the overly

17  broad question.   You can answer it if you can.

18     **A.   Do you want to rephrase the question**

19  **that is overly broad?**

20     Q.   That's Mr. Downs' opinion of it.   My

21  opinion is I'm asking you what occurred after he

1   approached your vehicle.  I don't think it's

2   overly broad.  Tell me as fully and completely as

3   you can what you recall occurring after he gets

4   out of his vehicle and he approaches your

5   vehicle.  Tell me as fully and completely as you

6   can what occurred at that point.

7          MR. DOWNS:  Same objection.  You can

8   answer it if you can.

9        **A.   He approached my vehicle.  I rolled my**

10  **window down.**

11       Q.   How far did you roll your window down?

12       **A.   At least three-quarters.**

13       Q.   All of the way down three-quarters?

14       **A.   Uh-huh.**

15       Q.   That's a yes?

16       **A.   Yes.  Three-quarters down.  And the**

17  **officer approached my car.  I had my credentials,**

18  **and I'm going to use my hand gestures as to what**

19  **he did.  I put my -- he approached my vehicle.**

20  **The window was down.**

21       Q.   Your credentials are in your right or

1   left hand?

2        A.   Left hand.

3        Q.   Just so it's clear.

4        A.   I had my license, registration and all

5   that ready.  He pushed my hand back in and said

6   roll your fucking window down.  I said my window

7   is down.  He said roll your fucking window down.

8   I said my window is down.  I have my credentials

9   here, sir.  And at that point it just kind of

10  escalated because his first initial response to

11  me was shocking.

12          So at this point, I'm thinking I need to

13  get some assistance, some help.  And so I tried

14  to dial 911 on my phone.  I dialed everything but

15  911.  And he just kept saying to me, if you don't

16  roll your F'ing window down, I'm going to bust

17  your window.  I said, sir, my window is down.  I

18  have my credentials here.  He says get out of the

19  car.  Get out of car.  I'm like, can you call for

20  backup.  I asked him if he could call for backup.

21  He says negative.  I said can we go to a lit

1   area.   He says you're not going anywhere.   Get

2   out of this car, get out of the car, I'm going to

3   drag your ass out of the car.   I'm like, okay.

4   Please, if you want to give me a ticket, whatever

5   the situation is, just a lot of high emotions,

6   whatever the situation is.   It was out of

7   character for any officer I had ever encountered,

8   law enforcement.   I could not understand, one,

9   what I was being pulled over for, and two, what

10  his reaction initially would be for me that way.

11       Q.   Let's back up a little bit.   You said

12  initially he pushed -- when you had your license

13  and your drivers license and registration out,

14  you had it in your left hand, and he pushed your

15  you hand back into the vehicle?

16       A.   Yes.

17       Q.   Do you know whether he used his right or

18  left hand to push your hand back in?

19       A.   I don't recall.

20       Q.   When you said his behavior was out of

21  character with other officers you had dealt with

1   before --

2       A.  With any law enforcement.

3       Q.  So what interaction had you had with law

4   enforcement prior to your interaction with Deputy

5   Cunningham?

6       A.  I was very good friends with Officer

7   Friendly.  They come to your school.  They're

8   there to help and serve your community.

9       Q.  So you were friends with the community

10  resource officer that would be at your school,

11  correct?

12      A.  Yes.  I had dealings with officers, even

13  dealing with my clients, so yes.

14      Q.  So after you asked whether there can

15  be -- whether he could call for backup, and he

16  says negative, what occurs next?

17      A.  I asked if we could go to a lit area.

18  He said you're not going anywhere.  And that's

19  when he just kind of -- it was just a lot of

20  expletives, and --

21      Q.  What exactly did he say?

1     A.  I'm going to drag you out of the car,

2  get your ass out of the car.  Just a lot of

3  ranting, you know.  And I'm begging and pleading

4  with him, sir, please just take my credentials.

5  Are you giving me a ticket?  Give me a ticket.

6  You know, I'm just trying to go home.  You know,

7  just he said if you don't -- if you don't get out

8  of the car I'm going to break your F'ing window.

9     Q.  Okay.  I take it you didn't get out of

10  the car?

11     A.  No, I did not.

12     Q.  Why didn't you get out of the car?

13     A.  Because I am one person on a very dark

14  road with no one else around.  That wasn't safe

15  to me, for me at all.  And under those

16  conditions, no.

17     Q.  So what occurs after he tells that you

18  he's going to break your fucking window?

19     A.  He had gloves, I don't know if he had

20  them in -- he began to put gloves on his hands,

21  and he took one step back like he was reaching

1    for something, I don't know what.  He took one

2    step back from my car.   I thought I could stay

3    here -- and I'm letting you know my thought

4    process at this time -- I could stay here and he

5    put a bullet in my head and leave me in the woods

6    and foul play or I could take off and try to save

7    my life.  So that's what I did.  He took one step

8    back from my car and I took off.  I got to the

9    stop sign at the end of the road, and my initial

10   thought was to make a left and go toward home.

11   And I began to think about all of the open wooded

12   areas going toward the left going across the

13   Conowingo Bridge or the Conowingo Dam.  There's a

14   tavern a little further down on the road, a

15   High's that would not have been open, a dark

16   area.  My next thought process was if I go to the

17   right there is a Royal Farms about a half a mile

18   or so up the road.  I'll go that way.  I went --

19        Q.  It's at the stop sign?

20        A.  Yes.  This is my thought process, like

21   you said you were thinking of your next question,

1    while he was going through his process I was

2    trying to think of a move to, you know, what am I

3    going to do when I get to this stop sign if I'm

4    able to get out of this situation.  So I went to

5    the right.

6         Q.  Can you go through the intersection or

7    does that dead-end right?

8         A.  There it's dead-end.  You're either

9    going right or left.  So I went to the right

10   toward the Royal Farms going further into Cecil

11   County.  And as I'm driving, he's coming behind

12   me.

13        Q.  How fast are you driving?

14        A.  I very deliberately did not go over 32

15   miles per hour.  Very deliberately.

16        Q.  Why 32?

17        A.  I have no idea.  But I knew I didn't

18   want to be caught saying that I was speeding.  I

19   knew that I had enough distance in between the

20   two of us at that time because he still had to

21   get to his vehicle, that I could probably get to

1    safety.  But I did not at any time want him to

2    say, oh, you were speeding.  So my digital

3    speedometer said 32.  And as I approached the

4    Royal Farms, another officer came out and cut me

5    off right in the middle of the road just before I

6    was able to get to the left turn to go into the

7    Royal Farms.

8         Q.  Let me stop you there.  You're going 32

9    miles an hour.  You get to the end of the road.

10   You could go left towards your house or right --

11        A.  No, no, no.  No, no.  No, no.  32 miles

12   an hour after I leave the officer.

13        Q.  Right.

14        A.  Once I make the right turn.

15        Q.  After you've made the right turn?

16        A.  After I've made that right turn.

17        Q.  From where the officer stops you, how

18   fast --

19        A.  On 222?

20        Q.  Yes.

21        A.  Probably about whatever the speed limit

1    was at that time.  There were two other cars in

2    front of me.

3        Q.  But you don't recall how fast you were

4    going?

5        A.  Not exactly right at the moment, no.

6        Q.  Did you stop at the stop sign?

7        A.  I did.

8        Q.  At Route 1?

9        A.  I did, because I had to think about

10    which way would be safest for me.

11        Q.  When the officer had you pulled over --

12    let me back up.  You testified that you had the

13    window three-quarters of the way down, correct?

14        A.  Uh-huh.

15        Q.  Is that correct?

16        A.  Yes.

17        Q.  How does that work in the car that you

18    had back then, the Chevy Cruze, did you hit a

19    button or did you have to roll it down?

20        A.  No.  It's an automatic window.

21        Q.  Did you ever attempt to roll the window

1    all of the way down?

2         A.   After his response of -- his first words

3    of being roll your fucking window down, no.  My

4    response was my window is rolled down, sir.  I'm

5    saying this to you, if I can give you my stuff.

6         Q.   So you make a right onto Route 1; is

7    that correct?

8         A.   Yes.

9         Q.   And you're going 32 miles an hour?

10        A.   Yes.

11        Q.   How far down Route 1 do you get?

12        A.   Just before the left turn into the

13   parking lot of the Royal Farms.

14        Q.   Is the Royal Farms on the left-hand

15   side?

16        A.   It's on the left-hand side.

17        Q.   You're going to have to educate me a

18   little bit here.  Can you give me an

19   approximation of how far it is from the stop sign

20   where you take the right --

21        A.   I'm estimating about a half a mile.

1          Q.   And you're going 32 miles an hour,

2    correct?

3          **A.   Yes.**

4          Q.   Is there a vehicle in front of you?

5          **A.   No.**

6          Q.   A vehicle behind you?

7          **A.   The officer.**

8          Q.   Does the officer have his lights on?

9          **A.   He has his lights on, and he's coming**

10   **behind me pretty fast.**

11         Q.   Before you got to the Royal Farms,

12   another officer pulled out in front of you?

13         **A.   Uh-huh.**

14         Q.   Is that a yes?

15         **A.   Yes.**

16         Q.   How close to the Royal Farms were you?

17         **A.   I just -- I was right at the -- the**

18   **other officer came out of the Royal Farms parking**

19   **lot, diagonal straight across Route 1.**

20         Q.   Straight across?

21         **A.   Straight across Route 1.**

1      Q.  You were basically at the Royal Farms

2   almost?

3      A.  Yes.

4      Q.  Is there anything on the right-hand side

5   of the road?

6      A.  I believe there's a -- like an auto shop

7   or something on the right-hand side of the road.

8   And did I know that then, no.  I was focused on

9   the Royal Farms.

10      Q.  So the other officer pulls out in front

11   of you on Route 1, correct?

12      A.  Uh-huh.

13      Q.  And is that officer --

14      A.  Yes, I'm sorry.

15      Q.  Is that officer in a marked cruiser or

16   unmarked cruiser?

17      A.  He's in a marked car.

18      Q.  And is his vehicle, his cruiser,

19   directly across Route 1?  Is it at an angle?  How

20   was it positioned?

21      A.  He came straight directly across the

1     **traffic of Route 1.  So directly across kind of**

2     **teed me.**

3          Q.  Kind of teed you?

4          **A.  Yes, I'm going straight.**

5          Q.  And he's basically straight across the

6     road; is that correct?

7          **A.  Yes.**

8          Q.  How close do you get to his vehicle?

9          **A.  I don't know.  I saw him, and I stopped.**

10         Q.  Can you give me any estimation of how

11    long it would have been?  Are we talking about

12    two feet, ten feet, twenty feet?

13              MR. DOWNS:  Objection.  She says she

14    doesn't know.

15         **A.  I don't know.  I saw him, and I stopped.**

16    **So I don't know exactly -- I don't know.  I don't**

17    **know.**

18         Q.  Okay.  So after you stopped, describe

19    for me as fully and completely as you can what

20    occurred?

21              MR. DOWNS:  Objection.  You can answer.

1       A.   So he comes across.   I stop.   Before I

2  get my car put in parked, barely, the officer

3  yanked open my door.

4       Q.   Which officer yanked the open the door?

5       A.   The officer that was in the car that cut

6  me off.

7       Q.   Do you know who that officer is?

8       A.   Now I believe it to be Pristash.

9       Q.   Describe for me what he looks like?

10      A.   Tall white male, dark hair.

11      Q.   When you say tall, how tall are you

12 talking about?

13      A.   Taller than me.   He had on a uniform.

14      Q.   Any idea how tall he is?

15      A.   I don't know.   For me being my height

16 everybody is six feet.   I don't know.

17      Q.   While male in uniform?

18      A.   Right, he was in uniform.

19      Q.   Was he giving you any commands at that

20 time?

21      A.   Get out of the car, yanking me out of

1    the car.

2         Q.   Before he goes ahead and puts his hand

3    on the door handle, does he give you any commands

4    to get out of vehicle?

5         A.   No, I got no commands.

6         Q.   Does he have a weapon drawn at that

7    point?

8         A.   I don't know.

9         Q.   So it's your testimony that he gave you

10   no verbal commands?

11        A.   No verbal commands.  I stopped my car,

12   and it seemed almost immediately he was at my

13   door, opened my door, yanked me out, and I still

14   had my seatbelt on, Cunningham was on the other

15   side of me.  And I think in some kind of way -- I

16   don't know -- I got out of my seatbelt some kind

17   of way.  I was yanked, pulled out of my vehicle,

18   thrown to the ground.  My face was smashed to the

19   ground almost like a rubbing in.  One officer had

20   my legs or someone had my legs.  Someone had my

21   legs.  There was someone with a knee in my back,

1    and Cunningham was trying to arrest me.  And

2    while he was trying to put the handcuffs on me

3    and put the handcuffs, as he was doing it, he was

4    twisting and twisting and twisting my right arm.

5        Q.  Let's see whether we can break that down

6    a little bit.  Officer Pristash comes to the

7    door.  He opens the door?

8        A.  He opens the door.

9        Q.  You said he grabs you, correct?

10       A.  Yes.

11       Q.  Describe for me where he grabs you?

12       A.  My hood.  So I had own a coat, and I had

13   on a sweat suit jacket.  So he was grabbing at

14   the hood.

15       Q.  Was he grabbing with one hand or two

16   hands?

17       A.  I don't know.

18       Q.  You said Cunningham was on the other

19   side.  Was he on the other side meaning the other

20   door?

21       A.  On the other door.  So it was just a lot

1    of lights and -- it was just a lot of commotion.

2         Q.  So who got you out of the car?

3         A.  Pristash.

4         Q.  Do you have any understanding of how you

5    get out of the seatbelt?

6         A.  I have no understanding of how.  I was

7    trying to fumble with it.  I remember saying my

8    seatbelt, my seatbelt.  So I may have hit the

9    button or it could have been Cunningham.  I'm not

10   sure.  It could have been me.  It would have been

11   both.  I don't know.  But I was trying to get out

12   of the seatbelt, because I was being yanked.

13        Once I was dislodged from the seatbelt

14   and yanked out, thrown immediately to the ground

15   in the middle of the street.  My glasses flew

16   off.  My earrings, my wedding ring flew off.  It

17   was just a lot of commotion.

18        Q.  Once they have you on the ground, you're

19   on the ground, which side is Pristash on, your

20   right side or your left side?

21        A.  I guess on my left, but I really don't

1   know.

2        Q.   Do you remember where Cunningham was?

3        A.   He was on my right side putting --

4   trying to put the handcuffs on.

5        Q.   Were there any other officers present at

6   that time?

7        A.   At that point in time, I have no idea.

8   I do know my legs were being held.  There was a

9   knee in my back and like up toward the upper part

10  of my back.  And Cunningham was handcuffing me.

11  I want to say it was Pristash, I'm not sure, but

12  I want to say it was him that there was a gun to

13  my head as I was pressed down to the ground on my

14  left temple.

15       Q.   So it's your testimony that you think

16  Pristash had a gun to your head?

17       A.   Uh-huh.

18       Q.   While Cunningham was trying to handcuff

19  you?

20       A.   Yes.  And I don't know who was on my

21  legs.

1      Q.   Do you know who was on your back, the

2   knee in your back?

3      A.   I'm thinking that it may have been

4   Pristash, but I don't know.

5      Q.   Do you believe there were three officers

6   present at the time?

7      A.   There had to have been.

8      Q.   At least three?

9      A.   At least at that time.  I don't know --

10  I do know that those two, Pristash approached my

11  vehicle, Cunningham approached the vehicle.

12     Q.   But based upon what you've described to

13  me, someone was holding your legs, someone having

14  a knee in your back, Cunningham trying to

15  handcuff you, and you are saying that Pristash

16  had a gun?

17     A.   A gun to my head.

18     Q.   You believe based upon that there were

19  more than two officers there, correct?

20     A.   Yes.

21     Q.   From the time that Pristash began

1  attempting to get you out of the vehicle until

2  the time that you were handcuffed, how much time

3  elapsed?

4       A.  I have no idea.

5       Q.  Are you able to quantify that at all?

6       A.  **No, I would not, no.  I don't know.  The**

7  **whole situation happened so quick, it seemed like**

8  **it was taking forever.**

9       Q.  Once you were handcuffed, what occurred

10  next?

