## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

TALATHA SHERRILL,

    Plaintiff

    v.

DEPUTY JOSEPH CUNNINGHAM, et al.,

    Defendants

\*    \*    \*    \*    \*    \*    \*    .\*    \*    \*    \*    \*

CIVIL NO. JKB-18-476

## MEMORANDUM

Plaintiff Talatha Sherrill filed suit against Defendants Deputy Joseph Cunningham and Corporal Jonathan Pristash, officers of the Cecil County Sheriff's Office, alleging they subjected her to an unlawful search and seizure and used excessive force during an arrest in violation of 42 U.S.C. § 1983. Sherrill also brings state law claims for negligence, gross negligence, malicious prosecution, and battery. Now pending before the Court is Defendants' Motion for Summary Judgment (ECF No. 50). No hearing is required. *See* Local Rule 105.6 (D. Md. 2018). For the reasons set forth below, Defendants' Motion for Summary Judgment will be granted in part and denied in part.

### I. *Background*

Shortly after 8:00 p.m. on January 14, 2016, Sherrill was driving her Chevy Cruze in Cecil County, Maryland after leaving a client's home on Old Schoolhouse Drive. (M.S.J. Ex. A at 139–40, ECF No. 50-3; Opp'n M.S.J. Ex. 3 at 37, ECF No. 56-3.) Sherrill, a psychiatric rehabilitation counselor, stands at four feet six inches tall and weighs about one hundred thirty pounds. (Opp'n M.S.J. Ex. 3 at 10, Ex. 8 at 1, ECF No 56-8.) Deputy Cunningham testified that around the same

time, an undercover officer in the area of the Schoolhouse Apartments near Old Schoolhouse Drive radioed that a silver Chevy Cruze was "traveling at a high rate of speed coming out of the apartments." (M.S.J. Ex. D at 16, ECF No. 50-6.) Deputy Cunningham testified that the Schoolhouse Apartments were a "[h]igh crime, high drug area." (*Id.* at 17.) Deputy Cunningham was on patrol nearby, and he saw the silver Chevy Cruze when it drove past him. (M.S.J. Ex. A at 28–31.) He testified that the speed limit was 50 miles per hour and the car appeared to be speeding. (*Id.* at 30–31.) Deputy Cunningham then "paced" the vehicle by driving behind it and determined it was moving at 69 miles per hour. (*Id.* at 31.) Sherrill, however, testified that she was only driving "about 50 [miles per hour] . . . No more than 55." (*Id.* at 143.) Sherrill did not recall the speed limit in the area, testifying, "I don't even remember. I want to say it was 55, but I don't really recall." (Opp'n M.S.J. Ex. 3 at 33.)

Deputy Cunningham pulled onto the road and activated his emergency lights in order to make the traffic stop. (M.S.J. Ex. A at 32–34.) After Sherrill pulled over, Deputy Cunningham approached her vehicle. (Opp'n M.S.J. Ex. 3 at 41–42.) At this point, the stories diverge. Sherrill testified that she had her license and registration in her hand and had partially rolled her window down. (*Id.* at 44–45.) She testified that she attempted to hand Deputy Cunningham these documents through the window, but "[h]e pushed [her] hand back in and said roll your fucking window down." (*Id.* at 45.) She testified that she said her window was down, and that he repeated his expletive-filled demand. (*Id.*) She testified that she asked if he could call for backup, and he responded, "Negative." (*Id.*) She said he seemed "irate" and was "screaming and yelling" at her. (M.S.J. Ex. A at 148.) She testified that she asked if they could go to a "lit area," and that he responded, "'You are not going anywhere. Get out of the car. I said get out of the F-ing car.'" (*Id.*) At this point, Sherrill testified that he began to put on gloves and pulled out a tool which she

2

assumed he would use to break her window. (*Id.* at 148–49.) She said she was "pretty much scared for [her] life." (*Id.* at 150.) She testified that she was on a "dark road" with "no street lights," so she decided to drive toward a Royal Farms where there would be "witnesses." (*Id.* at 150.)