11       A.  **I was handcuffed, and they put me on my**

12  **knees.**

13       Q.  They being who?

14       A.  **The officers.**

15       Q.  When you say the officers, can we try

16  and be a little bit more precise?  Do you now see

17  a third officer there, or do you see Pristash and

18  Cunningham putting you on your knees?

19       A.  **Everyone is behind me, so I'm not sure**

20  **who it was that put me to my knees.  I just know**

21  **that I was on my knees, and I was on my knees for**

1    what seemed to be quite a while, after being on

2    my knees in the middle of Route 1 for what seemed

3    like forever.

4        Q.  When you say quite a while, are you able

5    to explain to me how long was that?

6        A.  I think something like ten minutes.  It

7    was quite a while I was on my knees with

8    handcuffs, just left there.  At that point, I had

9    a gun to my head.  I wasn't moving.  When I was

10    finally stood up and turned around, there was

11    nothing less than 10 or 15 officers.  There were

12    marked cars, unmarked cars, canine units, just a

13    sea of officers and cars and lights and -- yes.

14        Q.  So you believe there were 10 or 15

15    officers that were on the scene, correct?

16        A.  Yes.

17        Q.  After you're on your knees for 10,

18    however long it was, what happens next?

19        A.  They pull me to put me on my feet.

20        Q.  Who assisted you to your feet?

21        A.  I have no idea.  I see all the officers.

1    I know that my -- I remember my arm hurting.

2         Q.   Which arm?

3         A.   The right arm.  And I was begging for

4    them to loosen the handcuffs, and I kept saying I

5    need to untwist my arm, I need to untwist my arm.

6         Q.   Were you feeling pain in any other parts

7    of your body other than your arm at that point?

8         A.   Everything was pained at that time.  I

9    had just been thrown to the ground.  But the

10   arm -- the elbow, or the arm.  I just said my

11   arm.  Next question.

12        Q.   Okay.  So you don't know who assisted

13   you to your feet?

14        A.   No, I don't.

15        Q.   Were you taken someplace?

16        A.   Eventually I was taken to the emergency

17   room.

18        Q.   When you're on Route 1, they didn't

19   leave you on Route 1, I take it.  Where did you

20   go from there?

21        A.   So they kind of moved over to the side

1    of the road.

2        Q.   Towards the Royal Farms or by the

3    auto --

4        A.   The auto mechanic, or whatever.

5        Q.   Did someone walk you over there?

6        A.   Yes.

7        Q.   Do you know who walked you over there?

8        A.   I do not recall who walked me.   But

9    there were many officers out there.

10       Q.   Was it Cunningham or Pristash that

11   walked you over?

12       A.   I do not know.   I don't know.   Someone

13   walked me over.   To be honest with you, I don't

14   know what happened at that point.   But I was

15   walked over.   At some point, someone moved my

16   vehicle out of the road.

17       Q.   Do you know who did that?

18       A.   Someone.   I don't know.

19       Q.   So someone moved your vehicle out of the

20   road?

21       A.   Someone moved my vehicle out of road

1  into the parking area where the other officers, I

2  guess this little auto place or whatever.

3       Q.  Are the officers saying anything to you?

4  Are you saying anything to the officers?

5       A.  At some point, I'm not sure when, about

6  each and every one of those officers came to me

7  and said what were you thinking?  Why did you

8  run?  Why did you run?  And I said because I was

9  terrified.  That was my response to every one of

10  them, I was terrified.  They moved the car and I

11  guess searched the vehicle.

12       Q.  When you say you guess, did you actually

13  observe it?

14       A.  I observed it.  They were searching the

15  vehicle.

16       Q.  Who was doing the search?

17       A.  All of the officers were looking through

18  the car.

19       Q.  When you say all of them, approximately

20  how many are we talking about?

21       A.  There were, like I said, 10 to 15

1    officers out there.  They seem to have come and

2    gone.  They kept coming.

3        Q.  But it's your recollection that the 10

4    or 15 officers were searching your vehicle?

5        A.  Uh-huh.

6        Q.  That's a yes?

7        A.  Yes.  I'm sorry.

8        Q.  That's fine.  Do you know whether the

9    officers who were doing the search, whether

10   Cunningham and Pristash were doing a search?

11       A.  I believe they did as well.

12       Q.  What's that based upon?

13       A.  I think just -- it just seemed like it

14   would be what they would do since they were the

15   ones that stopped me.  But there were many

16   officers around my vehicle and many of them were

17   in and out of the vehicle.

18       Q.  My question is:  In your mind's eye, do

19   you have a recollection of seeing Cunningham?

20       A.  In my mind's eye, all I see are red and

21   blue lights and officers.

1      Q.   That's why it's important for both of us

2   to let each other finish my question and your

3   answers.  So my question is:  Sitting here today,

4   are you able to say whether Cunningham and

5   Pristash were two of the 10 other 15 officers

6   that were searching your vehicle?

7      **A.   Yes.**

8      Q.   And what is that based upon?  Is that

9   based upon your recollection, or is that based

10  upon an assumption?

11     **A.   I'm going to say that's based upon my**

12  **recollection.**

13     Q.   What is it specifically --

14     **A.   Given who I know them to be seeing them**

15  **in court.**

16     Q.   Tell me specifically what you recall

17  them doing in terms of searching your vehicle?

18     **A.   They searched the trunk.  They searched**

19  **the inside of my vehicle.  At some point, there**

20  **was another officer that allowed me to sit in the**

21  **backseat of my car while he was searching.  I**

1   don't recall his name.

2        Q.  Well, let's back up here.  Tell me what

3   is your specific recollection of what Cunningham

4   and Pristash did in terms of the search?  Do you

5   know what they did specifically?

6        A.  I do recall Cunningham looking in my

7   trunk, the trunk of my car.  I do recall Pristash

8   bending over on the driver's side like I guess

9   looking on the floor and up under the steering

10  wheel area of my vehicle.  I do recall that.

11       Q.  Okay.  And then do you recall these

12  other officers also doing searches of your

13  vehicle?

14       A.  Yes.

15       Q.  Let me back up.  It's your testimony

16  that at some point an officer allowed you to sit

17  in your vehicle?

18       A.  Yes.

19       Q.  Provide your best description of what

20  that officer looked like?

21       A.  Tall white male, bald, kind of thick.

1      Q.   I know you said you don't remember his

2  name.  Do you remember his rank?  Did anyone

3  refer to him by a rank?

4      **A.   No, no one referred to him at this time**

5  **as a rank.  But he did have on a badge.  I want**

6  **it say his name started with a W, but I don't**

7  **recall.**

8      Q.   This officer allowed you to sit in the

9  back of the vehicle?

10      **A.   He did.  He was also the same officer**

11  **that loosened the handcuffs.**

12      Q.   When you were initially handcuffed, I

13  take it you were handcuffed behind your back,

14  correct?

15      **A.   Yes.**

16      Q.   At some point, were the handcuffs --

17  were you handcuffed in the front?

18      **A.   I believe by the time the paramedic**

19  **came.**

20      Q.   How much time do you think elapsed

21  before the paramedics arrived?

1      **A.  It seemed forever.  I don't know.  It**

2   **was a very long time.**

3      Q.  Can you give me any idea in terms of

4   time?

5      MR. DOWNS:  Objection.  The witness says

6   she doesn't know.  Asked and answered.

7      **A.  It was a long time.**

8      Q.  Okay.  How long do you think you

9   remained sitting in the back of your vehicle?

10      **A.  I don't know.**

11      Q.  Did you remain seated in the back of

12   your vehicle until the paramedics arrived?

13      **A.  I don't recall.**

14      Q.  Do you recall any conversations you had

15   with the officers other than what you've already

16   described or why did you run or why did you take

17   off, or something to that effect?

18      **A.  Yes.  I actually said to the officer**

19   **that was searching my car at the time, that was**

20   **the gentleman that I just told you about, I said**

21   **to him --**

1      Q.   This is the gentleman whose name you

2    believe begins with a W?

3      A.   Yes.   I can't remember.   But I said to

4    him, I am watching you, I am watching you.

5      Q.   Did he respond?

6      A.   He did not.   He also -- I mean, he was

7    just looking so intently.   Then he went to the

8    trunk of my car.   And at that point, I did ask

9    him what are you looking for?   And he says -- at

10   some point I think someone asked me, or he asked

11   me, someone asked me, I want to say it was him

12   but I'm not sure, oh, what was I doing in the

13   area?   What was I doing in the area?   I told him

14   I was working.   When he was in the trunk of my

15   car, I asked him what he was looking for.   And he

16   said to me, I'm looking for proof that you do

17   what you say you do.   He was looking through

18   my -- a stack of business card and he was looking

19   for a business card or something.   And I said,

20   well, I don't have a business card.   But I have a

21   client list.   So I told him where he could find

1    the client listing, and the client list had

2    addresses and all that stuff on it.  So I guess

3    that satisfied what he was looking for.  He also

4    was the officer that asked me if I wanted to go

5    to the emergency room, if I wanted medical

6    attention.  That's what he said, do you need

7    medical attention.

8        Q.  What was your response?

9        A.  Initially, I just kept saying look, I

10   just want to go home.  I'm not sure what's going

11   on.  I just want to go home.  After my arm was

12   paining me so terribly, I eventually said yes.

13       Q.  Okay.  Let me back up for a second.

14   When you were speaking to your pastor you said

15   you had an earpiece in?

16       A.  Uh-huh.  Only on the one side.  Always

17   on the right-hand side.

18       Q.  Did you keep the earpiece in?

19       A.  Once the officer came, no.

20       Q.  Where did you put the ear piece?

21       A.  I just pulled it out of my ear.

1    Q.  Tell me what happened once the

2  paramedics arrived.

3    A.  When the paramedics arrived, when they

4  came, the officer said -- Cunningham told them to

5  take me to Union Memorial in Elkton.  And the

6  driver said, well, that's not the closest

7  hospital, Harford Memorial is.  He said no, I

8  want her to go to Union in Elkton.

9    Q.  Did he tell you why, or did he give an

10  explanation?

11    A.  He was not talking to me.

12    Q.  Did he provide the driver an

13  explanation?

14    A.  No.  He just said that's where he wanted

15  me to go.  And she continuously said, yeah, but

16  the closest hospital is Harford Memorial.  And he

17  was very adamant about going to Union in Elkton.

18    Q.  Union in Elkton, just for purposes of

19  the record.

20    A.  Union Hospital in Elkton, Maryland.

21    Q.  Which is in Cecil County?

1      A.   Yes.

2      Q.   The driver was talking about Harford

3  Memorial, which is in Harford County, correct?

4      A.   Yes.   But it was the closest hospital.

5  I guess -- I don't know what happened.   I wound

6  up going there.   But there was an older gentleman

7  that came, and he said to the driver, he pulled

8  up in another Water Witch vehicle --

9      Q.   What kind of vehicle?

10      A.   It's called Water Witch.

11      Q.   What is that?

12      A.   Which I guess is their paramedic.   It's

13  called Water Witch.

14      Q.   This is another paramedic?

15      A.   Yes.

16      Q.   That's a new one on me.   I've never

17  heard of that before.

18      A.   He came, and the driver said you don't

19  have to do that.   You don't have to go all of the

20  way out there.   It's out of the way.   You don't

21  have to do that.   They know the rules.   You're

1   supposed to go to the closest hospital.  She said

2   oh, no, we don't have any calls.  I'll just go

3   ahead and do what he asked.  He said you don't

4   have to do that.  She says, well, I'll just do

5   it.  And so we wound up taking the very long ride

6   to Elkton, Maryland in Cecil County to Union

7   Hospital.

8       Q.  Where you were stopped on Route 1, that

9   was in Cecil County, correct?

10      A.  Yes, I believe that is still part of

11  Cecil County.

12      Q.  What, if any, medical treatment was

13  rendered by the paramedics at the scene?

14      A.  There was nothing rendered at the scene.

15      Q.  You were taken by ambulance?

16      A.  By ambulance.

17      Q.  And were you on a gurney, or how were

18  you situated?

19      A.  I stepped up into the ambulance.  Sat on

20  the gurney.  They strapped me in and took me to

21  the hospital.

1    Q.   Were you handcuffed at that point?

2    **A.   I was still handcuffed.**

3    Q.   Did anyone ride in the back of the

4    ambulance with you?

5    **A.   Yes, there were two people in the back**

6    **with me.**

7    Q.   And were they paramedics, or were they

8    law enforcement officers?

9    **A.   Paramedics.**

10   Q.   Did you say anything?  Do you recall any

11   discussion with the paramedics on the transport?

12   **A.   No, not that I recall.**

13   Q.   Do you recall or have an understanding

14   of how long it took to get from where you were

15   stopped to get to Union Memorial Hospital?

16   **A.   Do I recall how long?  It's close to a**

17   **30-minute drive.**

18   Q.   Okay.  So you think it took about 30

19   minutes to get to Union Memorial?

20   **A.   At least.**

21   Q.   Did a deputy sheriff from Cecil County,

1   was there a deputy sheriff from Cecil County at

2   Union Memorial Hospital?

3        A.   **Cunningham was there to receive me.**

4        Q.   Any other officers other than Deputy

5   Cunningham?

6        A.   **No.**

7        Q.   Once you got to Union Memorial, what's

8   your recollection of what treatment you received?

9        A.   They did an x-ray.   They said I had a

10  very bad sprain.   They gave me a sling, and that

11  **was it.**

12       Q.   How long do you think you were at Union

13  Memorial Hospital?

14       A.   **A couple hours, I guess.**

15       Q.   And were you in an actual room, or were

16  you -- where were you, in the emergency room?

17  Where were you?

18       A.   **There was like a room in the back**

19  **portion of the emergency room, I guess.**

20       Q.   Was Cunningham present when you were

21  being treated?

1      **A.   Yes, he was.**

2      Q.   Were you handcuffed or not handcuffed?

3      **A.   I remained handcuffed.**

4      Q.   So you remained handcuffed?

5      **A.   I remained handcuffed.**

6      Q.   Did you remain handcuffed the entire

7   time?

8      **A.   The entire time except for when the**

9   **x-ray was taken.**

10      Q.   They took the handcuffs off to do the

11   x-ray, and then they re-handcuffed you?

12      **A.   Yes, he re-handcuffed me.**

13      Q.   Did he handcuff you in the front or the

14   rear?

15      **A.   In the front.**

16      Q.   So where did you go after you left Union

17   Memorial Hospital?

18      **A.   By that time, it was -- I went to I**

19   **guess a holding cell in Elkton, the Detention**

20   **Center holding cell.**

21      Q.   Did you go back to the Sheriff's Office?

1     **A.   I don't know where it was, actually.**

2     Q.   Okay.

3     **A.   I went to a building and what seemed to**

4     **me to be like a back door.   There was a cell, all**

5     **concrete, and put in there.**

6     Q.   You were obviously transported from

7     Union Memorial?

8     **A.   By Cunningham in the back of his**

9     **vehicle.**

10    Q.   Were you handcuffed at that time?

11    **A.   I was handcuffed.**

12    Q.   Once you got to the holding cell, as

13    you've described it, did you remain handcuffed?

14    **A.   No.   Once he put me in the cell, he took**

15    **the handcuffs off.**

16    Q.   Was there anyone else in the cell?

17    **A.   No.**

18    Q.   How long did you remain in the cell?

19    **A.   Oh, gee, hours it seems.**

20    Q.   Okay.   So you believe you were in the

21    holding cell for a couple hours?

1      A.  Yes.

2      Q.  Did anyone come by and speak to you

3  during that time period?

4      A.  No.

5      Q.  Did -- what's the next thing that

6  occurred after you're waiting in the holding cell

7  for a couple of hours?

8      A.  After that I was stripped of all my

9  clothing, other than my blouse and my pants --

10      Q.  Who stripped you of your clothing?

11      A.  At that time, when I got there, I was

12  searched, so there was a female that searched me.

13  They took my clothes.  And I was left with my

14  blouse and my pants.

15      Q.  What clothes did they take?

16      A.  My jacket, the sweat suit jacket, my

17  shoes.  At that point, I don't know if I had a

18  hat on.  I didn't have a hat on at that point.

19  Anything other than my blouse and my pants.  So

20  once I took my shoes off, I walked into the cell,

21  and they took the handcuffs off, and that's where

1    I was.

2         Q.  You're in the cell for a couple hours,

3    correct?

4         A.  It seems that way, yes.

5         Q.  What occurred next?

6         A.  Cunningham came to take me out of the

7    cell.  I was fingerprinted and my picture taken

8    and put back in the cell.

9         Q.  Okay.  So your testimony is he did

10   fingerprint you?

11        A.  Yes.

12        Q.  Were you handcuffed during this process?

13        A.  I don't recall.

14        Q.  But your recollection is that they

15   photographed you, fingerprinted you, and then

16   they put you back in the cell?