Deputy Cunningham denies this characterization of their interaction. He testified that he introduced himself and identified himself as part of the Cecil County Sheriff's Office without using the expletive Sherrill alleged he used. (*Id.* at 42, 231–32.) He also testified that Sherrill never tried to hand him her license and registration through the window. (M.S.J. Ex. D at 53.) After Sherrill refused to roll her window down, he testified that he ordered her to step out of the vehicle twice and that she refused to do so. (M.S.J. Ex. A at 42.) At this point, he testified that he told her "if she refused to do so, [he] would be forced to break the window and extricate [or extract] her from the vehicle." (*Id.* at 42.) Deputy Cunningham testified that Sherrill said no and "sped off." (*Id.*) He then "radioed to dispatch that the vehicle had fled from the traffic stop," activated his siren, observed Sherrill fail to stop at a stop sign, and began following Sherrill. (*Id.* at 43.) He said he saw Sherrill "cross the double center line multiple times" and cross the white line onto the shoulder. (*Id.* at 44.) He once again paced his vehicle with Sherrill's vehicle and determined she was driving at 60 miles per hour where the speed limit was 40 miles per hour. (*Id.* at 45.) Sherrill testified that during this time she was driving 47 miles per hour because she thought Deputy Cunningham would hit her car and that she did stop at the stop sign before continuing toward the Royal Farms. (*Id.* at 149–50.)

Corporal Pristash testified that he was at the Royal Farms when he heard Deputy Cunningham call out that a vehicle had just fled a traffic stop, and he soon saw that vehicle heading in his direction. (M.S.J. Ex. A at 209–11.) Corporal Pristash attempted to do a U-turn to follow

Sherrill's vehicle, but when Sherrill's vehicle came close, both vehicles stopped to avoid hitting each other. (M.S.J. Ex. C at 18, ECF No. 50-5.)

The parties agree that Sherrill was subsequently removed from her vehicle and placed face down on the ground, but they dispute the way in which this occurred. Sherrill testified that before she was pulled out of her vehicle, she heard Corporal Pristash say, "'Get out of the car, get out of the car. What the 'F' is wrong with you. What's wrong with you. What's wrong with you.'" (M.S.J Ex. A at 152.) She continued, "And I am like, okay, and I had my arms up. I had my hands up so they could be seen, because I knew that, you know, you just need to let the officer see your hands. He yanked me out. Threw me on the ground. He had a gun in his hand . . ." (*Id.*) Sherrill testified that after she stopped her vehicle, "before I get my car put in park[], barely" Corporal Pristash "yanked open my door." (M.S.J. Ex. B at 57, ECF No. 50-4.) When asked whether Corporal Pristash had given any commands before he "put[] his hand on the door handle" of her vehicle, Sherrill responded, "No, I got no commands." (*Id.* at 58.)

Sherill testified that she was pulled from the car "with such force that [her] hood actually was ripped in half." (M.S.J. Ex. A at 180.) She testified she was "thrown immediately to the ground in the middle of the street. [Her] glasses flew off. [Her] earrings, [her] wedding ring flew off." (Opp'n M.S.J. Ex. 3 at 60.) She explained, "[Her] face was smashed to the ground almost like a rubbing in . . . There was someone with a knee in [her] back, and Cunningham was trying to arrest [her]." (*Id.* at 58.) She testified that she "went down with such force that [she] had bruises on [her] face," and that her face was "burning" and she was picking gravel and glass out of her face in the ambulance later that night. (M.S.J. Ex. A at 182.) She also testified that as Cunningham was attempting to put the handcuffs on her, "he twisted and twisted and twisted" her arm even though she "kept saying, 'My arm, my arm, my arm.'" (*Id.* at 153–54.)

4

The officers, however, testified that the interaction progressed quite differently. Corporal Pristash testified that he never used any expletives in his interaction with Sherrill. (*Id.* at 219.) According to the officers, Corporal Pristash gave multiple demands for Sherrill to show her hands and exit the vehicle, but Sherrill did not comply. (*Id.* at 219–220; M.S.J. Ex. C at 19.) Corporal Pristash testified that he "grabbed her by her coat and started to pull her out of the vehicle." (M.S.J. Ex. A at 221.) Deputy Cunningham then approached the vehicle and "grabbed" Sherrill's coat on her right and "assisted in lowering the subject to the ground." (*Id.* at 48.) Deputy Cunningham testified that she was placed on the ground gently, "with the least amount of force necessary." (M.S.J. Ex. D at 73–74.)

Corporal Pristash and Deputy Cunningham testified that Sherrill's hands were under her abdomen when she was lowered to the ground. (M.S.J. Ex. A at 48, 226.) Deputy Cunningham testified that they "ordered the suspect to put her hands behind her back multiple times. She continued to resist." (*Id.* at 48.) Corporal Pristash grabbed Sherrill's left side and Deputy Cunningham pulled on Sherrill's right side "to get her hands out from underneath of her." (*Id.*) Deputy Cunningham explained, "[a]s I got the subject's hands out from underneath her torso, utilizing a wrist manipulation, I maneuvered her arm behind her back and we proceeded to place her in handcuffs." (*Id.* at 49.) Sherrill, however, testified that she never placed her hands under her stomach. (*Id.* at 182.)