17        A.  Uh-huh.

18        Q.  That's a yes?

19        A.  Yes.

20        Q.  How long did you remain in the cell the

21   second time?

1    A.   Quite a while.  I'm not sure of how

2  long.  It just seemed to be a very long time.

3    Q.   Was anyone in the cell with you the

4  second time?

5    A.   No.

6    Q.   And then what occurred after that?

7    A.   Cunningham came back, put the handcuffs

8  on me again, and I got back in the car.  He had

9  all of my belongings.  They did give me my shoes

10 back to walk out to his car.  I got in the car,

11 and then by that time I guess we went to the

12 actual Detention Center, sat in the car for I

13 want to say about 20 minutes at the gate.  He

14 made a phone call on his cell phone, and he

15 said -- I don't know who he was talking to -- but

16 he said something to the effect of it won't go

17 through, it won't go through.  I don't know what

18 he was talking about.

19    And then after, I want to say about 20

20 minutes, because I remember asking him what time

21 it was.  And I recall him saying something like

1    1:17 or 12:17.  I remember something about 17.

2    So it was pretty late.

3            And so we were just sitting there at the

4    gate and waiting for I guess the gate to open.

5        Q.  Did you have any other conversation with

6    Cunningham either during the first transport or

7    the second transport?

8        A.  I was continuously begging him

9    throughout the entire process to allow me to

10   answer my phone, or he would answer my phone to

11   let me husband know that I was okay, because my

12   husband was calling me continuously.  My daughter

13   was calling me continuously.  My pastor was

14   calling me continuously.  And how do I know,

15   because they all three have distinctive rings.

16   They were back to back to back.  He had my cell

17   phone the entire time.  And I could hear the

18   phone ringing.  And I was just begging him to

19   answer the phone.

20           At some point in there we did go to the

21   Commissioner's Office.  I forgot about that part.

1  So we left the cell, went to the Commissioner's

2  Office and then went to the Detention Center.  I

3  think that's how that happened.

4      Q.  Did you appear in front of the

5  Commissioner?

6      A.  I did.

7      Q.  What do you recall about your appearance

8  in front of the Commissioner?

9      A.  I don't really recall exactly all that

10  was being said, but I didn't realize that I was

11  going to a Detention Center at the time.  I

12  thought that I was going to be able to sit there

13  and wait until 8:00 in the morning.

14      Q.  Do you recall anything about what

15  happened when you appeared before the

16  Commissioner?

17      A.  Other than the fact of me asking the

18  Commissioner if I could have my phone call.  And

19  the Commissioner said -- because Cunningham told

20  me that I wouldn't be able to have a phone call

21  until I got to the Commissioner.  That's what he

1    told me.

2         So when I got to the Commissioner, I was

3    asking for the phone call, and he said oh, you

4    can't do that until you're processed or something

5    to that effect.

6         Q.   Did the Commissioner ask you whether you

7    wanted a lawyer?

8         A.   Yes.  And I decided to wait to have

9    representation, which would be, he told me 8 or

10   8:30 in morning and then a public defender.

11        Q.   So you appeared before the Commissioner,

12   and the Commissioner asked whether you wanted an

13   attorney, and you said you did.

14        A.   Uh-huh.

15        Q.   The Public Defender -- you were told the

16   Public Defender would be available the next

17   morning, correct?

18        A.   Yes.

19        Q.   And then Cunningham took you to the

20   Detention Center, correct?

21        A.   Yes.

1      Q.   Okay.   And other than asking Cunningham

2   to either allow you to answer your phone and/or

3   to have him answer your phone, do you recall any

4   other conversations you had with Cunningham?

5      **A.   No.**

6      Q.   It's your testimony that on the two

7   transports from when you were transported to

8   Union Memorial and then transported to the

9   Commissioner and then transported to the

10   Detention Center, on each one of those

11   transports, you were handcuffed, correct?

12      **A.   Yes.**

13      Q.   What happens once you get to the

14   Detention Center?

15      **A.   I was strip searched.**

16      Q.   Do you recall who strip searched you?

17      **A.   It was a female officer.**

18      Q.   This is a Deputy Sheriff or a

19   Correctional Officer?

20      **A.   I don't recall.   I didn't know one from**

21   **the other at any time.   I was given the uniform,**

1    two left shoes that were way larger than what my

2    feet are, and yes, put into a cell.

3         Q.   Anyone else in the cell with you?

4         A.   No.

5         Q.   Were you seen by the Commissioner the

6    following morning?

7         A.   Yes.

8         Q.   When you got to the Detention Center,

9    did you ask to make any telephone calls?

10        A.   Yes.

11        Q.   Were you permitted to make any telephone

12   calls?

13        A.   No.

14        Q.   Who denied you the right to make the

15   telephone calls?

16        A.   The officers that were there.  They told

17   me I had to be processed, and that was the answer

18   that I got continuously.

19        Q.   So you -- were you ever permitted to

20   make any telephone calls?

21        A.   About 5:30 the next morning.

1      Q.   Where did you make the call from?

2      **A.   From the Detention Center.**

3      Q.   And this was from a Detention Center

4   phone, I take it?

5      **A.   The pay phone, yes.**

6      Q.   Were you seen by the Commissioner that

7   morning?

8      **A.   Yes.**

9      Q.   How was that done?  Was that done by

10  video?

11     **A.   No.   I was taken from the Detention**

12  **Center back to the courthouse transported by two**

13  **other officers.**

14     Q.   And you don't know whether they were

15  Deputy Sheriffs or Correctional Officers?

16     **A.   No.   I want to say they were deputies,**

17  **but I really don't recall.**

18     Q.   What time were you seen by the

19  Commissioner?

20     **A.   I guess it must have been about 8:30,**

21  **8:00, 8:30.**

1      Q.   And you were represented by the Public

2   Defender?

3      **A.   Yes.**

4      Q.   And were you released by the

5   Commissioner?

6      **A.   Yes.**

7      Q.   How did you get from the courthouse back

8   to your house or wherever you were going?

9      **A.   I was released back into the custody of**

10   **the officers that brought me there.**

11      Q.   Where did they take you?

12      **A.   Handcuffed, shackled around my ankles**

13   **and the waist.  They took me back to the**

14   **Detention Center and put me back in the cell, and**

15   **I waited.**

16      Q.   How long did you wait?

17      **A.   I wasn't released until the afternoon.**

18      Q.   And did someone pick you up at the

19   Detention Center?

20      **A.   My husband was there waiting for me.**

21      MR. DOWNS:  Is this a good place to take

1    a two-minute restroom break?

2              MR. KARPINSKI:  Yes.

3              (Recess.)

4    BY MR. KARPINSKI:

5         Q.  Before we go on too far, what's your

6    husband's cell phone number?

7         A.  443-326-8734.

8         Q.  And would that have been his number in

9    2016?

10        A.  Yes.

11        Q.  And what's the provider?

12        A.  AT&T.

13        Q.  And your daughter's cell phone number?

14        A.  443-310-8186.

15        Q.  Is that AT&T as well?

16        A.  Yes.

17        Q.  And your cell phone number?

18        A.  443-562-8959.

19        Q.  AT&T, correct?

20        A.  Yes.

21        Q.  Those would have been the cell phone

1    numbers on the date of this incident?

2         A.   I believe so, yes.

3         Q.   Well, is it possible --

4         A.   I was thinking about my daughter, but

5    yes.

6         Q.   You're comfortable that that was your

7    cell phone number at the time?

8         A.   Oh, yes.

9         Q.   So after you were released from the

10   Detention Center, and I take it your husband

11   picked you up, when was the first time you sought

12   medical treatment?

13        A.   On -- I was released on Friday.   I

14   sought medical treatment on Saturday.

15        Q.   Where did you go?

16        A.   Upper Chesapeake Medical Center in

17   Bel Air, Maryland.

18        Q.   What sort of symptoms were you having

19   that you felt necessitated medical treatment?

20        A.   My elbow looked like a softball was

21   sitting on it.   It was very swollen.

Deposition of Talatha Sherrill                    Talatha Sherrill v. Deputy Joseph Cunningham, et al.

1      Q.   Any other physical injuries?

2      A.   Bruises on the face from glass and

3   gravel being stuck in my skin from pressing.

4   Swollen limbs, but mainly it was the elbow.

5      Q.   Had you ever been to Upper Chesapeake

6   before?

7      A.   I don't believe so, no.

8      Q.   Do you have a primary care provider now?

9      A.   Yes, I do.

10      Q.   Who is that?

11      A.   Dr. Palisoc, P-A-L-I-S-O-C.

12      Q.   Where is Dr. Palisoc located?

13      A.   In Manchester, Pennsylvania.

14      Q.   How long has Dr. Palisoc been your

15   primary care physician?

16      A.   December.

17      Q.   Who was your primary care physician

18   before that?

19      A.   Robert Roby, R-O-B-Y, at Sinai Hospital

20   in Baltimore.

21      Q.   How long was Dr. Roby your primary care

1    physician?

2         A.   20 years.

3         Q.   Have you ever -- putting aside this

4    case, have you ever sought any counseling for

5    mental or emotional issues you may be having?

6         A.   No.

7         Q.   Have you ever been prescribed any

8    medication for depression or anxiety?

9         A.   No.

10         Q.   You saw someone at Chesapeake on that

11   Saturday following the incident.  What would have

12   been your next treatment that you received?

13         A.   I was sent to a specialist.

14         Q.   Do you remember the name of the

15   specialist?

16         A.   I believe they called him Dr. Raj,

17   R-A-J, and then I was sent to Dr. Abzug, and then

18   I went to -- yes, those two at Upper Chesapeake.

19         Q.   Dr. Raj, do you recall what kind of

20   treatment he gave you?

21         A.   I believe he was the one that put me in

1    the cast.

2         Q.   This --

3         A.   Wait a minute.  No, no, no.  Because I

4    was seen in the emergency room.  So the emergency

5    room put me in a cast.  He recasted it once he

6    did his examination.

7         Q.   The emergency room on the night of the

8    incident put you in a cast?

9         A.   That Saturday, yes.

10        Q.   They put a hard cast on?

11        A.   I believe so.

12        Q.   You believe Dr. Raj may have recasted it

13   at some point?

14        A.   Yes.

15        Q.   The other doctor, Abzug?

16        A.   I think we kept the cast, and after a

17   certain amount of time went to a soft cast.

18        Q.   What else do you recall about your

19   medical treatment?

20        A.   Not a whole lot.  It was a long time, it

21   seemed.

1    Q.   Do you recall seeing any other doctors?

2    **A.   Being evaluated at Orthopedic Associates**

3    **or Ortho Maryland.**

4    Q.   No other doctors that we haven't already

5    talked about?

6    **A.   Ortho Maryland, Dr. Keene, K-E-E-N-E.**

7    Q.   Did you seek any counseling as a result

8    of this incident?

9    **A.   I did.**

10   Q.   When did that begin?

11   **A.   I do not recall exactly when.  I don't**

12   **recall exactly when.**

13   Q.   Can you give me any estimation, a month

14   or two months?  If you can't, you can't.  But do

15   you have any approximation?

16   MR. DOWNS:   Objection.

17   **A.   I don't know.  I know I did it.**

18   Q.   Do you recall how frequently you sought

19   counseling?

20   **A.   I think like once or twice a week,**

21   **depending on what was needed, I guess.**

1    Q.  For how long?

2    **A.  It was a few months.**

3    Q.  Who did you see?

4    **A.  I went to Safe Harbor.**

5    Q.  Was this individual counseling, or was

6    this group counseling?

7    **A.  Individual.**

8    Q.  Did you ever have group counseling?

9    **A.  I did.  I did an IOP at Kaiser.**

10   Q.  What does IOP stand for?

11   **A.  Individual -- it's group therapy.  I**

12   **can't even think right now.  But yes.**

13   Q.  Do you recall when you did the therapy

14   at Kaiser?

15   **A.  It was like between spring, summer 2018.**

16   Q.  Was there something that prompted you to

17   begin group therapy in 2018 for an incident that

18   occurred in 2016?

19   **A.  Say that again.**

20   Q.  Was there something that prompted you to

21   begin therapy in 2017?

1          MR. DOWNS:  As long as you can answer

2    without discussing any conversations that you and

3    I had.

4          **A.   Okay.  Just a realization.  I still had**

5    **some things going on.**

6          Q.   Were you referred by your attorney to

7    group therapy?

8          **A.   No, I was not.**

9          Q.   Are you still in group therapy?

10         **A.   I am not.**

11         Q.   When did you stop your group therapy?

12         **A.   It ended sometime I think a few months**

13   **after I started.**

14         Q.   Why did you cease your group therapy?

15         **A.   I moved to Pennsylvania.**

16         Q.   Have you attempted to go ahead and find

17   a therapist or group therapy in Pennsylvania?

18         **A.   I have.**

19         Q.   Have you had any success in that regard?

20         **A.   Yes.**

21         Q.   Have you started group therapy in

1    Pennsylvania?

2            A.   Not group therapy, individual therapy.

3            Q.   Who are you seeing in Pennsylvania?

4            A.   I go to Tremetire, T-R-E-M-E-T-I-R-E.

5    The first name is Nicholle, N-I-C-H-O-L-L-E.

6            Q.   Where is Nicholle Tremetire located?

7            A.   In York, Pennsylvania.  It's Tremetire

8    Trauma Services.

9            Q.   What's your husband do for a living?

10           A.   He's a carpenter.

11           Q.   And what precipitated your move from

12   Maryland to Pennsylvania?

13           A.   Trauma.

14           Q.   When you say trauma, what do you mean?

15           A.   Trauma, traumatic experience dealing

16   with this situation, I moved.

17           Q.   It's your testimony that you moved from

18   Maryland to Pennsylvania as a result of the

19   incident on January 14 of 2016?

20           A.   2016, yes.

21           Q.   And that's what was the basis for your

1   decision to move?

2        **A.   Yes.**

3        Q.   How often do you see Nicholle Tremetire?

4        **A.   Once a week.**

5        Q.   For how long?

6        **A.   I'm still in treatment.**

7        Q.   I understand.  But how long is a

8   session, an hour, two hours?

9        **A.   About an hour.**

10        Q.   Okay.  Are you seeing anyone else

11   currently for any emotional issues as a result of

12   the incident in 2016?

13        **A.   No.**

14        Q.   Do you have a recollection of what you

15   were initially charged with?

16        **A.   Fleeing and eluding, driving right of**

17   **center.  That's all I recall.**

18        Q.   And your case was originally tried in

19   the District Court?

20        **A.   Yes.**

21        Q.   Do you remember who your attorney was?

1      **A.   Palmeiro.**

2      Q.   And you testified at trial?

3      **A.   I did.**

4      Q.   And did any of the officers testify?

5      **A.   Yes.**

6      Q.   Which officers testified?

7      **A.   Cunningham, Pristash, and the other one.**

8   **I can't remember his name.**

9      Q.   What was the outcome of your District

10   Court trial?

11     **A.   I don't recall.   I don't recall.**

12     Q.   Do you recall being found guilty of

13   anything?

14     **A.   I do not.**

15     Q.   You don't recall one way or the other?

16     **A.   No.   I know that it was dropped at the**

17   **Circuit Court level.**

18     Q.   At the what?

19     **A.   I believe at the Circuit Court level.   I**

20   **know that the charges were dropped.**

21     Q.   Let me ask you this:   You recall

1    appearing in the District Court, correct?

2         **A.   Honestly, it was just court for me.**

3         Q.   But you recall appearing and testifying

4    in court, correct?

5         **A.   Yes.**

6         Q.   District Court, Circuit Court, we'll

7    figure all that out some other time.  And then in

8    a subsequent period of time, the charges were

9    dropped, correct?

10        **A.   Yes.**

11        Q.   Did you actually need to appear again in

12   court, or were you just told by your lawyer --

13        **A.   No, I appeared every time.  Every**

14   **cancellation, every postponement, I was there.**

15        Q.   How many times do you believe court was

16   either canceled or postponed?

17        **A.   Four, at least.**

18        Q.   Were these after the time that you had

19   testified in court, or were there times before

20   you had testified in court?

21        **A.   What do you mean?**

1      Q.   That court had been canceled?

2      **A.   After the first initial time that I**

3  **testified in court?**

4      Q.   Yes.

5      **A.   Yes.**

6      Q.   Four times it had been continued?

7      **A.   At least, yes.**

8      Q.   Were you in court when you were told

9  that the charges were being dropped?