After Sherrill was arrested, Deputy Cunningham searched Sherrill's vehicle. (Opp'n M.S.J. Ex 4 at 185, ECF No. 56-4.) Deputy Cunningham testified that officers in his unit completed an inventory search for every vehicle prior to towing while it is still on the scene in order to record whether any valuables are present. (M.S.J. Ex. D at 93–94, Ex. H at 1, ECF No. 50-14.) Corporal Pristash testified that he was not involved in the vehicle search, (M.S.J. Ex. A at

5

224), but Sherrill testified that he was involved in the search, as were up to 15 other officers, (Opp'n M.S.J. Ex. 3 at 69–70). Sherrill testified that her Christmas bags were dumped out and the contents were left all over her trunk and car. (Opp'n M.S.J. Ex. 4 at 158.)

At some point after her arrest, Sergeant Walmsley came to the scene to supervise. (M.S.J. Ex. A. at 51.) After Sherrill was arrested, she told the officers that she was afraid of the police and that her right arm was in pain. (M.S.J. Ex. A at 49–50.) Sherrill was then taken to the hospital, and after an X-ray she was diagnosed with a sprained elbow. (Opp'n M.S.J. Ex. 3 at 79.) The only medical attention that she received at the hospital was an X-Ray. (M.S.J. Ex. A at 184.) After being released from the hospital, Sherrill saw another doctor who found that her right elbow was fractured. (Opp'n M.S.J. Ex. 6, ECF No. 56-6.)

Sherrill was later convicted in the District Court of Maryland for Cecil County for the misdemeanor of obstructing and hindering, as well as several traffic offenses, including eluding police, failure to obey traffic instructions, and failure to drive right of center. (M.S.J. Ex. M at 1, 5, 7, 12, ECF No. 50-19.) Sherrill appealed this conviction, and the State entered a nolle prosequi to all charges. (Opp'n M.S.J. Ex 8 at 1–2.) At the time of the appeal, the Defendants were unavailable because they were on leave, (M.S.J. Ex. G at 4, ECF No. 50-13, Ex. H at 5.), and the State's Attorney said that the reason for the nolle prosequi was the Defendants' unavailability, (M.S.J. Ex. N at 2–3, ECF No. 50-20).

## II.    *Motion for Summary Judgment*

The Defendants filed a motion for summary judgment on Sherrill's claims. Sherrill filed an opposition to that motion, but specifically stated that she did not contest the Defendants' motion as it related to her malicious prosecution claim and her claim that the arrest after the second stop

6

was unlawful. (Opp'n M.S.J. Mem. at 2 n.1, ECF No. 56.) The Court will now address the Defendants' motion.

### a. Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing predecessor to current Rule 56(a)). The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If sufficient evidence exists for a reasonable jury to render a verdict in favor of the party opposing the motion, then a genuine dispute of material fact is presented and summary judgment should be denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The facts themselves, and the inferences to be drawn from the underlying facts, must be viewed in the light most favorable to the opposing party. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008). Still, the opposing party must present those facts and cannot rest on denials. The opposing party must set forth specific facts, either by affidavit or other evidentiary showing, demonstrating a genuine dispute for trial. Fed. R. Civ. P. 56(c)(1). Furthermore, the opposing party must set forth more than a "mere . . . scintilla of evidence in support of [his] position." *Anderson*, 477 U.S. at 252.

### III. Analysis

### a. Count 1: Unlawful Search and Seizure

The Fourth Amendment provides individuals with the right to be free from "unreasonable searches and seizures." U.S. Const., amend. IV. Sherrill alleges that the Defendants violated the

Fourth Amendment because the first traffic stop and the search of her vehicle were unreasonable. The Court will evaluate each event in turn.

### i. First Traffic Stop

Traffic stops by the police qualify as "seizures" and therefore must be "reasonable" to comply with the imperatives of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809–10 (1996). "[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Id.* at 810.

Deputy Cunningham testified that an undercover officer near the Schoolhouse Apartments "called out" a silver Chevy Cruze as "traveling at a high rate of speed coming out of the apartments." (M.S.J. Ex. D at 16.) He further testified that the Schoolhouse Apartments were a "[h]igh crime, high drug area." (*Id.* at 17.) Deputy Cunningham testified that he observed a vehicle matching that description—Sherrill's vehicle—and "paced" his vehicle with Sherrill's to determine she was driving 69 miles per hour. (M.S.J. Ex. A at 31.) Deputy Cunningham testified that the speed limit in the area was 50 miles per hours. (*Id.*)