10     **A.   Yes.**

11     Q.   Who was representing you at that time?

12     **A.   Riddler, R-I-D-D-L-E-R, Riddle.**

13     Q.   Riddle.  I'll help you out.

14     **A.   I figured you knew.**

15     Q.   The four times that you appeared, did

16  the officers appear?

17     **A.   Not every time.  I'm not sure whether**

18  **they did or did not.**

19     Q.   Do you recall having any interaction

20  with the officers during the court proceedings?

21     **A.   What do you mean interactions?**

Case 1:18-cv-00476-JKB    Document 56-3    Filed 08/02/19    Page 105 of 128

Deposition of Talatha Sherrill                    Talatha Sherrill v. Deputy Joseph Cunningham, et al.

1        Q.   Conversations, discussions, anything of

2    that nature?

3        **A.   With the officers?**

4        Q.   Yes.

5        **A.   No.**

6        Q.   Do you have any photographs regarding

7    any of the injuries that you had?

8        **A.   Do I have photographs personally?**

9        Q.   Yes.

10       **A.   Yes.**

11       Q.   Have you shared those with your counsel?

12       **A.   Yes.**

13       Q.   What photographs do you believe you

14   have, ma'am?

15       **A.   What photographs do I believe I have?**

16       Q.   Uh-huh.

17       **A.   I'm sure you can obtain those from my**

18   **attorney, correct?**

19            MR. DOWNS:   I can proffer that I

20   received a photograph of a jacket that I'll send

21   over to you this weekend.

1          MR. KARPINSKI:  That's what it is, of a

2    jacket?

3          MR. DOWNS:  Of the jacket that she was

4    wearing at the time.

5               (Whereupon, Sherrill Deposition

6    Exhibit No. 1, Answers to Interrogatories,

7    marked.)

8               (Whereupon, Sherrill Deposition Exhibit

9    No. 2, Answers to Interrogatories, marked.)

10   BY MR. KARPINSKI:

11       Q.  I'm going to show you what's been marked

12   as Exhibit 1, and that's your Answers to

13   Interrogatories to Defendant Pristash.

14          Do you see that?

15       **A.  Okay.**

16       Q.  If you turn to the second-to-the-last

17   page, I just want to confirm, that's your

18   signature, correct?

19       **A.  Yes.**

20       Q.  And you understood you were signing

21   these under the penalties of perjury?

1       **A.   Yes.**

2       Q.   And the answers were to the best of your

3   knowledge or information at the time?

4       **A.   Yes.**

5       Q.   I take it you read the answers before

6   you signed them?

7       **A.   Yes.**

8       Q.   And you signed them because they were to

9   the best of your knowledge and recollection,

10  correct?

11      **A.   Yes.**

12      Q.   Turn to Exhibit 2.   If you turn to

13  the -- it looks like page -- fourth to the end,

14  that's your signature, ma'am?

15      **A.   Yes.**

16      Q.   The same question, you understood that

17  these are under the penalties of perjury?

18      **A.   Yes.**

19      Q.   And they are accurate to the best of

20  your knowledge, information, and belief at the

21  time you signed them?

1      **A.   Yes.**

2      Q.   Have you been a plaintiff or a defendant

3  in any lawsuit other than the one we've talked

4  about today?

5      **A.   A criminal lawsuit or civil?**

6      Q.   A civil lawsuit where you either have

7  brought a suit like you have in this particular

8  instance against someone, or you have been sued

9  by someone else?

10     **A.   No, not to this magnitude.**

11     Q.   Not only to this magnitude.  Basically

12  at all.  Have you ever been a plaintiff or a

13  defendant in any case?

14     **A.   Yes.**

15     Q.   What was the case about?

16     **A.   Probably a car accident or something.**

17     Q.   Was this a case that you brought the

18  suit or you were sued?

19     **A.   I probably brought the suit.**

20     Q.   Do you believe this happened on one

21  occasion or more than one occasion?

1     **A.   Maybe twice in my lifetime.**

2     Q.   Do you recall whether those were

3 actually lawsuits, or they were just claims for

4 injuries?

5     **A.   Claims.**

6         MR. KARPINSKI:   Ma'am, those are all the

7 questions I have for you.

8         MR. DOWNS:   I have a few followups.

9 EXAMINATION BY MR. DOWNS:

10     Q.   I want to take you back to the scene of

11 the incident after you were pulled out of the

12 car.  Are we in the same place?

13     **A.   Yes.**

14     Q.   So you mentioned that Officer Cunningham

15 twisted your right arm.  Do you remember saying

16 that on direct examination?

17     **A.   Yes.**

18     Q.   Describe the pain that you felt when

19 Officer Cunningham twisted your right arm?

20     **A.   It was just a sharp shooting pain that**

21 **went up and down through my arm.**

1    Q.  Which arm?

2    A.  My right arm.

3    Q.  Did you have that pain to your right arm

4  prior to --

5    A.  I didn't.

6    Q.  Sorry.  I need to finish my question.

7  That's my fault.  Did you experience that pain in

8  your right arm prior to Officer Cunningham

9  twisting your right arm?

10   A.  No.

11   Q.  Describe the amount of force that

12  Officer Cunningham used in twisting your right

13  arm?

14       MR. KARPINSKI:  Objection.

15   A.  To have the -- according to what I know

16  from the examination, to have the bone to be

17  broken where it was broken had to be pretty

18  much -- it had a lot of force.

19   Q.  You said bone broken.  To be clear,

20  which bone are we talking about, just generally?

21   A.  I don't recall the bone.

1    Q.  Where on your body?

2    **A.  It was my elbow.**

3    Q.  Which arm?

4    **A.  My right arm.**

5    Q.  You mentioned that Officer Pristash had

6    a gun to your head.  Do you remember that

7    testimony on direct examination?

8    **A.  I do.**

9    Q.  What side of your body was Officer

10   Pristash on?

11   **A.  The left side.**

12   Q.  What side of your body was Officer

13   Cunningham on at that time?

14   **A.  On the right side.**

15   Q.  So how do you know it was Officer

16   Pristash with the gun to your head as opposed to

17   Officer Cunningham?

18   **A.  Cunningham was arresting me -- well, was**

19   **putting the handcuffs on my wrists.**

20   Q.  You mentioned being thrown to the ground

21   before the twisting of the arm.  Do you know

1   which officer threw you to the ground?

2          A.   Pristash.   He was the one that pulled me

3   from the vehicle.

4          Q.   When he threw you to the ground,

5   describe what part of your body hit the ground?

6          A.   The right side of my body.   Well, my

7   whole body hit the ground.   I landed on the right

8   side of my face.

9          Q.   And describe how the right side of your

10  face felt when you were landing on the right side

11  of your face after Pristash threw you to the

12  ground?

13         A.   I was pretty scarred up.   Yes.

14         MR. DOWNS:   Nothing further.   Thank you

15  very much.   We're going to read and sign.

16         THE REPORTER:   Would you like a copy?

17         MR. DOWNS:   Yes, please.

18         (Whereupon, the deposition was concluded

19  at 11:51 a.m.)

20

21

1   STATE OF MARYLAND
    COUNTY OF BALTIMORE

2

3        I, Linda A. Crockett, a Notary Public of
   the State of Maryland, do hereby certify that the

4   within named, TALATHA SHERRILL, was deposed at
   the time and place herein set out, and after

5   having been duly sworn by me, was interrogated by
   counsel.

6

7        I further certify that the examination
   was recorded stenographically by me, and this
   transcript is a true record of the proceedings.

8        I further certify that the stipulations
   made herein were entered into by counsel in my

9   presence.

10        I further certify that I am not of
   counsel to any of the parties, nor an employee of

11   counsel, nor related to any of the parties, nor
   in any way interested in the outcome of this

12   action.

13        As witness my hand and notarial seal
   this 27th day of March, 2019.

14   My commission expires:  December 28, 2020

15

16   _____
         Notary Public

17

18

19

20

21

1                    INDEX OF WITNESSES

2       WITNESS                                    PAGE

3    TALATHA SHERRILL

4

5       By Mr. Karpinski:                            3

6       By Mr. Downs:                              109

7

8

9                    E X H I B I T S

10                 (Retained by counsel.)

11   EXHIBIT NUMBER:                               PAGE

12   No. 1        Answers to Interrogatories      106

13   No. 2        Answers to Interrogatories      106

14

15

16

17

18

19

20

21

1                    CERTIFICATE OF DEPONENT

2

3         I hereby certify that I have read and

4    examined the within transcript, and the same is a

5    true and accurate record of the testimony given

6    by me.

7         Any additions or corrections that I feel are

8    necessary, I will write on a separate sheet of

9    paper to the original transcript.

10

11

12

13

14         _____

15                    TALATHA SHERRILL

16

17

18         _____

19                    DATE

20

21

Deposition of Talatha Sherrill                                    Talatha Sherrill v. Deputy Joseph Cunningham, et al.

## WORD INDEX

**< 1 >**
**1**  36:*12, 13*
52:*8*  53:*6, 11*
54:*19, 21*  55:*11,*
*19*  56:*1*  64:2
65:*18, 19*  77:8
106:*6, 12*
114:*12*
**1:17**  85:*1*
**1:18-CV-00476-J**
**KB**  1:*8*
**10**  39:*1*  64:*11,*
*14, 17*  67:*21*
68:*3*  69:5
**106**  114:*12, 13*
**109**  114:*6*
**11:51**  112:*19*
**12:17**  85:*1*
**120**  2:*13*
**14**  16:*12, 19*
19:*13*  20:*1*
25:*19*  26:*12*
33:*14*  100:*19*
**15**  27:*2, 3, 5*
39:*1*  64:*11, 14*
67:*21*  68:*4*
69:*5*
**17**  85:*1*
**17345**  6:*5*
**18**  1:*13*
**1850**  2:*13*

**< 2 >**
**2**  106:*9*  107:*12*
114:*13*
**20**  1:*14*  2:5
84:*13, 19*  95:2
**2014**  37:*4*
**2016**  16:*12, 19*
17:*13*  19:*14*
20:*1*  25:*19*
33:*14*  92:9
98:*18*  100:*19,*
*20*  101:*12*
**2017**  11:*7*  12:*3*
98:*21*
**2018**  19:*12, 14*
98:*15, 17*

**2019**  1:*13*
113:*13*
**2020**  113:*14*
**21013**  6:*17*
**21201**  2:*6*
**21202**  2:*14*
**222**  30:*15, 18*
31:*2, 4, 5, 12, 21*
33:*13, 19*  36:9
51:*19*
**24**  19:*12, 14*
**24th**  18:*18*
**27**  24:*5*
**2714**  6:*16*
**27th**  113:*13*
**28**  113:*14*

**< 3 >**
**3**  114:*5*
**30**  78:*18*
**30-minute**  78:*17*
**32**  50:*14, 16*
51:*3, 8, 11*  53:9
54:*1*

**< 4 >**
**410**  2:*7, 15*
**43**  6:*1*
**443-310-8186**
92:*14*
**443-326-8734**
92:*7*
**443-562-8959**
92:*18*
**443-813-8443**
38:*17*
**462-4529**  2:*7*

**< 5 >**
**5:30**  89:*21*
**55**  33:*5*

**< 6 >**
**6**  30:*9, 9*
**65**  6:*4*

**< 7 >**
**7**  28:*14, 15*
**727-5000**  2:*15*

**< 8 >**
**8**  12:*1*  26:*17*
87:*9*
**8:00**  35:*10*
86:*13*  90:*21*
**8:30**  87:*10*
90:*20, 21*

**< 9 >**
**9**  27:*1*
**9:30**  1:*13*
**901**  2:*5*
**911**  45:*14, 15*
**93**  7:*14*  8:2
**95**  8:*2*

**< A >**
**a.m**  1:*13*  27:*1*
112:*19*
**abbreviation**
5:*19*
**Aberdeen**  12:*1,*
*2*
**ability**  5:*10*
40:*7*
**able**  13:*12*
16:*14, 21*  20:*19*
21:*1, 4, 9, 13*
40:*8*  42:*10, 12*
43:*6*  50:*4*  51:6
63:*5*  64:*4*  69:*4*
86:*12, 20*
**Absolutely**
13:*10, 10*
**Abzug**  95:*17*
96:*15*
**accident**  18:*13,*
*17, 20*  19:*4*
37:*8*  108:*16*
**accurate**  5:*12*
107:*19*  115:5
**ACTION**  1:*7*
113:*12*
**activate**  36:*18*
**activates**  35:*21*
36:*16*
**actual**  79:*15*
84:*12*

**adamant**  75:*17*
**additions**  115:7
**address**  6:*3, 6,*
*8, 18, 20*
**addresses**  74:2
**Adults**  24:*8*
**aesthetician**  9:6,
*14*
**affect**  5:*10*
**afternoon**  91:*17*
**after-school**
21:*21*  22:2
**age**  5:*21*
**ago**  14:*7, 7*
**agreed**  3:*4*
**ahead**  4:*14*
21:*4*  58:*2*  77:3
99:*16*
**Air**  19:*7*  93:*17*
**al**  1:*8*
**aliases**  5:*14*
**allow**  85:*9*  88:2
**allowed**  69:*20*
70:*16*  71:*8*
**ambulance**
77:*15, 16, 19*
78:*4*
**amount**  96:*17*
110:*11*
**angle**  55:*19*
**ankles**  91:*12*
**answer**  5:*2*
13:*20*  26:9
27:*9, 11, 12*
43:*17*  44:*8*
56:*21*  85:*10, 10,*
*19*  88:*2, 3*
89:*17*  99:*1*
**answered**  72:*6*
**answers**  4:*6*
5:*12*  28:*18*
69:*3*  106:*6, 9,*
*12*  107:*2, 5*
114:*12, 13*
**anxiety**  95:*8*
**apologize**  15:*9*
**appear**  86:*4*
103:*11*  104:*16*
**appearance**  86:7

**adamant** ...
**additions** ...

**< APPEARANCES >**

**appeared**  86:*15*
87:*11*  103:*13*
104:*15*
**appearing**
103:*1, 3*
**apply**  11:*1*
**appointments**
20:*17*
**approached**
41:*10, 12*  42:*8,*
*11*  44:*1, 9, 17,*
*19*  51:*3*  62:*10,*
*11*
**approaches**
43:*13*  44:*4*
**approximately**
16:*8*  36:*14*
67:*19*
**approximation**
53:*19*  97:*15*
**area**  31:*11*
32:*13, 21*  33:*9,*
*10, 13*  35:*11*
46:*1*  47:*17*
49:*16*  67:*1*
70:*10*  73:*13, 13*
**areas**  49:*12*
**arm**  19:*1, 1, 2*
21:*9*  59:*4*  65:*1,*
*2, 3, 5, 5, 7, 10,*
*10, 11*  74:*11*
109:*15, 19, 21*
110:*1, 2, 3, 8, 9,*
*13*  111:*3, 4, 21*
**arrest**  59:*1*
**arrested**  25:*20*
**arresting**  111:*18*
**arrived**  71:*21*
72:*12*  75:*2, 3*
**Ashley**  30:*3*
**aside**  25:*19*
95:*3*
**asked**  11:*4*
45:*20*  47:*14, 17*
72:*6*  73:*10, 10,*
*11, 15*  74:*4*
77:*3*  87:*12*

**appointments** (continued)

**asking** 11:2
43:21 84:20
86:17 87:3
88:1
**ass** 46:3 48:2
**assist** 15:15
**assistance** 21:6
45:13
**assistant** 39:15
40:3, 5
**assisted** 64:20
65:12
**Associates** 20:4
97:2
**assume** 10:13
15:10 23:18
**assumption**
15:12 69:10
**Assurance** 10:19
**attempt** 52:21
**attempted** 99:16
**attempting** 63:1
**attend** 8:1
39:19
**attended** 7:14
8:2
**attention** 74:6, 7
**attorney** 87:13
99:6 101:21
105:18
**atypical** 40:16
**audible** 4:8
**auto** 55:6 66:3,
4 67:2
**automatic**
21:12 52:20
**available** 25:17
87:16
**Avenue** 19:7
20:9

**< B >**
**back** 14:5, 14
18:21, 21 19:10
20:16 33:13
41:7 45:5
46:11, 15, 18
48:21 49:2, 8
52:12, 18 58:21
61:9, 10 62:1, 2,