Sherrill, on the other hand, testified she was driving "about 50 [miles per hour] . . . No more than 55." (*Id.* at 143.) Though Sherrill claims in her Opposition that the speed limit was 55 miles per hour, there is no support in the record for this assertion.[1] Her only reference to the speed limit in the area comes in her deposition, in which Sherrill is asked, "What was the speed limit then?" She replies, "Then, I don't even remember. I want to say it was 55, but I don't really recall." (Opp'n M.S.J. Ex. 3 at 33.) Sherrill argues that based on this statement, there is a genuine dispute of material fact regarding whether she was exceeding the speed limit before she was

---

[1] Sherrill cites to two exhibits in support of this assertion, yet neither exhibit provides any such support. Page 143 of Exhibit 4 contains no statement regarding the speed limit in the area. That page only discusses how fast Sherrill was driving. (Opp'n M.S.J. Ex. 4 at 143.) Nor does Exhibit 3, Sherrill's deposition transcript, provide any evidence that the speed limit was actually 55 miles per hour.

initially pulled over. Despite Sherrill's claims to the contrary, there is no genuine dispute of material fact that the speed limit in the area was 50 miles per hour. The party opposing a motion for summary judgment "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Rather, the party opposing summary judgment on the ground that a fact is genuinely disputed must support this claim by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1). Sherrill fails to do that here, and the only information in the record she cites in support of the speed limit being 55 miles per hour is her statement, "I don't even remember. I want to say it was 55, but I don't really recall." (Opp'n M.S.J. Ex. 3 at 33.) Because "mere speculation" is insufficient to create a genuine dispute, the Court finds that there is no genuine dispute that the speed limit was 50 miles per hour where Sherrill was pulled over. *Beale*, 769 F.2d at 214.

Even if the Court were to accept Sherrill's testimony that she was driving "no more than 55" miles per hour—disregarding Deputy Cunningham's testimony that she was driving 69 miles per hour—Sherill has still admitted to driving above the speed limit of 50 miles per hour. Accordingly, the Court finds that there is no genuine dispute of material fact about whether Sherrill was speeding when she was first pulled over by Deputy Cunningham. Because Deputy Cunningham has established that Sherrill was violating a traffic law when he pulled her over, he has established that there was probable cause for the traffic stop. *Whren*, 517 U.S. at 810. The parties do not dispute that Sherrill's subsequent arrest after she fled—committing additional traffic violations and a misdemeanor in the process—was also reasonable. Accordingly, Deputy Cunningham did not violate Sherrill's Fourth Amendment right from unlawful seizure with either the initial stop or the later stop and arrest.

### ii. Vehicle Search

Sherrill also claims that the Defendants violated her Fourth Amendment rights when they searched her car without a warrant following her arrest after the second stop. Though warrantless searches are typically forbidden under the Fourth Amendment, an "inventory search" is an exception to the general rule. *Colorado v. Bertine*, 479 U.S. 367, 371 (1987). "[I]nventory procedures serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." *Id.* at 372. Inventory searches "must not be a ruse for a general rummaging in order to discover incriminating evidence" and the police "policy or practice . . . should be designed to produce an inventory." *Fla. v. Wells*, 495 U.S. 1, 4 (1990).

Deputy Cunningham testified that while there is not a written policy on inventory searches in Cecil County, in his unit at the time, for "every vehicle that was towed, an inventory search was completed" at the scene prior to towing.[2]  (M.S.J. Ex. D at 93–94.)  In his affidavit, Deputy Cunningham explained that it is his department's policy to record whether anything of value is in the vehicle, and he attached a corresponding property record form from the Cecil County Sherriff's Office "which is used if valuables are taken from a vehicle in an inventory search." (M.S.J. Ex. H at 1–2, 6.)

Sherrill argues that the inventory search was unlawful because one can make the "reasonable inference" that Defendants were "looking for evidence of a crime when they searched her car." (Opp'n M.S.J. Mem. at 9.) In support of this inference, Sherrill points to her testimony that Sergeant Walmsley searched her purse and wallet after her arrest and told her "'I am just looking, making—looking for some—something to make sure that you are doing what you said

---

[2] Sherrill testified that Officer Walmsley later decided her vehicle would not be towed as a "courtesy" to her. (Opp'n M.S.J. Ex. A at 169.)

that you do.'" (Opp'n M.S.J. Ex. 4 at 156.) Even accepting this testimony as true, this has no bearing on whether the Defendants in this case, Officer Cunningham and Deputy Pristash, conducted an unlawful search of her vehicle. As to Cunningham and Pristash, Sherrill testified that she remembered "Cunningham looking in my trunk," and "Pristash bending over on the driver's side . . . looking on the floor and up under the steering wheel area . . ." (Opp'n M.S.J. Ex. 3 at 70.) This description does not suggest that the Defendants were doing anything inappropriate for a typical inventory search.