14 70:2, 15
71:9, 13 72:9,
11 74:13 78:3,
5 79:18 80:21
81:4, 8 83:8, 16
84:7, 8, 10
85:16, 16, 16
90:12 91:7, 9,
13, 14 109:10
**background** 7:7
11:11
**backseat** 69:21
**backup** 45:20,
20 47:15
**bad** 79:10
**badge** 42:15
71:5
**baked** 29:6
**bald** 70:21
**Baldwin** 6:16
**Baltimore** 1:14
2:6, 13, 14 7:9,
12, 16 8:3, 12
20:11 24:16, 17
94:20 113:1
**barely** 57:2
**based** 11:13, 13
16:2 62:12, 18
68:12 69:8, 9, 9,
11
**basically** 11:12,
13 13:7 55:1
56:5 108:11
**basis** 12:6
39:16 40:18
100:21
**began** 26:21
48:20 49:11
62:21
**begging** 48:3
65:3 85:8, 18
**begins** 73:2
**behalf** 2:8, 16
**behavior** 46:20
**Bel** 19:7 93:17
**belief** 107:20
**believe** 16:20
20:4, 8 22:13
28:4, 17 33:1
55:6 57:8 62:5,

18 64:14 68:11
71:18 73:2
77:10 81:20
93:2 94:7
95:16, 21 96:11,
12 102:19
103:15 105:13,
15 108:20
**Bell** 38:11, 12,
19 39:21 40:12
**B-E-L-L** 38:11
**Bellona** 20:8
**Bell's** 38:14
40:3
**belong** 39:12, 14
**belongings** 84:9
**bending** 70:8
**best** 70:19
107:2, 9, 19
**beyond** 8:10
**bit** 13:4 20:17
46:11 53:18
59:6 63:16
**blessed** 29:9
**blouse** 82:9, 14,
19
**blue** 68:21
**Bluetooth** 34:18
**body** 65:7
111:1, 9, 12
112:5, 6, 7
**bone** 110:16, 19,
20, 21
**born** 7:11, 12
**Braswell** 25:1, 6,
14
**B-R-A-S-W-E-L-
L** 25:2
**break** 5:5, 6
48:8, 18 59:5
92:1
**breath** 13:19
**Bridge** 49:13
**brings** 28:2
**broad** 43:17, 19
44:2
**broken** 16:14
17:4 110:17, 17,
19

**brought** 91:10
108:7, 17, 19
**Bruises** 94:2
**building** 81:3
**bullet** 49:5
**business** 10:3
12:17 15:7
73:18, 19, 20
**bust** 45:16
**button** 52:19
60:9

**< C >**
**cabbage** 29:5,
10
**call** 31:2, 3
37:12 41:7
45:19, 20 47:15
84:14 86:18, 20
87:3 90:1
**called** 10:8, 10
76:10, 13 95:16
**calling** 85:12,
13, 14
**calls** 77:2 89:9,
12, 15, 20
**canceled** 103:16
104:1
**cancellation**
103:14
**candy** 29:20
**canine** 64:12
**capable** 13:17
**car** 18:13, 16,
20 21:11 35:11
37:5, 7 41:20
42:2 43:3
44:17 45:19, 19
46:2, 2, 3 48:1,
2, 8, 10, 12 49:2,
8 52:17 55:17
57:2, 5, 21 58:1,
11 60:2 67:10,
18 69:21 70:7
72:19 73:8, 15
84:8, 10, 10, 12
108:16 109:12
**card** 73:18, 19,
20

**care** 9:18
10:18 94:8, 15,
17, 21
**carpenter**
100:10
**carry** 40:8
**cars** 31:21
33:21 34:1
35:7 36:6, 7
52:1 64:12, 12,
13
**case** 4:1 95:4
101:18 108:13,
15, 17
**cast** 17:4, 8, 10,
12, 19 96:1, 5, 8,
10, 16, 17
**caught** 50:18
**cease** 40:5
99:14
**Cecil** 14:3, 7
16:13 24:16
27:1 50:10
75:21 77:6, 9,
11 78:21 79:1
**cell** 34:19
38:16 80:19, 20
81:4, 12, 14, 16,
18, 21 82:6, 20
83:2, 7, 8, 16, 20
84:3, 14 85:16
86:1 89:2, 3
91:14 92:6, 13,
17, 21 93:7
**Center** 80:20
84:12 86:2, 11
87:20 88:10, 14
89:8 90:2, 3, 12
91:14, 19 93:10,
16 101:17
**certain** 40:7, 8
96:17
**certainly** 5:3
**CERTIFICATE**
115:1
**certificates** 9:11
**certification**
9:14 10:14
15:10

**certifications** 9:*21* 10:*5, 6*
**certified** 9:*16*
**certify** 113:*3, 5, 8, 10* 115:*3*
**changed** 8:*18*
**changes** 23:*2*
**character** 46:*7, 21*
**charged** 101:*15*
**charges** 102:*20* 103:*8* 104:*9*
**Charles** 1:*14*
**check** 34:*6, 6*
**Chesapeake** 93:*16* 94:*5* 95:*10, 18*
**Chevy** 37:*4* 52:*18*
**childhood** 9:*15, 17*
**choice** 12:*16, 21*
**chosen** 13:*1*
**Christmas** 29:*6*
**church** 39:*7, 12, 14, 17, 19* 40:*14*
**Circuit** 102:*17, 19* 103:*6*
**City** 24:*17*
**CIVIL** 1:*7* 108:*5, 6*
**claims** 109:*3, 5*
**classes** 8:*19*
**clear** 4:*20* 45:*3* 110:*19*
**cleared** 41:*8*
**client** 28:*1* 30:*1* 38:*21* 73:*21* 74:*1, 1*
**clientele** 14:*3*
**clients** 12:*7* 14:*2, 10* 15:*15, 21* 24:*4, 6* 25:*5, 9, 11, 12, 13* 27:*2, 6, 13* 28:*19* 29:*18* 47:*13*
**client's** 16:*7*
**clinical** 11:*11*

**clinician** 11:*12, 14, 15*
**close** 8:*5* 16:*6* 22:*11* 54:*16* 56:*8* 78:*16*
**closest** 75:*6, 16* 76:*4* 77:*1*
**clothes** 82:*13, 15*
**clothing** 82:*9, 10*
**coat** 59:*12*
**Colaresi** 2:*12*
**Collins** 1:*14* 2:*4*
**come** 13:*13* 31:*20* 37:*20* 41:*20* 42:*1* 47:*7* 68:*1* 82:*2*
**comes** 57:*1* 59:*6*
**comfortable** 93:*6*
**coming** 32:*20* 50:*11* 54:*9* 68:*2*
**commands** 57:*19* 58:*3, 5, 10, 11*
**commission** 113:*14*
**Commissioner** 86:*5, 8, 16, 18, 19, 21* 87:*2, 6, 11, 12* 88:*9* 89:*5* 90:*6, 19* 91:*5*
**Commissioner's** 85:*21* 86:*1*
**commonly** 30:*20*
**commotion** 60:*1, 17*
**communicate** 4:*10*
**community** 47:*8, 9*
**company** 23:*2, 3*
**complaint** 28:*17*
**complete** 5:*11* 8:*4*

**completely** 13:*16* 43:*15* 44:*2, 5* 56:*19*
**completing** 8:*5*
**compliant** 16:*1, 5*
**concluded** 112:*18*
**concrete** 81:*5*
**conditions** 35:*9* 48:*16*
**confirm** 106:*17*
**connect** 35:*2*
**connected** 35:*3*
**Connecting** 34:*21*
**Conowingo** 31:*8, 9* 36:*12* 49:*13, 13*
**constant** 14:*15*
**continued** 104:*6*
**continuously** 75:*15* 85:*8, 12, 13, 14* 89:*18*
**contractual** 24:*19*
**conversation** 40:*12* 85:*5*
**conversations** 39:*15* 72:*14* 88:*4* 99:*2* 105:*1*
**cookies** 29:*6, 7, 8, 21*
**copy** 112:*16*
**Corporal** 26:*10*
**correct** 7:*4* 9:*1* 21:*17* 26:*3* 32:*8* 36:*14* 38:*3* 40:*10* 41:*1* 47:*11* 52:*13, 15* 53:*7* 54:*2* 55:*11* 56:*6* 59:*9* 62:*19* 64:*15* 71:*14* 76:*3* 77:*9* 83:*3* 87:*17, 20* 88:*11* 92:*19* 103:*1, 4,*

*9* 105:*18* 106:*18* 107:*10*
**Correctional** 88:*19* 90:*15*
**corrections** 115:*7*
**counsel** 3:*5* 105:*11* 113:*5, 8, 10, 11* 114:*10*
**counseling** 95:*4* 97:*7, 19* 98:*5, 6, 8*
**counselor** 10:*4, 8* 13:*14, 18* 15:*5, 11*
**County** 7:*16* 8:*3* 14:*3, 4, 7* 16:*13* 19:*5, 6* 24:*16, 16, 17* 27:*2* 50:*11* 75:*21* 76:*3* 77:*6, 9, 11* 78:*21* 79:*1* 113:*1*
**couple** 79:*14* 81:*21* 82:*7* 83:*2*
**COURT** 1:*1* 4:*2, 4, 7, 12* 33:*16, 17* 69:*15* 101:*19* 102:*10, 17, 19* 103:*1, 2, 4, 6, 6, 12, 15, 19, 20* 104:*1, 3, 8, 20*
**courtesy** 5:*3*
**courthouse** 90:*12* 91:*7*
**covered** 24:*15*
**credentials** 41:*6, 7, 21* 44:*17, 21* 45:*8, 18* 48:*4*
**criminal** 108:*5*
**Crockett** 1:*15, 21* 113:*3*
**cruiser** 55:*15, 16, 18*
**Cruze** 37:*4* 52:*18*

**CUNNINGHAM** 1:*7* 26:*3, 7, 16* 43:*12, 13* 47:*5* 58:*14* 59:*1, 18* 60:*9* 61:*2, 10, 18* 62:*11, 14* 63:*18* 66:*10* 68:*10, 19* 69:*4* 70:*3, 6* 75:*4* 79:*3, 5, 20* 81:*8* 83:*6* 84:*7* 85:*6* 86:*19* 87:*19* 88:*1, 4* 102:*7* 109:*14, 19* 110:*8, 12* 111:*13, 17, 18*
**current** 5:*21* 6:*3* 14:*17*
**currently** 10:*2, 3* 19:*8* 101:*11*
**custody** 91:*9*
**cut** 51:*4* 57:*5*
**cutout** 36:*10* 37:*13*

**< D >**
**daily** 15:*15* 39:*16*
**Dam** 31:*9* 49:*13*
**Danielle** 3:*16*
**dark** 35:*9, 9, 10* 43:*8* 48:*13* 49:*15* 57:*10*
**date** 33:*17* 93:*1* 115:*19*
**daughter** 6:*9, 21* 7:*3* 21:*7* 85:*12* 93:*4*
**daughter's** 6:*12* 92:*13*
**day** 9:*18* 12:*8* 13:*7, 9* 26:*13, 15, 19, 20, 21* 27:*2* 28:*20* 39:*7* 40:*11, 13* 113:*13*
**days** 12:*10*
**day-to-day** 12:*6*

CRC Salomon, Inc.
Office (410) 821-4888
www.crcsalomon.com - info@crcsalomon.com
2201 Old Court Road, Baltimore, MD 21208
Page: 3
Facsimile (410) 821-4889

dead-end 50:7, 8
deal 14:2, 12, 13
dealing 47:13
100:15
dealings 47:12
dealt 46:21
December
18:18 19:12, 14
94:16 113:14
decided 87:8
decision 101:1
Defendant
106:13 108:2,
13
Defendants 1:9
2:16 4:1
defender 87:10,
15, 16 91:2
degree 7:19
8:4, 6, 8, 20 9:2
degrees 7:17
deliberately
50:14, 15
denied 89:14
denomination
39:13
depending 97:21
DEPONENT
115:1
deposed 113:4
Deposit 28:10
Deposition 1:12
3:6, 18 4:4 5:5
106:5, 8 112:18
depression 95:8
deputies 90:16
DEPUTY 1:7
26:3, 7, 16
42:10 43:13
47:4 78:21
79:1, 4 88:18
90:15
describe 32:13
34:3 42:10, 12
43:6, 14 56:18
57:9 59:11
109:18 110:11
112:5, 9
described 62:12
72:16 81:13

description
70:19
desired 8:8
detained 25:20
Detention 80:19
84:12 86:2, 11
87:20 88:10, 14
89:8 90:2, 3, 11
91:14, 19 93:10
determining
16:4
device 34:19
diagonal 54:19
dial 45:14
dialed 45:14
digital 51:2
direct 109:16
111:7
direction 31:9
directives 16:3
directly 25:11
35:11, 17 55:19,
21 56:1
director 21:21
22:14 24:20
discuss 39:6
discussing 39:3
99:2
discussion 78:11
discussions
105:1
dislodged 60:13
distance 35:19,
20 36:3 50:19
distinctive 85:15
DISTRICT 1:1,
2 4:2, 3 101:19
102:9 103:1, 6
doctor 96:15
doctors 97:1, 4
doing 12:3
41:18 59:3
67:16 68:9, 10
69:17 70:12
73:12, 13
Door 21:17
23:4, 5, 17 24:1
57:3, 4 58:3, 13,
13 59:7, 7, 8, 20,

21 81:4
doors 30:6
doubt 43:4
doubts 42:18,
20 43:2
Downs 1:13
2:3, 4 13:19
27:11 33:2
43:16, 20 44:7
56:13, 21 72:5
91:21 97:16
99:1 105:19
106:3 109:8, 9
112:14, 17
114:6
Dr 94:11, 12, 14,
21 95:16, 17, 19
96:12 97:6
drag 46:3 48:1
drawn 58:6
Drexel 7:14, 18,
20 8:1, 11
drive 21:1, 5, 14
28:8 30:5, 15
31:20 78:17
driven 20:18, 21
driver 75:6, 12
76:2, 7, 18
drivers 46:13
driver's 70:8
driving 33:19
34:5 35:4, 7, 8,
18 37:2 50:11,
13 101:16
dropped 102:16,
20 103:9 104:9
dry 35:9
duly 3:10 113:5
Dunbar 7:8, 9,
13
duties 13:17
15:19 21:19
23:9, 11

< E >
ear 34:20
74:20, 21
earlier 26:18
27:1 28:20
early 9:15, 17

earpiece 34:20
74:15, 18
earplugs 34:14,
16, 18
earrings 60:16
East 2:13 32:17
easy 4:14
educate 53:17
educated 15:9
education 9:4,
15, 17, 20
educational 7:7
8:10
effect 72:17
84:16 87:5
eight 6:7
either 35:19
50:8 85:6 88:2
103:16 108:6
elapsed 63:3
71:20
elbow 16:14
17:4, 8, 12 18:9,
14 19:9 65:10
93:20 94:4
111:2
Elementary
22:6, 21
Elkton 75:5, 8,
17, 18, 20 77:6
80:19
eluding 101:16
emergency
65:16 74:5
79:16, 19 96:4,
4, 7
emotional 95:5
101:11
emotions 46:5
employed 10:2
employee
113:10
employment
10:13 16:15, 16,
17, 18
encountered
46:7
ended 99:12
endurance 5:4

enforcement
46:8 47:2, 4
78:8
entered 113:8
entire 80:6, 8
85:9, 17
escalated 45:10
ESQUIRE 2:3,
11
estimating 53:21
estimation
56:10 97:13
et 1:8
evaluated 97:2
events 14:6
Eventually
65:16 74:12
everybody 57:16
exacerbated
19:2
exactly 9:8
17:16 25:8
31:18 33:17
47:21 52:5
56:16 86:9
97:11, 12

EXAMINATION
3:13 96:6
109:9, 16
110:16 111:7
113:5
examined 115:4
example 15:18
Exhibit 106:6, 8,
12 107:12
114:11
experience 8:10
100:15 110:7
expires 113:14
explain 13:15
14:8 15:18
64:5
explanation
75:10, 13
expletives 47:20
explicit 13:4
extend 5:3
eye 68:18, 20