Sherrill also claims that there is a dispute regarding whether the officers searched her vehicle "to satisfy their suspicions as to the reason she fled from the police" because they believed "Sherrill was seen driving her car out of a high crime area." (Opp'n M.S.J. Mem. at 9.) However, "[a]n officer's suspicion that contraband may be present [in the vehicle] does not invalidate an otherwise lawful inventory search." *United States v. Matthews*, 591 F.3d 230, 235 n.7 (4th Cir. 2009) (alterations in original) (quoting *United States v. Cox*, 955 F.2d 42 (4th Cir. 1992)). Thus, even if the Defendants suspected that Sherrill's vehicle contained contraband, the presence of this belief would not negate the lawfulness of the inventory search here.

Lastly, Sherrill claims that the Defendants "dumped" her Christmas gift bags in her trunk "all over the place," and that her groceries were "thrown all over the place." (Opp'n M.S.J. Ex. 4 at 157–58.) Even if the officers dumped her grocery bags and Christmas bags out in her car, this does not render this search unconstitutional, or imply that the search was merely a "ruse" to search for contraband. Deputy Cunningham testified that it was policy to record whether any items of value were in the vehicle before it was towed, and the only way for officers to accomplish that would be to look in bags and containers. *See Matthews*, 591 F.3d at 237–38 (determining inventory search of bags in car was appropriate because "[o]nly by performing a full inventory of the car—

which includes opening closed containers—could an officer identify all the vehicle's valuables and effectively secure them" as required for complete inventory). Sherrill makes no allegations about missing or damaged items, and the fact that her items were not neatly placed back in the bags they came in does not render this search unconstitutional. *See Colorado*, 479 U.S. at 383 (Marshall, J., dissenting) (upholding an inventory search where the dissent explained the "interior of the vehicle was left in disarray"). Accordingly, even accepting Sherrill's testimony regarding the search as accurate, the search of Sherrill's vehicle was lawful. Therefore, the Court will grant the Defendants' motion for summary judgment on Count 1.

### b. *Count II: Excessive Force*

The Defendants also request summary judgment on Sherrill's claim that they used excessive force in removing her from her vehicle and handcuffing her during the second traffic stop after she had fled from Deputy Cunningham. They also argue that even if they are found to have violated the Constitution by using excessive force, they are still entitled to qualified immunity on these claims. Qualified immunity protects government officials from civil liability "unless the official's conduct violated a clearly established constitutional right." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). To determine whether an official is covered by qualified immunity, the Court asks (1) "whether a constitutional violation occurred" and (2) "whether the right violated was clearly established." *Melgar ex rel. Melgar v. Greene*, 593 F.3d 348, 353 (4th Cir. 2010). Under the second prong, "the clearly established right must be defined with specificity." *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019). This is "'especially important'" in cases alleging the use of excessive force, where the outcome "'depends very much on the facts of each case.'" *Id.* (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152–53 (2018)). Therefore, "police

officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela*, 138 S. Ct. at 1153 (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 309 (2015)).

In evaluating a claim for qualified immunity at the summary judgment stage, the Court views the facts and inferences drawn from those facts in the light most favorable to the nonmoving party. *Graham v. Gagnon*, 831 F.3d 176, 184 (4th Cir. 2016). In other words, "the officers are assumed to have possessed the information they would have had if events unfolded as [Sherrill] asserts." *Id.* The Court will consider each prong in turn.

### *i. Constitutional Violation*

To evaluate the first factor, the Court must determine whether a constitutional violation occurred. Though "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it," courts must make an objective inquiry into the "facts and circumstances of each particular case" to determine whether the use of force was reasonable. *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). In doing so, courts must consider: (1) "the severity of the crime at issue"; (2) "whether the suspect poses an immediate threat to the safety of the officers or others"; and (3) "whether [s]he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. "The extent of the plaintiff's injury is also a relevant consideration." *Jones v. Buchanan*, 325 F.3d 520, 527 (4th Cir. 2003). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.