< F >
face 58:*18*
94:2 112:8, *10*,
*11*
Facials 9:*10*
fact 19:*19* 43:2
86:*17*
faded 40:6
fair 25:*17, 18*
40:*18*
familiar 10:*12*
family 5:*17*
14:*19*
far 17:7 44:*11*
53:*11, 19* 92:5
Farms 49:*17*
50:*10* 51:*4, 7*
53:*13, 14* 54:*11,*
*16, 18* 55:*1, 9*
66:2
fast 50:*13*
51:*18* 52:3
54:*10*
fault 110:7
feel 13:*16*
115:7
feeling 65:6
feet 56:*12, 12,*
*12* 57:*16* 64:*19,*
*20* 65:*13* 89:2
Felecia 38:*11*
F-E-L-E-C-I-A
38:*11*
felt 93:*19*
109:*18* 112:*10*
female 82:*12*
88:*17*
field 10:*17*
figure 103:7
figured 104:*14*
finally 64:*10*
find 73:*21*
99:*16*
fine 68:8
F'ing 45:*16*
48:8
fingerprint
83:*10*

fingerprinted
83:7, *15*
finish 5:2 8:*4,*
*15* 69:2 110:6
first 3:*10* 21:2
26:*16* 31:*10*
45:*10* 53:2
85:6 93:*11*
100:*5* 104:2
five 6:*19* 21:*3*
41:*13, 15, 17*
five-minute
41:*19*
Fleeing 101:*16*
flew 60:*15, 16*
floor 70:9
focused 55:8
following 14:*15*
20:*1* 89:6
95:*11*
follows 3:*12*
followups 109:*8*
force 110:*11, 18*
forever 63:8
64:*3* 72:*1*
Forgot 10:6
85:*21*
forth 14:6, *14*
foul 49:6
found 102:*12*
four 21:2
103:*17* 104:6,
*15*
fourth 107:*13*
frankly 14:*14*
frequently
19:*15* 24:*15*
97:*18*
Friday 93:*13*
Friendly 47:7
friends 47:6, *9*
front 32:*1, 7*
33:*21* 35:8
36:6, 7 52:2
54:*4, 12* 55:*10*
71:*17* 80:*13, 15*
86:*4, 8*
fruit 28:*19*
fucking 45:6, 7

48:*18* 53:*3*
full 3:*14* 5:*11*
fully 13:*15*
43:*14* 44:2, *5*
56:*19*
fumble 60:7
functional 15:*16*
further 49:*14*
50:*10* 112:*14*
113:*5, 8, 10*

< G >
garden 29:*11*
gate 84:*13*
85:*4, 4*
gather 21:*10*
gear 21:7, *8*
geared 11:*3*
gearshift 21:*13*
gee 81:*19*
generally 110:*20*
gentleman
72:*20* 73:*1*
76:6
gestures 4:*10*
44:*18*
getting 8:*20*
give 4:8, *15*
19:*13* 20:*20*
29:*3, 15, 18*
41:*11* 46:*4*
48:*5* 53:*5, 18*
56:*10* 58:*3*
72:*3* 75:9 84:9
97:*13*
given 3:*17*
69:*14* 88:*21*
115:*5*
giving 48:*5*
57:*19*
glass 94:2
glasses 60:*15*
gloves 48:*19, 20*
go 4:*14* 5:*15*
11:*1* 16:4 21:*4,*
*8* 30:*16* 37:*20,*
*21* 45:*21* 47:*17*
48:*6* 49:*10, 16,*
*18* 50:*6, 14*
51:*6, 10* 65:*20*

74:*4, 10, 11*
75:*8, 15* 76:*19*
77:*1, 2* 80:*16,*
*21* 84:*16, 17*
85:*20* 92:5
93:*15* 99:*16*
100:*4*
goal 8:*19*
goes 35:6 58:2
going 4:5, *7*
18:*1* 19:8, *15*
30:*11, 12* 32:*16,*
*19, 20* 33:*15*
44:*18* 45:*16*
46:*1, 2* 47:*18*
48:*1, 8, 18*
49:*12, 12* 50:*1,*
*3, 9, 10* 51:*8*
52:*4* 53:9, *17*
54:*1* 56:*4*
69:*11* 74:*10*
75:*17* 76:6
86:*11, 12* 91:*8*
99:*5* 106:*11*
112:*15*
Good 18:7, *7, 7*
25:*15* 47:6
91:*21*
Goodwin 27:*18*
grabbing 59:*13,*
*15*
grabs 59:*9, 11*
graduate 7:*13,*
*18*
graduated 7:*8*
gravel 94:*3*
Green 6:*16*
Griffith 6:*4*

G-R-I-F-F-I-T-H
6:*4*
ground 58:*18,*
*19* 60:*14, 18, 19*
61:*13* 65:*9*
111:*20* 112:*1, 4,*
*5, 7, 12*
group 98:6, *8,*
*11, 17* 99:7, *9,*
*11, 14, 17, 21*
100:2

guess 15:8
17:*20* 21:2
28:*13* 31:*1*
36:8 38:*21*
39:*10* 43:*4*
60:*21* 67:2, *11,*
*12* 70:8 74:2
76:*5, 12* 79:*14,*
*19* 80:*19* 84:*11*
85:*4* 90:*20*
97:*21*
guilty 102:*12*
gun 61:*12, 16*
62:*16, 17* 64:*9*
111:*6, 16*
gurney 77:*17,*
*20*

< H >
hair 57:*10*
half 49:*17*
53:*21*
hand 4:*10*
44:*18* 45:*1, 2, 5*
46:*14, 15, 18, 18*
58:2 59:*15*
113:*13*
handcuff 61:*18*
62:*15* 80:*13*
handcuffed
63:2, *9, 11*
71:*12, 13, 17*
78:*1, 2* 80:*2, 2,*
*3, 4, 5, 6* 81:*10,*
*11, 13* 83:*12*
88:*11* 91:*12*
handcuffing
61:*10*
handcuffs 59:2,
*3* 61:*4* 64:8
65:*4* 71:*11, 16*
80:*10* 81:*15*
82:*21* 84:7
111:*19*
handle 13:*12*
58:*3*
handling 13:*17*
hands 48:*20*
59:*16*

**happened** 14:6
63:7  66:14
75:1  76:5  86:3,
15  108:20
**happens** 64:18
88:13
**happy** 13:2
**Harbor** 98:4
**hard** 17:4, 10,
12  96:10
**Harford** 14:4
19:5, 6  24:16
75:7, 16  76:2, 3
**hat** 82:18, 18
**Hayes** 27:18
**head** 4:11  49:5
61:13, 16  62:17
64:9  111:6, 16
**heading** 31:8, 9
**Health** 10:18
13:13, 18  14:1
15:17
**hear** 36:20
85:17
**heard** 76:17
**height** 57:15
**held** 61:8
**help** 45:13
47:8  104:13
**hey** 29:20
**High** 7:8, 9  9:4,
20  46:5
**High's** 49:15
**history** 10:13
11:11
**hit** 52:18  60:8
112:5, 7
**Hodges** 30:3, 4
**hold** 9:11  22:8
**holding** 62:13
80:19, 20  81:12,
21  82:6
**home** 14:16
16:1  19:19
30:12, 14, 16
39:5, 6  48:6
49:10  74:10, 11
**honest** 22:17
66:13

**Honestly** 103:2
**hood** 59:12, 14
**hospital** 75:7,
16, 20  76:4
77:1, 7, 21
78:15  79:2, 13
80:17  94:19
**hour** 24:13
50:15  51:9, 12
53:9  54:1
101:8, 9
**hours** 15:13
79:14  81:19, 21
82:7  83:2
101:8
**house** 30:11, 14
51:10  91:8
**Howard** 12:1
**hurting** 65:1
**husband** 6:9, 21
20:14  33:16
85:11, 12  91:20
93:10  100:9
**husband's** 6:10
92:6

**< I >**
**ID** 41:21
**idea** 19:13
20:20  41:11
50:17  57:14
61:7  63:4
64:21  72:3
**immediately**
58:12  60:14
**important** 4:8,
21  69:1
**incapacitated**
17:3
**incident** 16:12
20:1  25:20
26:2, 8, 12  28:2
93:1  95:11
96:8  97:8
98:17  100:19
101:12  109:11
**incorrect** 15:11
**INDEX** 114:1

**individual** 11:3
98:5, 7, 11
100:2
**information**
107:3, 20
**in-home** 9:18
**initial** 45:10
49:9  104:2
**Initially** 20:17
46:10, 12  71:12
74:9  101:15
**injuries** 18:19
94:1  105:7
109:4
**inside** 69:19
**inspections**
11:10
**instance** 108:8
**intently** 73:7
**interaction**
26:16  47:3, 4
104:19
**interactions**
104:21
**interest** 14:18
**interested**
113:11
**Intermittently**
19:17
**interrogated**
113:5
**Interrogatories**
28:18  106:6, 9,
13  114:12, 13
**intersection**
50:6
**involved** 18:16
37:7
**IOP** 98:9, 10
**issue** 19:3, 20
**issues** 13:13
14:1, 13  95:5
101:11

**< J >**
**Jacelyn** 27:14
29:2, 3
**J-A-C-E-L-Y-N**
27:14

**jacket** 59:13
82:16, 16
105:20  106:2, 3
**Jaffe** 27:19
**J-A-F-F-E** 27:19
**January** 16:12,
18  17:1, 13
19:13  20:1
25:19  26:12
33:14  100:19
**JASON** 2:3
**job** 4:14  12:18
13:2  16:8
22:15
**jobs** 12:12, 16
**Johnson** 27:16
28:4, 6  30:2
**Johnson's**
30:11, 14
**Joppatowne**
22:17, 21
**JOSEPH** 1:7
43:12
**July** 11:7
**June** 16:21
17:2

**< K >**
**Kaiser** 98:9, 14
**Karp** 2:12
**KARPINSKI**
2:11, 12  3:13,
21  92:2, 4
106:1, 10  109:6
110:14  114:5
**Keene** 97:6
**K-E-E-N-E** 97:6
**keep** 74:18
**Keepers** 23:7,
13, 14, 16, 19
**kept** 45:15
65:4  68:2  74:9
96:16
**KEVIN** 2:11
3:21
**kids** 22:3
**kind** 5:1  19:2,
18  25:10  37:2,
13  40:6  45:9
47:19  56:1, 3

58:15, 16  65:21
70:21  76:9
95:19
**knee** 58:21
61:9  62:2, 14
**knees** 63:12, 18,
20, 21, 21  64:2,
7, 17
**knew** 50:17, 19
104:14
**know** 5:6  18:3
26:3, 7, 10
32:17  33:6
39:7  41:5  43:1
46:17  48:3, 6, 6,
19  49:1, 3  50:2
55:8  56:9, 14,
15, 16, 16, 17
57:7, 15, 16
58:8, 16  59:17
60:11  61:1, 8,
20  62:1, 4, 9, 10
63:6, 20  65:1,
12  66:7, 12, 12,
14, 17, 18  68:8
69:14  70:5
71:1  72:1, 6, 10
76:5, 21  81:1
82:17  84:15, 17
85:11, 14  88:20
90:14  97:17, 17
102:16, 20
110:15  111:15,
21
**knowledge**
107:3, 9, 20

**< L >**
**landed** 112:7
**landing** 112:10
**Lane** 6:4  32:19,
20, 20
**lanes** 32:15
**larger** 89:1
**Latasha** 27:14
28:3, 6, 12, 13
**late** 39:5  85:2
**law** 46:8  47:2,
3  78:8

CRC Salomon, Inc.
Office (410) 821-4888
www.crcsalomon.com - info@crcsalomon.com
2201 Old Court Road, Baltimore, MD 21208
Page: 6
Facsimile (410) 821-4889

Case 1:18-cv-00476-JKB   Document 56-3   Filed 08/02/19   Page 122 of 128

Deposition of Talatha Sherrill                                    Talatha Sherrill v. Deputy Joseph Cunningham, et al.

lawsuit 108:3, 5, 6
lawsuits 109:3
lawyer 87:7 103:12
leads 31:19
learned 43:9
leave 16:15, 18 22:12 23:16 30:10 49:5 51:12 65:19
left 16:17 19:1 23:18, 21 38:21 45:1, 2 46:14, 18 49:10, 12 50:9 51:6, 10 53:12 60:20, 21 61:14 64:8 80:16 82:13 86:1 89:1 111:11
left-hand 35:16 53:14, 16
legs 58:20, 20, 21 61:8, 21 62:13
letting 49:3
level 102:17, 19
license 10:20 11:2, 5, 9, 13 45:4 46:12, 13
licensed 9:6 11:14, 15
licenses 9:12
licensing 10:16 11:1
life 49:7
lifetime 109:1
lights 36:1, 16 54:8, 9 60:1 64:13 68:21
Lillian 27:18
limbs 94:4
limit 32:21 33:1, 3, 6 51:21
limitation 13:8
limitations 13:1
Linda 1:15, 21 113:3

list 73:21 74:1
listing 74:1
lit 45:21 47:17
little 13:4 20:17 36:10 37:13 46:11 49:14 53:18 59:6 63:16 67:2
live 6:14, 18 30:4
lived 6:6, 20 28:7, 8 30:6
Lively 39:18
lives 6:8
living 15:16 100:9
located 11:21 14:3 20:10 94:12 100:6
long 6:6, 18 22:19 36:5 38:18 39:9 56:11 64:5, 18 72:2, 7, 8 77:5 78:14, 16 79:12 81:18 83:20 84:2, 2 91:16 94:14, 21 96:20 98:1 99:1 101:5, 7
longer 41:14
look 74:9
looked 70:20 93:20
looking 67:17 70:6, 9 73:7, 9, 15, 16, 17, 18 74:3
looks 57:9 107:13
loosen 65:4
loosened 71:11
lot 14:1 21:7 25:10 29:5, 8, 9 32:2, 2, 3, 7 33:20 34:8 37:18 46:5 47:19 48:2 53:13 54:19

59:21 60:1, 17 96:20 110:18
lower 18:21
Lutherville 20:11 22:5, 20

< M >
ma'am 105:14 107:14 109:6
magnitude 108:10, 11
major 8:18
making 23:1
male 42:14 43:5 57:10, 17 70:21
Manchester 6:5, 15 94:13
maneuver 21:6, 13
manual 21:10
March 1:13 113:13
marked 42:6, 7 43:2 55:15, 17 64:12 106:7, 9, 11
married 7:1
MARYLAND 1:2, 15 2:6, 14 4:3 6:16 7:16 8:3, 11, 14 9:7, 13 10:7, 15, 21 12:1, 2 14:4, 4 20:4, 8 75:20 77:6 93:17 97:3, 6 100:12, 18 113:1, 3
mean 8:17 14:11 37:15, 15 43:1, 3 73:6 100:14 103:21 104:21
meaning 59:19
mechanic 66:4
med 8:9
medical 74:5, 7 77:12 93:12, 14, 16, 19 96:19

medication 95:8
medications 5:9
members 39:20
Memorial 75:5, 7, 16 76:3 78:15, 19 79:2, 7, 13 80:17 81:7 88:8
mental 13:13, 17 14:1 15:17 95:5
mentioned 109:14 111:5, 20
Michael 6:11
middle 51:5 60:15 64:2
mile 49:17 53:21
miles 36:4, 14 50:15 51:9, 11 53:9 54:1
mind's 68:18, 20
minimum 24:8, 9, 13 41:13
Ministries 39:18
minute 96:3
minutes 39:1 41:13, 15, 17 64:6 78:19 84:13, 20
mirrors 34:7
missing 29:8
mom 27:16
moment 52:5
Monday 1:13
month 24:9, 10 97:13
months 6:7, 7 17:5, 21 19:17 21:3 97:14 98:2 99:12
morning 86:13 87:10, 17 89:6, 21 90:7
move 21:8, 9 50:2 100:11 101:1
moved 22:14, 16, 20 23:1

65:21 66:15, 19, 21 67:10 99:15 100:16, 17
moving 64:9

< N >
name 3:14, 21 5:20 6:10, 12 10:9 22:18 23:3 24:21 25:1 27:15, 16, 17 28:4 31:18 38:10 39:17 42:15 43:9, 11 70:1 71:2, 6 73:1 95:14 100:5 102:8
named 113:4
names 27:5, 8, 10
nature 105:2
necessarily 12:19
necessary 115:8
necessitated 93:19
need 5:5 45:12 65:5, 5 74:6 103:11 110:6
needed 97:21
needs 15:17
negative 45:21 47:16
neighbor 20:16
nerve 19:3, 19
Never 26:1 76:16
new 22:13 25:5, 9 76:16
Nicholle 100:5, 6 101:3
N-I-C-H-O-L-L-E 100:5
nickname 5:17, 18, 19
nicknames 5:14
night 96:7
nine 6:7
nodding 4:10

normally 40:9
notarial 113:13
Notary 1:15
113:3, 16
notes 17:7
NUMBER 1:7
38:14, 16 92:6,
8, 13, 17 93:7
114:11
numbers 93:1
Nye 27:19
N-Y-E 27:19