As to the first factor, the parties dispute the severity of the crime Sherrill committed. It is undisputed that Sherrill had fled from the police at a traffic stop and led the police on a car chase

until she stopped by the Royal Farms. Sherrill argues this is only a non-violent misdemeanor, and there was "no[] information she was violent or wanted for any violent offense." (Opp'n M.S.J. Mem. at 11.) The Fourth Circuit has recognized that the first factor of the *Graham* analysis weighs in favor of the plaintiff where the crime committed was a "minor" one. *Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir. 1994) ("pick[ing] up a five dollar bill that [plaintiff] knew had been lost by someone else" was minor offense which weighed against use of force). *See also, Yates v. Terry*, 817 F.3d 877, 885 (4th Cir. 2016) (committing "nonviolent, minor traffic infractions" and misdemeanor of driving without a license weighs against use of force). But, as the Sixth Circuit has said, "[e]vading a police officer cannot be dismissed as a minor traffic violation." *Dunn v. Matatall*, 549 F.3d 348, 354 (6th Cir. 2008). Here, Sherrill fled a traffic stop and led the police on a short chase prior to giving any identification to the officers, so they did not know who she was or whether she was wanted for any crimes. Such a crime, though not a severe, violent felony, is more than simply a "minor" offense. Thus, the Court finds this factor is neutral and does not weigh either for or against the use of force.

The second factor courts must consider is whether the suspect posed an immediate threat to the safety of the officers or to others. Whether use of force was reasonable "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Sherrill argues that she posed no threat to the officers because she was "an unarmed 4'6 woman with no criminal history." (Opp'n M.S.J. Mem. at 11.) However, as explained above, the officers did not know that Sherrill was unarmed or that she had no criminal history at the time of the second stop. Corporal Pristash testified he could not see into the vehicle because it was dark, (M.S.J. Ex. C at 22), and Deputy Cunningham said he did not notice Sherrill's size when she was in the vehicle because he was focused on looking at her hands,

(M.S.J. Ex. D at 70). However, once the Defendants had removed Sherrill from her vehicle and prior to placing her on the ground, Deputy Cunningham testified that he was aware of her size. (M.S.J. Ex. D at 82.) Sherrill says each officer had one of her arms at this point, and Deputy Cunningham knew that Sherrill was a small woman outnumbered by much larger men. Based on Sherrill's testimony, the Defendants could not have believed that she posed an immediate threat to them at that point. Accordingly, the second factor weighs against the use of force Sherrill contends was employed when she was thrown and tackled to the ground.

The final *Graham* factor asks whether the plaintiff was resisting arrest or attempting to flee. By the time Sherrill was pulled over, she had defied Deputy Cunningham's orders to exit her vehicle and fled a traffic stop. Corporal Pristash testified that he was commanding Sherrill to show her hands at this point. (M.S.J. Ex. A at 216.) Sherrill testified that she also heard Corporal Pristash say, "Get out of the car, get out of the car . . . And I am like, okay, and I had my arms up . . . He yanked me out. Threw me on the ground." (*Id.* at 152.) Sherrill testified that she was "yanked" out of the car "two seconds" after she had put it in park. (*Id.*) She testified that when she was going down to the ground one of the officers "kind of pushed me down" and her arms were behind her. (Opp'n M.S.J. Ex. 4 at 153.) She also testified that Officer Cunningham put his knee in her neck and "pressed [her] head to the ground." (*Id.*) She says Deputy Cunningham then "twisted and twisted" her arm in the process of placing handcuffs on her, which resulted in a fractured elbow. (*Id.* at 153–54.) At her deposition, Sherrill testified that the knee was on her back or the upper portion of her back, and that she had bruises on her face "from the glass and gravel being stuck in my skin from pressing."[3] (Opp'n M.S.J. Ex. 3 at 61, 94.)

---

[3] Defendants submitted a photo of Sherrill taken a few hours after the accident which, in the Court's view, does not show any evidence of facial abrasions or bruising which Sherrill claims resulted from this encounter. (M.S.J. Ex. I, ECF No. 50-15; Opp'n M.S.J. Ex. 3 at 94.) Sherrill does not address this photo in her Opposition Memorandum. Sherrill also testified that the only treatment she received at the hospital was an X–Ray, (M.S.J. Ex. A at 184), and

Viewing the facts in a light most favorable to Sherrill, as the Court must do at this stage, a dispute exists regarding whether Sherrill was resisting arrest and whether she posed a threat to the officers at this point of the encounter. According to her testimony, Sherrill had both her hands up in the vehicle as directed by Corporal Pristash. (M.S.J. Ex. A at 152, 216.) Even if she had driven away from the first traffic stop, Sherrill testified that she was not resisting arrest at this point. Based on her testimony, the final two *Graham* factors, as well as the severity of the injury, weigh against the use of force she claims was employed against her, and the first *Graham* factor is neutral. Accordingly, if a jury believed this Plaintiff, they could reasonably determine that the Defendants' use of force was unreasonable. Because a genuine dispute of material fact exists over the circumstances surrounding Sherrill's removal from her vehicle, the Court will deny Defendants' motion for summary judgment on Sherrill's excessive force claim as it relates to her arrest.[4]