< O >
Objection 13:19
33:2 43:16
44:7 56:13, 21
72:5 97:16
110:14
observe 35:5, 8,
11 67:13
observed 67:14
obtain 7:17, 19
9:2, 3 10:20
105:17
obtained 11:4, 9
obviously 81:6
occasion 108:21,
21
occur 19:4
occurred 43:21
44:6 56:20
63:9 82:6 83:5
84:6 98:18
occurring 44:3
occurs 34:3
43:15 47:16
48:17
o'clock 30:9
Office 10:18
80:21 85:21
86:2
officer 14:15
30:17 31:7, 11
32:2, 6 34:4, 7
35:5, 17, 21
36:13 37:10
38:2, 19 40:20,
21 42:3, 8, 17,
19 44:17 46:7

47:6, 10 51:4,
12, 17 52:11
54:7, 8, 12, 18
55:10, 13, 15
57:2, 4, 5, 7
58:19 59:6
63:17 69:20
70:16, 20 71:8,
10 72:18 74:4,
19 75:4 88:17,
19 109:14, 19
110:8, 12 111:5,
9, 12, 15, 17
112:1
officers 16:13
33:20 46:21
47:12 61:5
62:5, 19 63:14,
15 64:11, 13, 15,
21 66:9 67:1, 3,
4, 6, 17 68:1, 4,
9, 16, 21 69:5
70:12 72:15
78:8 79:4
89:16 90:13, 15
91:10 102:4, 6
104:16, 20
105:3
Oh 11:6 41:3
51:2 73:12
77:2 81:19
87:3 93:8
Okay 8:19
12:20 18:7
20:12 25:13
35:4 41:14
46:3 48:9
56:18 65:12
70:11 72:8
74:13 78:18
81:2, 20 83:9
85:11 88:1
99:4 101:10
106:15
Old 28:8 30:5
31:16, 17, 19
older 76:6
Once 51:14
60:13, 18 63:9
74:19 75:1

79:7 81:12, 14
82:20 88:13
96:5 97:20
101:4
ones 27:21
32:11 68:15
Open 21:16
23:4, 5, 17 24:1
49:11, 15 57:3,
4 85:4
opened 58:13
openings 35:15
opens 59:7, 8
opinion 43:20,
21
Opportunity
23:17
opposed 111:16
oranges 29:6, 10
original 115:9
originally
101:18
Ortho 20:4, 8
97:3, 6
Orthopedic
20:3 97:2
outcome 102:9
113:11
overbroad 13:20
overhead 36:1
overly 43:16, 19
44:2
owner 11:17, 18
12:5, 17 13:3
ownership 14:18

< P >
P.A 2:4, 12
p.m 26:17
28:14
p.m. 28:15
page 106:17
107:13 114:2,
11
pain 18:21, 21
19:3, 10, 19
65:6 109:18, 20
110:3, 7
pained 65:8

paining 74:12
paired 25:9
Palisoc 94:11,
12, 14
P-A-L-I-S-O-C
94:11
Palmeiro 102:1
pants 82:9, 14,
19
paper 115:9
paramedic
71:18 76:12, 14
paramedics
71:21 72:12
75:2, 3 77:13
78:7, 9, 11
Parents 10:10
11:20 14:18
park 21:14
parked 57:2
parking 32:1, 3,
6 33:20 34:8
53:13 54:18
67:1
part 18:10
61:9 77:10
85:21 112:5
particular
12:15 39:12
108:7
particularly
37:18
parties 3:5
113:10, 11
parts 65:6
passed 32:1
pastor 34:15
35:5 38:7 39:9,
21 40:3, 12
41:3 74:14
85:13
pastor's 38:10
path 30:13
37:14, 16
patient 16:7
Patrol 10:10
11:20 14:18
pay 90:5
penalties

106:21 107:17
pending 4:2
Pennsylvania
6:5 94:13
99:15, 17 100:1,
3, 7, 12, 18
people 78:5
period 17:14
19:15 20:20
22:8 23:12
41:19 82:3
103:8
perjury 106:21
107:17
permitted 89:11,
19
person 48:13
personally
15:21 105:8
Philadelphia
7:15
phone 34:11, 12,
13, 14, 19, 21
35:2, 3 38:5
41:8 45:14
84:14, 14 85:10,
10, 17, 18, 19
86:18, 20 87:3
88:2, 3 90:4, 5
92:6, 13, 17, 21
93:7
photograph
105:20
photographed
83:15
photographs
105:6, 8, 13, 15
physical 17:5,
17, 19 18:1, 8, 9,
11, 14 19:9, 15,
21 20:2, 6, 12
94:1
physician 94:15,
17 95:1
pick 91:18
picked 29:13
93:11
picture 83:7
piece 74:20

Case 1:18-cv-00476-JKB   Document 56-3   Filed 08/02/19   Page 124 of 128

Deposition of Talatha Sherrill                                    Talatha Sherrill v. Deputy Joseph Cunningham, et al.

place 67:2
91:21 109:12
113:4
Placida 24:21
P-L-A-C-I-D-A
25:1
Plaintiff 1:5
2:8 108:2, 12
Play 23:6, 13,
14, 16, 18 49:6
pleading 48:3
please 3:14 7:6
46:4 48:4
112:17
point 16:14
31:6 34:11, 12,
13 35:18 37:3
39:10 42:3, 16
43:7 44:6 45:9,
12 58:7 61:7
64:8 65:7
66:14, 15 67:5
69:19 70:16
71:16 73:8, 10
78:1 82:17, 18
85:20 96:13
police 31:11
40:21 42:19
poor 26:5
Port 28:10
portion 79:19
position 22:9,
12 23:21
positioned 55:20
possible 4:14
93:3
post 9:4, 20
postponed
103:16
postponement
103:14
pre 8:9
precipitated
100:11
precise 63:16
prefer 14:16
preliminary
3:21
prescribed 95:7
presence 113:9

present 61:5
62:6 79:20
pressed 61:13
pressing 94:3
pretty 31:16
36:5 43:8
54:10 85:2
110:17 112:13
prevent 13:8
primary 94:8,
15, 17, 21
prior 6:14
14:17 19:12
21:16 23:6
26:2, 7 28:2
47:4 110:4, 8
Pristash 26:10
57:8 59:6 60:3,
19 61:11, 16
62:4, 10, 15, 21
63:17 66:10
68:10 69:5
70:4, 7 102:7
106:13 111:5,
10, 16 112:2, 11
probably 4:17
26:21 29:13
30:8 50:21
51:21 108:16,
19
proceeded 36:8,
11
proceedings
104:20 113:7
process 9:16
11:8, 10 15:11
25:10 49:4, 16,
20 50:1 83:12
85:9
processed 87:4
89:17
produce 29:5
proffer 105:19
program 10:8,
9, 11 11:16
14:20 15:1, 4
22:1, 2 24:21
progress 17:7
prompted 98:16,

20
proof 73:16
provide 5:11
15:3 70:19
75:12
provider 9:19
92:11 94:8
PRP 10:5, 8
14:20
psychiatric 10:4,
7, 11 15:1, 3, 5
psychiatrist
16:3, 7
Psychologically
13:12
psychology
8:13, 16, 20
PTSD 14:12
Public 1:16
87:10, 15, 16
91:1 113:3, 16
pull 34:4, 7
35:5 37:11
38:2 64:19
pulled 41:4, 21
46:9 52:11
54:12 58:17
74:21 76:7
109:11 112:2
pulling 38:19
pulls 35:12, 13,
21 37:10 38:2
40:20 41:2
55:10
purposes 75:18
pursued 8:13,
16
push 46:18
pushed 45:5
46:12, 14
put 22:13
44:19 48:20
49:5 57:2 59:2,
3 61:4 63:11,
20 64:19 74:20
81:5, 14 83:8,
16 84:7 89:2
91:14 95:21
96:5, 8, 10
puts 58:2

Putting 25:19
27:10 61:3
63:18 95:3
111:19

< Q >
Quality 10:18
quantify 63:5
quarter 26:17
30:9
question 4:16,
17, 19 5:2 6:2
13:7, 20 18:6
26:5 43:17, 18
49:21 65:11
68:18 69:2, 3
107:16 110:6
questioning 13:5
questions 4:6, 6,
9 5:11 15:8
109:7
quick 63:7
quite 14:13
17:15 27:17
41:9 64:1, 4, 7
84:1

< R >
raised 7:12
Raj 95:16, 19
96:12
R-A-J 95:17
rank 71:2, 3, 5
ranting 48:3
reaching 48:21
reaction 46:10
read 107:5
112:15 115:3
reading 3:6
ready 45:5
realization 99:4
realize 86:10
really 17:20
19:18 24:19
33:5 43:7
60:21 86:9
90:17
rear 80:14
reason 12:15
25:21

recall 17:20
26:13, 15 27:8
28:1, 6 30:1
31:4 33:5
36:19 39:2
44:3 46:19
52:3 66:8
69:16 70:1, 6, 7,
10, 11 71:7
72:13, 14 78:10,
12, 13, 16 83:13
84:21 86:7, 9,
14 88:3, 16, 20
90:17 95:19
96:18 97:1, 11,
12, 18 98:13
101:17 102:11,
11, 12, 15, 21
103:3 104:19
109:2 110:21
recasted 96:5,
12
receive 79:3
received 79:8
95:12 105:20
receiving 18:12
Recess 92:3
recollection
68:3, 19 69:9,
12 70:3 79:8
83:14 101:14
107:9
record 3:15
75:19 113:7
115:5
recorded 113:7
red 68:20
refer 71:3
reference 28:19
referred 25:11
30:20 71:4
99:6
regard 99:19
regarding 105:6
region 24:15
registration
41:21 45:4
46:13
regular 40:17
regulations 16:2

**rehabilitation**
10:*4, 7, 11*  15:*1,
3, 5*
**re-handcuffed**
80:*11, 12*
**related**  40:*14*
113:*11*
**relationship**
11:*11*  16:*6*
**released**  91:*4, 9,
17*  93:*9, 13*
**remain**  72:*11*
80:*6*  81:*13, 18*
83:*20*
**remained**  72:*9*
80:*3, 4, 5*
**remember**
22:*18*  27:*5, 15,
17, 21*  33:*4*
60:*7*  61:*2*  65:*1*
71:*1, 2*  73:*3*
84:*20*  85:*1*
95:*14*  101:*21*
102:*8*  109:*15*
111:*6*
**rendered**  77:*13,
14*
**rephrase**  43:*18*
**replaced**  22:*13*
**Reported**  1:*20*
25:*3*
**reporter**  4:*5, 7,
12*  112:*16*
**reporting**  17:*7*
**represent**  4:*1*
**representation**
87:*9*
**represented**
91:*1*
**representing**
104:*11*
**request**  25:*16*
**resource**  47:*10*
**respective**  3:*5*
**respond**  73:*5*
**response**  4:*15*
45:*10*  53:*2, 4*
67:*9*  74:*8*
**responses**  4:*9*

**responsibilities**
15:*20*  21:*20*
23:*10*
**restroom**  92:*1*
**result**  97:*7*
100:*18*  101:*11*
**Retained**  114:*10*
**return**  16:*21*
**Riddle**  104:*12,
13*
**Riddler**  104:*12*
**R-I-D-D-L-E-R**
104:*12*
**ride**  77:*5*  78:*3*
**right**  18:*8*  19:*1,
2, 20*  21:*9*
31:*13, 20*  32:*9*
33:*15*  34:*10*
42:*21*  44:*21*
46:*17*  49:*17*
50:*5, 7, 9, 9*
51:*5, 10, 13, 14,
15, 16*  52:*5*
53:*6, 20*  54:*17*
57:*18*  59:*4*
60:*20*  61:*3*
65:*3*  89:*14*
98:*12*  101:*16*
109:*15, 19*
110:*2, 3, 8, 9, 12*
111:*4, 14*  112:*6,
7, 9, 10*
**right-hand**  32:*3,
5*  35:*14, 15*
55:*4, 7*  74:*17*
**right-handed**
17:*6*
**ring**  60:*16*
**ringing**  85:*18*
**rings**  85:*15*
**River**  30:*21*
**Road**  6:*16*
14:*5, 14*  30:*16,
16, 21*  31:*18, 19*
32:*14, 14, 16, 18*
34:*6*  35:*16*
36:*5*  37:*17*
48:*14*  49:*9, 14,
18*  51:*5, 9*  55:*5,*

**7**  56:*6*  66:*1, 16,
20, 21*
**Robert**  94:*19*
**Roby**  94:*19, 21*
**R-O-B-Y**  94:*19*
**roll**  44:*11*  45:*6,
7, 16*  52:*19, 21*
53:*3*
**rolled**  44:*9*
53:*4*
**room**  65:*17*
74:*5*  79:*15, 16,
18, 19*  96:*4, 5, 7*
**Route**  31:*2, 4, 4,
12*  33:*13, 16*
36:*12, 13*  52:*8*
53:*6, 11*  54:*19,
21*  55:*11, 19*
56:*1*  64:*2*
65:*18, 19*  77:*8*
**routine**  40:*11*
**Royal**  49:*17*
50:*10*  51:*4, 7*
53:*13, 14*  54:*11,
16, 18*  55:*1, 9*
66:*2*
**rubbing**  58:*19*
**rules**  76:*21*
**run**  10:*5*  11:*14,
16*  67:*8, 8*
72:*16*
**running**  10:*8*

**< S >**
**safe**  48:*14*  98:*4*
**safest**  52:*10*
**safety**  51:*1*
**sat**  41:*9, 12*
77:*19*  84:*12*
**satisfied**  74:*3*
**Saturday**  93:*14*
95:*11*  96:*9*
**save**  49:*6*
**saw**  27:*2, 14, 16*
28:*1, 11, 13*
29:*16*  30:*1, 8*
31:*10*  32:*2*
56:*9, 15*  95:*10*
**saying**  36:*20*
45:*15*  50:*18*

**53:***5*  60:*7*
62:*15*  65:*4*
67:*3, 4*  74:*9*
84:*21*  109:*15*
**says**  41:*4*
45:*18, 21*  46:*1*
47:*16*  56:*13*
72:*5*  73:*9*  77:*4*
**scarred**  112:*13*
**scene**  64:*15*
77:*13, 14*
109:*10*
**School**  7:*8, 9*
9:*4, 20*  22:*3, 6,
14, 16, 18, 21*
47:*7, 10*
**Schoolhouse**
28:*8*  30:*5, 15*
31:*16, 17, 19*
**sea**  64:*13*
**seal**  113:*13*
**search**  67:*16*
68:*9, 10*  70:*4*
**searched**  67:*11*
69:*18, 18*  82:*12,
12*  88:*15, 16*
**searches**  70:*12*
**searching**  67:*14*
68:*4*  69:*6, 17,
21*  72:*19*
**seatbelt**  58:*14,
16*  60:*5, 8, 8, 12,
13*
**seated**  72:*11*
**second**  74:*13*
83:*21*  84:*4*
85:*7*
**second-to-the-las
t**  106:*16*
**see**  4:*4*  12:*7*
15:*21*  24:*7, 11*
25:*16*  32:*6*
33:*19*  34:*7*
42:*16*  59:*5*
63:*16, 17*  64:*21*
68:*20*  98:*3*
101:*3*  106:*14*
**seeing**  68:*19*
69:*14*  97:*1*