### ii. Clearly Established Right

Having established a constitutional violation may have occurred, the Court then asks whether this right was "clearly established." *Melgar*, 593 F.3d at 353. "In determining whether a right was clearly established at the time of the claimed violation, courts in this circuit [ordinarily] need not look beyond the decisions of the Supreme Court, [the] court of appeals [for the Fourth Circuit], and the highest court of the state in which the case arose . . ." *Edwards v. City of Goldsboro*, 178 F.3d 231, 251 (4th Cir. 1999) (internal quotation marks omitted). Here, the right at issue is the right of a compliant individual who has fled a traffic stop and led police on a short

___

therefore she received no treatment for any facial injuries the night of the encounter. This Court is not a medical expert and accordingly cannot say that this photo negates Sherrill's testimony, but the apparent discrepancy in her testimony and the photograph taken after the incident will need to be addressed at trial.

[4] Of course, if a jury finds the Defendants' version of events more credible, the analysis of whether the amount of force used was reasonable would be quite different. *See Brown v. Gilmore*, 278 F.3d 362, 369 (4th Cir. 2002) (upholding use of "minimal" force on noncompliant plaintiff because "[t]he circumstances surrounding the arrest gave the officers no reason to believe [plaintiff] would be amenable to their requests.") At the summary judgment stage, the Court cannot wade into such credibility determinations. *Anderson*, 477 U.S. at 255.

chase to be free from being violently thrown from her vehicle, with her head slammed and pushed into the ground, and handcuffed through an arm twist that is forceful enough to fracture her elbow.

"[T]he right to make an arrest carries with it the right to use a degree of physical coercion or threat thereof to effect the arrest." *Brown v. Gilmore*, 278 F.3d 362, 369 (4th Cir. 2002). However, the Fourth Circuit has found that it was "clear" at the time of Sherrill's arrest that "a police officer's unprovoked tackling of a nonthreatening, nonresisting misdemeanor suspect to effect his arrest violates the Fourth Amendment." *Barfield v. Kershaw Cty. Sheriff's Office*, 638 F. App'x 196, 203 (4th Cir. 2016) (finding this right clearly established as of November 2011). *See also, Smith v. Ray*, 781 F.3d 95, 103 (4th Cir. 2015) (throwing plaintiff to ground, jamming knee in plaintiff's back, and twisting plaintiff's arms behind her was unreasonable when plaintiff had been compliant until pulling her arm away and stepping back from the officer). According to Sherrill's testimony, she had her hands up when Pristash and Cunningham pulled her from her vehicle, each officer had a hold of either arm, and she had a gun pointed at her. She was pulled and thrown from the vehicle with such force that her jacket ripped, and her wedding ring flew off. Accordingly, because Sherrill's testimony describes the violent tackle of a compliant individual suspected of a misdemeanor offense, with her arms raised and posing no apparent threat, the Court cannot say at this juncture whether the Defendants are protected from liability through qualified immunity.

### *IV. State Law Torts*

In addition to her federal claims, Sherrill brings state law claims for negligence, gross negligence, battery, and malicious prosecution. As a preliminary matter, Sherrill states that she does not oppose the Defendants' Motion for Summary Judgment on her malicious prosecution claim. (Opp'n M.S.J. Mem. at 2 n.1.) As explained above, probable cause existed for both the

17

traffic stop and arrest. *See supra* pp. 8–9. Because there is no genuine dispute that the factors required for a malicious prosecution claim, including lack of probable cause, *Nasim v. Tandy Corp.*, 726 F. Supp. 1021, 1023 (D. Md. 1989), *aff'd*, 902 F.2d 1566 (4th Cir. 1990), are not met, the Court will grant Defendants' motion for summary judgment on this claim.

Sherrill's remaining state claims are based on the same facts as her excessive force claim. With regards to Sherrill's battery and gross negligence claims, the federal law on Fourth Amendment excessive force claims also governs. *Richardson v. McGriff*, 762 A.2d 48, 56 (Md. 2000) (Fourth Amendment jurisprudence "controls petitioner's actions for battery and gross negligence.") Because the Court has determined that there is a genuine dispute of material fact about whether the Defendants used excessive force in arresting Sherrill, the Court also denies Defendants' motion for summary judgment on Sherrill's state law claims of battery and gross negligence for those same reasons. Similarly, because the Court has determined that there is a genuine dispute of material fact over whether the Defendants' actions were reasonable in carrying out Sherrill's arrest, the Court also finds that there is a genuine dispute of material fact of whether the Defendants were negligent. *See Sigman v. Town of Chapel Hill*, 161 F.3d 782, 789 (4th Cir. 1998) (finding defendants could not be negligent because their actions were reasonable "as a matter of law").[5] Accordingly, the Court denies the Defendants' summary judgment motion regarding Sherrill's remaining state law claims.