**100:***3*  101:*10*
**seek**  97:*7*
**seen**  24:*8, 9*
30:*7*  89:*5*  90:*6,
18*  96:*4*
**send**  105:*20*
**sense**  4:*18*
**sent**  95:*13, 17*
**separate**  115:*8*
**separated**  16:*16*
**serve**  47:*8*
**Services**  14:*19*
15:*2*  100:*8*
**session**  101:*8*
**set**  113:*4*
**setup**  32:*14*
**seven**  39:*10*
**shackled**  91:*12*
**shared**  105:*11*
**sharp**  109:*20*
**sheet**  115:*8*
**sheriff**  78:*21*
79:*1*  88:*18*
**Sheriffs**  90:*15*
**Sheriff's**  80:*21*
**SHERRILL**  1:*4,
12*  3:*9, 16, 17*
25:*15*  106:*5, 8*
113:*4*  114:*3*
115:*15*
**shifts**  21:*7*
**shocking**  45:*11*
**shoes**  82:*17, 20*
84:*9*  89:*1*
**shoot**  41:*3*
**shooting**  109:*20*
**shop**  55:*6*
**short**  9:*18*
**shoulder**  37:*11,
12*
**show**  106:*11*
**side**  32:*4, 5*
35:*14, 15, 17*
53:*15, 16*  55:*4,
7*  58:*15*  59:*19,
19*  60:*19, 20, 20*
61:*3*  65:*21*
70:*8*  74:*16, 17*
111:*9, 11, 12, 14*
112:*6, 8, 9, 10*

sign 32:*10*
49:*9, 19* 50:*3*
52:*6* 53:*19*
112:*15*
signature
106:*18* 107:*14*
signed 107:*6, 8,*
*21*
signing 3:*6*
106:*20*
Sinai 94:*19*
sir 45:*9, 17*
48:*4* 53:*4*
siren 36:*18, 19*
sit 69:*20* 70:*16*
71:*8* 86:*12*
sitting 18:*3*
41:*5* 69:*3* 72:*9*
85:*3* 93:*21*
situated 77:*18*
situation 46:*5,*
*6* 50:*4* 63:*7*
100:*16*
six 24:*8* 57:*16*
skills 15:*16*
skin 94:*3*
sling 79:*10*
smashed 58:*18*
soft 17:*19*
96:*17*
softball 93:*20*
someplace 65:*15*
sorry 11:*7*
55:*14* 68:*7*
110:*6*
sort 4:*11* 10:*12,*
*14* 15:*2, 10*
40:*11* 93:*18*
sought 93:*11,*
*14* 95:*4* 97:*18*
sounds 33:*20*
South 1:*14* 2:*5*
space 37:*19*
speak 4:*21*
38:*12* 82:*2*
speaker 36:*21*
speaking 38:*7,*
*19* 74:*14*
specialist 95:*13,*
*15*

specific 11:*2*
70:*3*
specifically
69:*13, 16* 70:*5*
speed 32:*21*
33:*1, 3, 6* 51:*21*
speeding 50:*18*
51:*2*
speedometer
51:*3*
spend 24:*12*
sprain 79:*10*
spring 98:*15*
stack 73:*18*
stand 14:*21*
98:*10*
start 3:*20* 26:*5,*
*18*
started 71:*6*
99:*13, 21*
state 3:*14* 9:*7,*
*13* 10:*7, 14, 15,*
*21* 16:*2* 113:*1,*
*3*
STATES 1:*1*
4:*2*
stay 14:*16*
49:*2, 4*
steering 70:*9*
stenographically
113:*7*
step 48:*21*
49:*2, 7*
stepped 77:*19*
stipulated 3:*4*

STIPULATIONS
3:*3* 113:*8*
Stones 39:*18*
stood 64:*10*
stop 16:*11*
32:*10* 34:*10*
49:*9, 19* 50:*3*
51:*8* 52:*6, 6*
53:*19* 57:*1*
99:*11*
stopped 14:*16*
30:*17* 31:*7*
56:*9, 15, 18*

58:*11* 68:*15*
77:*8* 78:*15*
stops 51:*17*
straight 54:*19,*
*20, 21* 55:*21*
56:*4, 5*
strapped 77:*20*
Strayer 8:*14*
Street 1:*14* 2:*5,*
*13* 12:*1* 31:*14,*
*15, 15, 21* 36:*10*
60:*15*
streets 35:*12*
strip 88:*15, 16*
stripped 82:*8,*
*10*
stuck 94:*3*
stuff 3:*21*
29:*16* 53:*5*
74:*2*
subsequent
103:*8*
subsequently
43:*9*
success 99:*19*
sued 108:*8, 18*
suit 14:*5* 59:*13*
82:*16* 108:*7, 18,*
*19*
Suite 2:*5, 13*
summer 98:*15*
supervisor
24:*18, 20*
supposed 77:*1*
sure 4:*15* 13:*6*
16:*1* 17:*16*
31:*1, 16, 18*
33:*15* 34:*17*
40:*6* 60:*10*
61:*11* 63:*19*
67:*5* 73:*12*
74:*10* 84:*1*
104:*17* 105:*17*
surgery 17:*5*
Susquehanna
30:*21*
sustain 18:*19*
sweat 59:*13*
82:*16*

swollen 93:*21*
94:*4*
sworn 3:*10*
113:*5*
symptoms 93:*18*

< T >
tag 42:*16*
take 4:*3* 5:*6*
14:*5* 19:*10*
20:*14, 15, 16, 19*
26:*2* 33:*16*
37:*10* 38:*3*
40:*21* 48:*4, 9*
49:*6* 53:*20*
65:*19* 71:*13*
72:*16* 75:*5*
82:*15* 83:*6*
90:*4* 91:*11, 21*
93:*10* 107:*5*
109:*10*
taken 1:*12* 4:*7*
65:*15, 16* 77:*15*
80:*9* 83:*7*
90:*11*
TALATHA 1:*4,*
*12* 3:*9, 16*
113:*4* 114:*3*
115:*15*
talk 17:*4* 26:*8*
39:*6*
talked 9:*21*
39:*4* 97:*5*
108:*3*
talking 34:*17,*
*18* 35:*4* 40:*13*
56:*11* 57:*12*
67:*20* 75:*11*
76:*2* 84:*15, 18*
110:*20*
Tall 57:*10, 11,*
*11, 14* 70:*21*
Taller 57:*13*
tasks 40:*8*
tavern 35:*14*
49:*14*
Taylor 27:*18*
Teacora 6:*13*
T-E-A-C-O-R-A
6:*13*

Team 15:*19*
16:*11, 16* 21:*16*
22:*15* 24:*3*
teed 56:*2, 3*
telephone 38:*14*
89:*9, 11, 15, 20*
tell 3:*10* 4:*18*
33:*17* 40:*10*
44:*2, 5* 69:*16*
70:*2* 75:*1, 9*
telling 9:*1*
tells 48:*17*
temple 61:*14*
ten 56:*12* 64:*6*
terms 69:*17*
70:*4* 72:*3*
terrible 6:*1*
terribly 74:*12*
terrified 67:*9,*
*10*
Tessie 27:*18*
test 5:*4*
testified 3:*11*
52:*12* 102:*2, 6*
103:*19, 20*
104:*3*
testify 102:*4*
testifying 103:*3*
testimony 33:*12,*
*14* 58:*9* 61:*15*
70:*15* 83:*9*
88:*6* 100:*17*
111:*7* 115:*5*
Thank 112:*14*
therapeutic 16:*2*
therapist 16:*3,*
*7* 99:*17*
therapists 15:*14,*
*15*
therapy 17:*5,*
*18, 19* 18:*2, 8, 9,*
*11, 14* 19:*9, 16,*
*21* 20:*2, 7, 13*
98:*11, 13, 17, 21*
99:*7, 9, 11, 14,*
*17, 21* 100:*2, 2*
thick 70:*21*
thing 15:*6*
29:*7* 34:*17*
82:*5*

things 4:*11*
14:*9* 29:*9, 13,
18* 39:*7, 8* 40:*7,
13, 14* 99:*5*
think 10:*1*
22:*17* 24:*5*
28:*11* 33:*16*
38:*18* 44:*1*
49:*11* 50:*2*
52:*9* 58:*15*
61:*15* 64:*6*
68:*13* 71:*20*
72:*8* 73:*10*
78:*18* 79:*12*
86:*3* 96:*16*
97:*20* 98:*12*
99:*12*
thinking 18:*3, 4,
5, 6* 27:*13*
45:*12* 49:*21*
62:*3* 67:*7* 93:*4*
third 63:*17*
thought 11:*6*
41:*8* 49:*2, 3, 10,
16, 20* 86:*12*
three 14:*7*
23:*15* 24:*10*
36:*4, 14* 62:*5, 8*
85:*15*
three-quarters
44:*12, 13, 16*
52:*13*
threw 112:*1, 4,
11*
thrown 58:*18*
60:*14* 65:*9*
111:*20*
Thursday 26:*14*
ticket 46:*4*
48:*5, 5*
time 5:*5* 7:*1*
8:*9, 11* 13:*14,
18* 17:*14, 16*
19:*13, 14, 18*
20:*18, 21* 22:*8*
23:*12* 24:*5, 11,
21* 26:*15, 19*
28:*11* 31:*10*
33:*8, 11* 35:*19,
20, 21* 36:*2*

38:*8* 41:*11*
43:*7* 49:*4*
50:*20* 51:*1*
52:*1* 57:*20*
61:*6, 7* 62:*6, 9,
21* 63:*2, 2* 65:*8*
71:*4, 18, 20*
72:*2, 4, 7, 19*
80:*7, 8, 18*
81:*10* 82:*3, 11*
83:*21* 84:*2, 4,
11, 20* 85:*17*
86:*11* 88:*21*
90:*18* 93:*7, 11*
96:*17, 20* 103:*7,
8, 13, 18* 104:*2,
11, 17* 106:*4*
107:*3, 21*
111:*13* 113:*4*
times 21:*7*
24:*9, 10* 39:*4*
103:*15, 19*
104:*6, 15*
today 4:*4* 5:*9*
28:*2* 69:*3*
108:*4*
told 72:*20*
73:*13, 21* 75:*4*
86:*19* 87:*1, 9,
15* 89:*16*
103:*12* 104:*8*
toughest 6:*2*
traffic 37:*19*
56:*1*
training 15:*13*
transcript
113:*7* 115:*4, 9*
transmission
21:*10*
transport 78:*11*
85:*6, 7*
transported
81:*6* 88:*7, 8, 9*
90:*12*
transports 88:*7,
11*
trauma 19:*1*
100:*8, 13, 14, 15*
traumatic

100:*15*
travel 37:*14, 16*
traveling 14:*14*
treated 79:*21*
treatment 19:*20*
77:*12* 79:*8*
93:*12, 14, 19*
95:*12, 20* 96:*19*
101:*6*
Tremetire
100:*4, 6, 7*
101:*3*
T-R-E-M-E-T-I-
R-E 100:*4*
trial 102:*2, 10*
tried 45:*13*
101:*18*
triggering 14:*2,
10*
true 113:*7*
115:*5*
trunk 69:*18*
70:*7, 7* 73:*8, 14*
truth 3:*10, 11,
11*
try 4:*20* 49:*6*
63:*15*
trying 19:*19*
25:*8* 48:*6* 50:*2*
59:*1, 2* 60:*7, 11*
61:*4, 18* 62:*14*
turn 31:*13, 20*
51:*6, 14, 15, 16*
53:*12* 106:*16*
107:*12, 12*
turned 64:*10*
twenty 56:*12*
twice 97:*20*
109:*1*
twisted 109:*15,
19*
twisting 59:*4, 4,
4* 110:*9, 12*
111:*21*
two 16:*8* 22:*10*
23:*15* 31:*21*
32:*7, 9, 11, 15*
33:*21* 34:*1, 8*
35:*7* 46:*9*
50:*20* 52:*1*

56:*12* 59:*15*
62:*10, 19* 69:*5*
78:*5* 88:*6* 89:*1*
90:*12* 95:*18*
97:*14* 101:*8*
two-lane 32:*14,
16, 17*
two-minute 92:*1*
type 15:*6*
types 29:*7* 39:*8*
typical 29:*15*

< U >
Uh-huh 27:*4*
34:*2* 38:*1*
44:*14* 52:*14*
54:*13* 55:*12*
61:*17* 68:*5*
74:*16* 83:*17*
87:*14* 105:*16*
understand
4:*17, 19* 5:*7, 10*
25:*8* 46:*8*
101:*7*
understanding
60:*4, 6* 78:*13*
understood
106:*20* 107:*16*
uniform 42:*15*
43:*3, 5* 57:*13,
17, 18* 88:*21*
uniformed
42:*17*
Union 75:*5, 8,
17, 18, 20* 77:*6*
78:*15, 19* 79:*2,
7, 12* 80:*16*
81:*7* 88:*8*
UNITED 1:*1*
4:*2*
units 64:*12*
University 7:*15,
16* 8:*3, 11, 13,
14*
unmarked 42:*6*
55:*16* 64:*12*
untwist 65:*5, 5*
upper 61:*9*
93:*16* 94:*5*

95:*18*
use 44:*18*
usually 39:*5*

< V >
vehicle 35:*13*
37:*2* 41:*1, 10,
12* 42:*4, 6, 7, 8,
11* 43:*14* 44:*1,
4, 5, 9, 19* 46:*15*
50:*21* 54:*4, 6*
55:*18* 56:*8*
58:*4, 17* 62:*11,
11* 63:*1* 66:*16,
19, 21* 67:*11, 15*
68:*4, 16, 18*
69:*6, 17, 19*
70:*10, 13, 17*
71:*9* 72:*9, 12*
76:*8, 9* 81:*9*
112:*3*
vehicles 32:*7, 9*
34:*8*
verbal 4:*15*
58:*10, 11*
video 90:*10*
visited 29:*19*
vocation 9:*9*
voluntarily
23:*18, 21*
volunteer 29:*14*
vs 1:*6*

< W >
waist 91:*13*
wait 86:*13*
87:*8* 91:*16*
96:*3*
waited 91:*15*
Waiting 41:*20*
42:*1* 82:*6* 85:*4*
91:*20*
waived 3:*7*
Walk 7:*6*
30:*10* 35:*6*
66:*5* 84:*10*
walked 66:*7, 8,
11, 13, 15* 82:*20*
want 4:*13* 33:*4,
15* 34:*16* 36:*4*

43:*18*  46:*4*
50:*18*  51:*1*
61:*11, 12*  71:*5*
73:*11*  74:*10, 11*
75:*8*  84:*13, 19*
90:*16*  106:*17*
109:*10*
**wanted**  74:*4, 5*
75:*14*  87:*7, 12*
**watching**  73:*4, 4*
**Water**  76:*8, 10,*
*13*
**way**  37:*19*
39:*4*  44:*13*
46:*10*  49:*18*
52:*10, 13*  53:*1*
58:*15, 17*  76:*20,*
*20*  83:*4*  89:*1*
102:*15*  113:*11*
**weapon**  58:*6*
**wearing**  106:*4*
**wedding**  60:*16*
**week**  12:*10*
13:*7, 9*  26:*13*
97:*20*  101:*4*
**weekend**  105:*21*
**weeks**  17:*15, 15*
**Well**  3:*20*
12:*19*  14:*5*
18:*15*  20:*16*
30:*5*  41:*6*
68:*11*  70:*2*
73:*20*  75:*6*
77:*4*  92:*15*
93:*3*  111:*18*
112:*6*
**went**  7:*14, 15*
20:*18*  27:*1*
29:*8, 14*  40:*13*
49:*18*  50:*4, 9*
73:*7*  80:*18*
81:*3*  84:*11*
86:*1, 2*  95:*18*
96:*17*  98:*4*
109:*21*
**We're**  4:*3*
15:*14*  26:*8*
34:*5, 17*  112:*15*
**West**  19:*7*

32:*17*
**we've**  108:*3*
**wheel**  70:*10*
**Whereabouts**
19:*6*
**white**  42:*14*
43:*5*  57:*10*
70:*21*
**Williams**  27:*18*
**Win**  15:*19*
16:*11, 15*  21:*16*
22:*15*  24:*3*
**window**  44:*10,*
*11, 20*  45:*6, 6, 7,*
*8, 16, 17, 17*
48:*8, 18*  52:*13,*
*20, 21*  53:*3, 4*
**wintertime**
29:*12*
**wireless**  35:*1*
**Witch**  76:*8, 10,*
*13*
**witness**  3:*7*
72:*5*  113:*13*
114:*2*
**WITNESSES**
114:*1*
**wooded**  35:*11*
37:*13*  49:*11*
**woods**  35:*16*
49:*5*
**word-of-mouth**
25:*14*
**words**  53:*2*
**work**  12:*8, 10*
14:*17*  15:*14*
16:*14*  17:*1*
25:*15*  26:*19, 21*
29:*14*  39:*5*
52:*17*
**worked**  15:*19*
21:*16*  23:*6*
24:*3*
**working**  13:*6, 9*
16:*11*  23:*12*
73:*14*
**worry**  14:*15*
**wound**  76:*5*
77:*5*

**wrists**  111:*19*
**write**  115:*8*
**writing**  17:*7*

**< X >**
**x-ray**  79:*9*
80:*9, 11*

**< Y >**
**yanked**  57:*3, 4*
58:*13, 17*  60:*12,*
*14*
**yanking**  57:*21*
**yeah**  75:*15*
**year**  7:*13, 18*
8:*7*
**years**  6:*19*  8:*1*
14:*6, 7*  16:*9*
22:*10*  23:*14, 15*
39:*11*  95:*2*
**York**  100:*7*
**Young**  27:*14,*
*14*  29:*2, 3, 3*
**Youth**  24:*9*