### a. *Maryland Tort Claims Act Immunity*

Defendants also argue that they are protected from liability from Sherrill's state law claims under the Maryland Tort Claims Act ("MTCA"), Md. Code Ann., State Gov't § 12–101 *et seq.*

---

[5] As the Court noted in its Memorandum on Defendants' Motion to Dismiss (ECF No. 29), the Court is unclear as to what the difference is between Sherrill's claims for negligence and gross negligence. The Court again reiterates that Sherrill cannot receive "double recovery for a single injury." *Kramer v. Emche*, 494 A.2d 225, 231 (Md. Ct. Spec. App. 1985).

The MTCA "insulate[s] state employees generally from tort liability if their actions are within the scope of employment and without malice or gross negligence." *Lee v. Cline*, 863 A.2d 297, 307 (Md. 2004). "[Actual] malice is established by proof that the defendant-officer 'intentionally performed an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff.'" *Bord v. Baltimore Cty.*, 104 A.3d 948, 964 (Md. Ct. Spec. App. 2014) (alteration in original) (quoting *Town of Port Deposit v. Petetit*, 688 A.2d 54, 62 (Md. Ct. Spec. App. 1997)). This is a subjective inquiry and "is generally a question for the jury." *Henry v. Purnell*, 652 F.3d 524, 536 (4th Cir. 2011).

Here, the Court finds that Sherrill has presented facts which, if believed, could support a jury's finding that the officers evinced malice in their arrest of Sherrill. With respect to Deputy Cunningham, Sherrill testified that he immediately began screaming expletives at her after he stopped her the first time for a minor speeding offense, pushed her hand with her license and registration back into the car when she tried to hand her credentials to him, and threatened to "drag" her out of her vehicle. (M.S.J. Ex. B at 45–46.) When Deputy Cunningham joined Corporal Pristash at the second stop, Sherrill testified that she was thrown out of her vehicle, her "face was smashed to the ground almost like a rubbing in," and Cunningham was twisting her right arm with enough force that the elbow fractured when, according to Sherrill's testimony, she offered no resistance. (M.S.J. Ex. B at 58, Ex. A at 153–54.) If she is believed, the Court finds that a jury could find that Deputy Cunningham wanted to "willfully injure" Sherrill and evinced malice during her arrest that would preclude him from the protection of the MTCA. *Bord*, 104 A.3d at 964.

With respect to Corporal Pristash, at the time he got out of his car at the second stop, he testified that he only knew that Sherrill had fled a traffic stop and been identified by an undercover vehicle for leaving the Schoolhouse Apartments while speeding. (M.S.J Ex. C at 14.) Sherrill testified Corporal Pritsash started yelling, "'Get out of the car, get out of the car. What the 'F' is wrong with you. What's wrong with you. What's wrong with you.'" (M.S.J. Ex. A at 152.) Then, Sherrill testified that Corporal Pristash "yanked" her out of the car, put his gun to her head and "threw" her down on the ground with such force that her wedding ring flew off and her head was slammed to the ground. (*Id.* at 153; M.S.J. Ex. B at 58.) If this testimony is believed, the Court finds that a reasonable jury could find that Corporal Pristash also wanted to "willfully injure" Sherrill, *Bord*, 104 A.3d at 964 (quoting *Town of Port Deposit*, 688 A.2d at 62), and accordingly, the Court cannot say that he would be protected from liability under the MTCA.[6] Therefore, because a reasonable jury could find that the Defendants operated with actual malice, the Court declines to find at this stage that Defendants would be protected from liability under the MTCA.

## V. *Conclusion*

For the foregoing reasons, an Order shall enter granting in part and denying in part Defendants' Motion for Summary Judgment. The Court will grant summary judgement in favor of Defendants on Count I (unlawful search and seizure) and Count VIII (malicious prosecution). The court will deny Defendants' motion for summary judgment on Count II (excessive force), Count VI (negligence), Count VII (gross negligence), and Count IX (battery).

DATED this /4 day of November, 2019.

---

[6] Because immunity under the MTCA requires individuals act without malice or gross negligence, *Lee*, 863 A. 2d at 307, the Court's conclusion that a reasonable jury could find the Defendants acted with malice means the Court need not determine whether Defendants' actions could also be found to be grossly negligent.

BY THE COURT:

James K. Bredar
Chief Judge